UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ARELLANO,<br>CDCR #G-55782,<br><br>                              Plaintiff,<br><br>v.<br><br>F. SEDIGHI, et al.,<br><br>                              Defendants. | Case No.:  15-cv-02059-AJB-BGS<br><br>**REPORT AND<br>RECOMMENDATION:**<br><br>**(1) DENYING IN PART AND<br>GRANTING IN PART<br>DEFENDANTS' MOTION TO<br>DISMISS**<br><br>**AND**<br><br>**(2) DENYING PLAINTIFF'S<br>MOTION TO DISCLOSE NAME OF<br>DOE #1**<br><br>[ECF Nos. 20, 36] |

## I.    INTRODUCTION

Plaintiff Raul Arellano ("Plaintiff"), a state prisoner proceeding *pro se* and *informa paperis*, filed a Second Amended Complaint ("SAC") *nunc pro tunc* to October 19, 2016, alleging civil rights violations pursuant to 42 U.S.C. § 1983 against defendants Dr. Sedighi,

Chief Physician and Surgeon R. Walker, Chief Medical Executive S. Roberts, Deputy Director of Policy and Risk Management J. Lewis, Chief Executive Officer M. Glynn, and Nurse Busalacchi ("Defendants"). (ECF No. 10.) Presently before the Court are Defendants' motion to dismiss Plaintiff's SAC (ECF No. 20) and Plaintiff's motion to disclose the name of Doe #1 (ECF No. 36). The Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.

After a thorough review of Plaintiff's SAC, the parties' motion papers, and all supporting documents, and for the reasons discussed below, the Court **RECOMMENDS** that the motion to dismiss (ECF No. 20) be (1) **GRANTED IN PART AND DENIED IN PART** as to defendant Dr. Sedighi; (2) **GRANTED** as to defendants Walker, Roberts, Lewis, Glynn; and (3) **DENIED** as to defendant Busalacchi. Further, the Court **RECOMMENDS** that the motion to disclose the name of Doe #1 (ECF No. 36) be **DENIED.**

## II.    PLAINTIFF'S ALLEGATIONS[1]

Plaintiff is a state prisoner currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego. (ECF No. 10 at 2.)[2]

### A. Plaintiff's Medical History

Plaintiff suffers from seizures as well as nerve damage stemming from head trauma in 2010. (*Id.* at 7.) While housed at Calipatria State Prison from August 2011 until November 2011, he was prescribed Gabapentin[3] for his symptoms. (*Id.*)

---

[1] The Court accepts Plaintiff's factual allegations as true only for the purposes of assessing Defendants' motion to dismiss.

[2] All page number citations refer to the page numbers generated by the CM/ECF system.

[3] Although not material to the Court's determination, the Court interprets Plaintiff's reference to "neurotens" to be a reference to Neurontin. Neurontin is the brand name for the generic drug gabapentin. *See Neurotonin*, RxList, https://www.rxlist.com/neurontin-drug.htm (last visited February 26, 2018). Plaintiff refers to both interchangeably throughout the SAC.

On November 15, 2011, Plaintiff was transferred to RJD.  (*Id*.)  In February 2012, Plaintiff was taken off Gabapentin and placed on a new medication.  This switch led to "more severe pain," and more frequent and aggressive seizures.  (*Id*.)  He fell from his top bunk in March 2012 which led to a new lower back injury and symptoms of neuropathy. (*Id*.)

From 2012 to March 2015, Plaintiff attempted unsuccessfully to change his course of treatment.  (*Id*. at 8.)  He filed grievances requesting to change his seizure medication back to Gabapentin because the medication he was placed on (1) was "ineffective to [his] symptoms" and (2) gave him "severe side effects such as suicidal thoughts, vomiting" and "deprive[d him] of life necessities; eating, sleeping exercise."  (*Id*.)

On March 1, 2015, Plaintiff was in the suicide infirmary.  A psychiatrist took him off of Elavil (pain medication) and Keppra (seizure medication) "due to all bad side effects described and because part of those side effects is suicidal thoughts."  (*Id*.)  On or around March 11, 2015, Plaintiff was taken off of a seizure medication called Trileptal[4] due to an allergic reaction and placed on no other medication.  He was told by Miss Barros, the head of mental health, that a doctor ("Doe #1") had permanently taken him off of all seizure and pain medication until further notice.  (*Id*. at 8, 10.)

Plaintiff once again was in the suicide infirmary on March 19, 2015.  (*Id*. at 8.)  From March 19, 2015 to March 27, 2015 while Plaintiff was isolated in the suicide infirmary, he was attended to by Dr. Sedighi.  (*Id*. at 9-10.)  He told Dr. Sedighi about his medical needs, including that he had been taken off all medication for seizures and pain.  (*Id*. at 9, 11.)  He also informed him that "without any pills [his] seizures become very aggressive and severe."  (*Id*.)  He informed Dr. Sedighi that "without any pills my seizures become very aggressive and severe to points where my tongue rolls back and I can't breathe."  (*Id*. at 11.)  Plaintiff told Dr. Sedighi he "needed to be put on Gabapentin or something similar."

---

[4] Plaintiff references Trileptal as "Triliptol" in the SAC.

(*Id.*)  He saw Dr. Sedighi holding a chart with his medical history that stated he used to take Gabapentin.  (*Id.*)  Plaintiff alleges that Dr. Sedighi reviewed Plaintiff's medical chart and saw he was prescribed Gabapentin before, which reduced his pain and did not give him side effects like the other medications.  (*Id.* at 9.)  Dr. Sedighi did not give Plaintiff any medication.  (*Id.* at 11.)  He allegedly said that "he didn't care he was putting [Plaintiff's] life at risk or harm, neither what [Plaintiff] was suffering.  He was just not going to put [Plaintiff] on anything."  (*Id.*)

Five days after seeing Dr. Sedighi, Plaintiff had a seizure during which he injured his neck on his metal bed.  (*Id.* at 9, 11.)  A hospital doctor informed Plaintiff he had no broken bones but that he would suffer from pain in the future.  (*Id.*)  At the time of filing the SAC, Plaintiff was in pain and could not sleep.  (*Id.*)

In December 2015, Plaintiff was prescribed Neurontin by another doctor.  (*Id.* at 19.)

**B. Plaintiff's Administrative Grievances**

1. <u>Administrative Review</u>

Defendants Walker, Roberts, Lewis, and Glynn are "in charge [of] review[ing] grievances."  (ECF No. 10 at 22.)  From May to August 2015, Plaintiff "through grievances . . . informed all defendants about [his] emerging serious medical needs" and "they didn't do anything to help."  (*Id.* at 9.)  He further contends that "all defendants knew through my grievances that I was receiving inadequate and ineffective course of treatment as to serious medical needs."  (*Id.* at 22.)  Plaintiff alleges again, in his opposition to Defendants' motion to dismiss ("Opposition") that Defendants Walker, Roberts, Lewis, and Glynn were "aware I was suffering, and didn't do nothing." (ECF 31 at 8.)  Plaintiff's grievance and Defendants' responses were not provided with the SAC.[5]

---

[5] Plaintiff's grievance and Defendants' responses were included as exhibits with the initial Complaint (ECF No. 1-1 at 1-10 [Grievance dated March 29, 2015].)  However, Plaintiff's grievances and Defendant's responses were not included with the SAC.  (*See* ECF No. 10.)  Neither Plaintiff nor Defendants referenced these documents in their pleadings and motion papers.  As Civil Local Rule 15.1 requires that an amended complaint "be complete in itself without reference to the superseded pleading,"

### 2. Nurse Busalacchi Interview

Between April and July 2015, while Plaintiff was in solitary confinement, defendant Nurse Busalacchi heard Plaintiff's claim. (ECF No. 10 at 13.) During his interview with Nurse Busalacchi, Plaintiff recounted his history of seizures and corresponding treatment. (*Id.* at 15-16.) He told her the following:

Initially he was given Neurontin, Keppra, and Dilantin[6] to try and control his seizures. By August 9, 2011, he no longer was taking Dilantin and Keppra due to side effects that put his "health and life at risk." (*Id.* at 15.) He informed her that on or about January to March 2012, doctors at RJD switched his prescription from Neurontin to Keppra. (*Id.*) During the beginning of March 2015, his use of Keppra was discontinued due to its many side effects, including suicidal thoughts. (*Id.*) During April 2015, he was prescribed Dilantin for his seizures. Since he had resumed taking Dilantin, the following severe side effects were back:

> (1) It makes me dizzy which has cause me to fall; (2) dizziness and nausea, doesn't allow food to stay [i]n stomach because I vomit; (3) it doesn't allow[ ] me to be aware of my surrounding which is why I fall; (4) deprives me of sleep because it keeps waking me up due to a feeling of falling; (5) doesn't allow[ ] me to exercise, or stand without feeling or falling and nausea.

(*Id.* at 15.) Further, Plaintiff told defendant Nurse Busalacchi that the only medication that works for him is Neurontin, a "known effective medication prescribed by a specialist." (*Id.* at 15-16.) He was "open for anything as long as [Dilantin] was taken off." (*Id.* at 18.)

After receiving the above information from Plaintiff, defendant Nurse Busalacchi denied Plaintiff's grievance because allegedly (1) she did not "feel like changing [the] prescription because although [Plaintiff has] fall[en] due to side effects, [he is] still alive

---

the Court did not consider the documents themselves in addition to the factual allegations raised in Plaintiff's SAC.
[6] Dilantin is referred to as some form of "Delantin" throughout Plaintiff's SAC.

without broken bones or in a coma"; (2) "all inmates lie," and (3) she had too much work and did not have the "strength and time to do paperwork." (*Id*. at 16.)

Additionally, Plaintiff informed defendant Nurse Busalacchi that the pain medication Elavil he was prescribed at RJD was not effective as to his symptoms of neuropathy, head nerve damages, and back and neck nerve damage. (*Id*. at 19-20.) He alleges that he told her it was resulting in the following severe side effects: "(1) nausea; (2) deprivation of sleep; (3) deprivation of walking; (4) deprivation of able to eat and sustain food on my stomach; (5) falling and hurting myself due to dizziness of the side effect; (6) interfere with breathing, severe pain." (*Id.*) He also alleges she knew that he had been taken off of Elavil in March 2015 as it was "part of why [he] tried to commit suicide." (*Id*. at 20.) He requested Neurontin or something else other than Elavil.

However, Nurse Busalacchi raised Plaintiff's dosage of Elavil "not caring it was putting [his] life at risk, and medication was ineffective for [his] nerve pain." (*Id.*) She did not make any other changes to his medications for the same alleged reasons as discussed above. (*Id.*)

### III. PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on September 15, 2015. (ECF No. 1.) Plaintiff's initial complaint was dismissed during initial screening on February 1, 2016. (ECF No. 3.) His first amended complaint, filed April 6, 2016, was dismissed on August 22, 2016 as frivolous and for failing to state a claim. (ECF Nos. 7-8.) Plaintiff filed the operative SAC *nunc pro tunc* to October 19, 2016, in which he alleges civil rights violations pursuant to Defendants: (1) Dr. Sedighi; (2) Walker; (3) Roberts; (4) Lewis; (5) Glynn; and (6) Nurse Busalacchi. (ECF No. 10.) Plaintiff alleges that all Defendants violated his Eight Amendment right to freedom for cruel and unusual punishment. (*Id.*) He also alleges that Dr. Sedighi violated his procedural due process rights under the Fourteenth Amendment and his rights under the Americans with Disabilities Act. (*Id.* at 12.) Defendants filed a motion to dismiss the claims asserted in Plaintiff's SAC which is presently before the Court. (ECF No. 20.) Plaintiff filed his Opposition *nunc pro tunc* to

June 1, 2017. (ECF No. 31.) Defendants filed a Reply on June 15, 2017. (ECF No. 32.) Plaintiff also filed a Sur-Reply[7] (ECF No. 34) and Motion to Disclose the Name of Doe #1 (ECF No. 36) *nunc pro tunc* to June 22, 2017.

## IV.   DISCUSSION

### A. Legal Standards

#### 1. Motion to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Id.* Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to provide a defendant of "fair notice of what the . . . claim is and the grounds upon which it rest." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 677.

Further, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The requirement for facial plausibility is met when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a claim's plausibility, the Court must "draw on its judicial experience and common sense." *Id.* at 679 (determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). A

---

[7] The Court has reviewed and taken into account the contents of Plaintiff's Motion for Leave to File Sur Reply (ECF No. 34); thus the Motion (ECF No. 34) is **GRANTED**.

"mere possibility of misconduct" falls short of meeting this plausibility standard. *Iqbal*, 556 U.S. at 678-79; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). The court is "not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of the facts presented and construe all inferences from them in the light most favorable to the nonmoving party. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (per curiam); *Johnson v. Riverside Healthcare Sys.*, *LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008). Further, the court may consider allegations contained in the pleadings, exhibits attached to the complaint, and documents and matters properly subject to judicial notice. *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007).

2. <u>Standards Applicable to *Pro Se* Litigants</u>

The factual allegations of a *pro se* inmate must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Accordingly, in a civil rights case, the Court must construe the pleadings of a *pro se* plaintiff liberally and afford him the benefit of any doubt. *Garmon v. County. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). "This rule is particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992). However, despite the liberal interpretation a court must give to *pro se* pleadings, it cannot provide "essential elements of the claim that were not initially pled." *Ivey v. Bd. Of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.* Even a *pro se* plaintiff must specify "with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim." *Jones v. Cmty. Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 649 (9th Cir. 1984).

The Court should grant a *pro se* litigant leave to amend his complaint "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation omitted). Before dismissing a complaint filed by a *pro se* plaintiff, a court must give some notice of the complaint's deficiencies. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995) ("[a] pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment"). Nevertheless, when amendment of a complaint would be futile, the Court may dismiss without leave to amend. *Id.* at 1105-06, 1111; *see Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1088 (9th Cir. 2002) ("there is no need to prolong the litigation by permitting further amendment" if a "basic flaw" in pleading cannot be cured by amendment).

**B. Analysis**

1. Cruel and Unusual Punishment

Plaintiff claims that all Defendants acted with deliberate indifference to his serious medical needs in violation of his Eight Amendment right to freedom from cruel and unusual punishment. (ECF No. 10.) Defendants argue that Plaintiff's deliberate indifference claims should be dismissed as he merely alleges a difference of medical opinion as to his appropriate course of treatment, which cannot amount to deliberate indifference. (ECF No. 20-1 at 7.) Further, as inmates do not have a constitutionally protected right to the prison grievance system, Plaintiff's claims against the defendants due to their participation in or oversight of his grievances are not actionable under section 1983. (*Id.* at 8; ECF No. 32 at 1-4.)

*i. Applicable Law*

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, and human decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations

omitted). A violation of the Eighth Amendment occurs when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104.

To maintain a claim of deliberate indifference based on medical care in prison, a plaintiff must establish two requirements, one objective and one subjective. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, a plaintiff must "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks and citation omitted)).

"A medical need is serious if failure to treat it will result in significant injury or the unnecessary and wanton infliction of pain." *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (2014) (en banc) (internal quotation marks and citations omitted). Defendants are not disputing that Plaintiff adequately alleges a serious medical need in the SAC. (*See* ECF No. 20-1 at 7-8; ECF No. 32 at 2-4, 6-7.) Thus, for purposes of assessing Defendants' motion, the Court assumes that Plaintiff's medical needs are serious.

To show deliberate indifference, an inmate must allege sufficient facts to indicate that the prison official has a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk." *Id.* (internal quotation marks and citation omitted).

Eighth Amendment doctrine makes clear that "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681

F.3d 978, 987 (9th Cir.2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc); *Toguchi*, 391 F.3d at 1057, 1059-60 (finding deceased inmate's family claim that one medication was superior to another, and thus should not have been discontinued, amounted only to a difference of opinion and not deliberate indifference). Further, inadvertent failure to provide adequate medical care, gross negligence, medical malpractice, or a mere delay in medical care are all insufficient to violate the Eighth Amendment. *See Estelle*, 429 U.S. at 105-07; *Wilhelm*, 680 F.3d at 1122; *Toguchi*, 391 F.3d at 1060; *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam). To plead a claim involving alternative choices of medical treatment, a plaintiff must establish that the treatment chosen was both "'medically unacceptable under the circumstances,' and chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (internal quotation marks and citation omitted).

A prison official's alleged improper processing of an inmate's grievance, without more, fails to serve as a basis for section 1983 liability. *See generally Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (prisoners have no "separate constitutional entitlement to a specific prison grievance procedure"); *Shallowhorn v. Molina*, 572 Fed. App'x 545, 547 (9th Cir. 2014) (quoting *Ramirez*, 334 F.3d at 860) ("because inmates lack a separate constitutional entitlement to a specific grievance procedure, these defendants cannot be held liable under § 1983 for denying plaintiff's appeal"). However, "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he knowingly fail[s] to respond to an inmate's requests for help." *Peralta*, 744 F.3d 1076, 1085–86 (citation and internal quotation marks omitted); *see Rapalo v. Lopez*, No. 1:11-cv-01695-LJO-BAM (PC), 2017 WL 931822, at *17-18 (E.D. Cal. Mar. 9, 2017) ("Generally, liability is not imposed on a chief medical officer whose sole act was to review medical appeals[,]" but "a medically-trained individual who is made aware of serious medical needs through reviewing a prisoner's appeal may be liable for failure to treat those needs.").

Further, it does not amount to deliberate indifference when a prison official serving in an administrative role relies on the opinions of qualified medical staff in responding to prisoner grievances. *See Peralta*, 744 F.3d at 1087 ("decision to sign appeals that he knew had already been reviewed by at least two qualified dentists, when he had no expertise to contribute to that review, isn't a wanton infliction of unnecessary pain"); *also Doyle v. Cal. Dep't of Corr. & Rehab.*, 2015 WL 5590728, at *9 (N.D. Cal. Sept. 23, 2015) ("It simply cannot be said that, by signing off on the denials at the second . . . level[ ], defendants . . . disregarded a substantial risk of harm to [plaintiff]'s health by failing to take reasonable steps to abate it.").

### ii. Defendant Dr. Sedighi

Plaintiff alleges that Dr. Sedighi was deliberately indifferent to his serious medical needs when he refused to prescribe Plaintiff any seizure medication during Plaintiff's March 2015 stay in the suicide infirmary.[8] (ECF No. 10 at 8-11.) Defendants assert "the core of Plaintiff's claim [to be] that Dr. Sedighi declined Plaintiff's request to prescribe gabapentin." (ECF No. 20-1 at 6.) They argue Plaintiff fails to state a claim because he alleges nothing more than a difference of medical opinion and fails to show that Dr. Sedighi's conduct was "medically unacceptable under the circumstances." (*Id.* at 6-7; ECF No. 32 at 3-4.) Further, Defendants frame defendant Dr. Sedighi's choice to leave Plaintiff un-medicated as "maintain[ing] the status quo established by another doctor between eight and sixteen days earlier." (ECF No. 20-1 at 7.)

---

[8] In his Opposition, Plaintiff pleads facts alleging that Dr. Sedighi was also deliberately indifferent to his serious medical needs when ignoring his complaints about the ineffective nature of, and severe side effects from, prescribed pain and seizure medication. (ECF No. 31 at 1-5.) He alleges that "Dr. Sedighi insisted for those 4 years he have me on Elavil, Keppra, even though he knew it violated the Constitution because it was ineffective for my seizures. It gave me severe side effects such as vomiting, dizziness, falls, suicidal thoughts. And pain didn't allow me to walk, to go eat, exercise and to do bathroom needs." (*Id.* at 4.) However, Plaintiff does not allege these facts as to Dr. Sedighi in the SAC. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (new allegations contained in an opposition are irrelevant for Rule 12(b)(6) purposes). As the Court's recommendation is to allow Plaintiff to proceed on the allegations against Dr. Sedighi as currently pled in the SAC, these additional allegations are not addressed.

The Court agrees in part with Defendants' characterization of the SAC. However, while Plaintiff does repeatedly allege his disagreement with his course of treatment in the SAC, he also alleges facts regarding a period of time in March 2015 when he was not being provided with *any* medication to treat his seizures or pain. (ECF No. 10 at 8-11; *see also* ECF No. 31 at 2-4.) Although he repeatedly claims in the SAC that "Gabapentin work[s] better than all other epilepsy pills", he also alleges he informed Dr. Sedighi during that time that "either one I'll take right now because something is better than nothing." (ECF No. 10 at 10-11 ["Next I explain to Sedighi that, 'I needed to be put in[sic] Gabapentin or something similar . . . ."].) Thus, more is at issue here than a mere difference of opinion over the type of medication Plaintiff was prescribed.

Plaintiff alleges facts as to Dr. Sedighi, that if credited, as they must be at this stage of litigation, show he purposefully failed to treat Plaintiff's serious medical need. Specifically, Plaintiff alleges that following Doe #1 removing him from all medications, he informed Dr. Sedighi while in the suicide infirmary that he "needed to be put on Gabapentin or something," (*Id.* at 11) and that his pain becomes "severe whenever [he is] not taking no medication at all." (*Id.*) He told Dr. Sedighi that "without any pills my seizures become very aggressive and severe to points where my tongue rolls back and I can't breathe." (*Id.*) Further, Plaintiff asserts that "[Dr. Sedighi] said he didn't care he was putting my life at risk of harm, neither what [sic] I was suffering." (*Id.*) Plaintiff had a seizure five days later that required hospitalization. (*Id.* at 9, 11.)

Thus, Plaintiff's SAC alleges that (1) he received continuous drug treatment from mid-2011 until March 2015; (2) he informed Dr. Sedighi of the serious medical risks of being left unmediated; (3) he was told by Dr. Sedighi that he "did not care he was putting my life at risk"; (4) Dr. Sedighi refused to provide him with any form of medication; and (5) Plaintiff had a seizure five days later that resulted in a hospital visit and ongoing neck pain. At this procedural posture, Plaintiff's factual allegations against Dr. Sedighi satisfy both the objective and subjective prongs of the Court's Eight Amendment inquiry. Thus, taking Plaintiff's allegations as true as they must be at this stage of litigation, the Court

concludes that Plaintiff sufficiently pleads a claim for deliberate indifference to serious medical needs against Dr. Sedighi.  *See Erickson*, 551 U.S. at 94 ("when ruling on a defendant's motion to dismiss, a judge must assume as true all of the factual allegations in the complaint").

Therefore, the Court **RECOMMENDS** Defendants' Motion to Dismiss (ECF No. 20) as to Plaintiff's Eighth Amendment deliberate indifference claim against defendant Dr. Sedighi be **DENIED**.

### iii. Defendants Walker, Roberts, Lewis, and Glynn

Plaintiff's claims against defendants Walker, Roberts, Lewis, and Glynn are solely based on their participation in and oversight of the administrative grievance process. Defendant Walker is the Chief Physician and Surgeon at RJD.  (ECF No. 10 at 3.) Defendant Roberts is the Chief Medical Executive at RJD.  (*Id.*)  Finally, Defendant Lewis is the Deputy Director of the Policy and Risk Management Services and defendant Glynn is the Chief Executive Officer at RJD.  (*Id.*)

Plaintiff alleges that defendants Walker, Roberts, Lewis, and Glynn are "in charge to review grievances by inmates" and their responses to his grievance violated his Eighth Amendment right to be free from cruel and unusual punishment and amounted to deliberate indifference.  (*See id.* at 21-22.)  He alleges that "all Defendants knew through [his] grievances that [he] was receiving inadequate and ineffective course of treatment as to serious medical needs."  (*Id.* at 22.)  He claims that despite being aware that his current course of treatment was "ineffective to [his] serious medical need" and was "giving severe side effects that was putting [his] life and health at risk" (*id.* at 21-22), defendants Walker, Roberts, Lewis, and Glynn "didn't do nothing to help."  (*Id.* at 9.)  Defendants argue that because "there can be no liability under section 1983 from participating in an inmate grievance system", Plaintiff has failed to state a claim as to these defendants.  (ECF No. 20-1 at 8.)

There is no vicarious liability for civil rights violations.  *Iqbal*, 556 U.S. at 676-77; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002); *Peralta*, 744 F.3d at 1085-86.

14

Defendants are correct that a prison official's alleged improper processing of an inmate's grievance, without more, fails to serve as a basis for section 1983 liability. *See generally Ramirez*, 334 F.3d at 860 (prisoners have no "separate constitutional entitlement to a specific prison grievance procedure"); *see Shallowhorn*, 572 Fed. App'x at 547 (citing *Ramirez*, 334 F.3d at 860) (finding district court properly dismissed section 1983 claims against defendants who "were only involved in the appeals process"); *Cummer v. Tilton*, 465 Fed. App'x 598, 599 (9th Cir. 2012) (same); *Dragasits v. Yu*, No. 16-CV-1998 BEN (JLB), 2017 WL 3141802, at *14 (S.D. Cal. July 24, 2017) (collecting cases relying on *Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003) to hold that a "prison official's mere administrative review of a prisoner's health care appeal cannot serve as the basis of the official's liability under § 1983"), *adopted sub nom. Dragasits v. Jin Yu*, 2017 WL 4044909 (S.D. Cal. Sept. 13, 2017); *Bell v. California Dep't of Corr. & Rehab.*, No. 14-CV-1397-BEN-PCL, 2016 WL 8736865, at *7 (S.D. Cal. Mar. 29, 2016) (finding that because plaintiff's complaint only involved defendants' roles in administrative review of his inmate appeals, their actions did "not create liability under § 1983"), *adopted* 2016 WL 8737572 (S.D. Cal. Apr. 29, 2016), *aff'd sub nom. Bell v. Glynn*, 696 Fed. App'x 249 (9th Cir. 2017). Plaintiff's allegations stem only from defendants Walker, Roberts, Lewis, and Glynn's administrative oversight of the grievance process; without more, such claims are not cognizable under section 1983.

Plaintiff has not pled that the defendants Walker, Roberts, Lewis, and Glynn provided direct medical care to him or saw him for treatment. Plaintiff summarily asserts that "all Defendants knew through my grievances that I was receiving inadequate and ineffective course of treatment." (ECF No. 10 at 22.) Such a "vague and conclusory" allegation is insufficient to survive a motion to dismiss. *See Ivey*, 673 F.2d at 268; *Jones*, 733 F.2d at 649 (even a *pro se* plaintiff must specify "with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim").

He has not alleged that these defendants were personally involved in any decisions about the appropriate course of Plaintiff's treatment. He has not pled facts, such as

reviewing of Plaintiff's medical records or interviewing Plaintiff, indicating that these defendants were aware of the existence of an excessive risk to Plaintiff's health. Further, he has not pled that these defendants Walker, Roberts, Lewis, and Glynn had any sort of medical expertise to assess Plaintiff's medical needs.[9] Thus, Plaintiff has failed to demonstrate, how defendants Walker, Roberts, Lewis, and Glynn participated in, knew of, or reasonably should have known of any constitutional injury. *See Farmer*, 511 U.S. at 837 (to be liable for a claim of deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002) (even if a prison official should have been aware of the risk, if he "was not, then [he] has not violated the Eighth Amendment, no matter how severe the risk"), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Additionally, to the extent Plaintiff is contending defendants Walker, Roberts, Lewis, and Glynn should have ordered different medical treatment, prison officials serving in administrative roles are not deliberately indifferent when they rely on the opinions of qualified medical staff in responding to a plaintiff's medical grievance. *See Peralta*, 744 F.3d at 1087; *Doyle*, 2015 WL 5590728, at *9.

Thus, Plaintiff has failed to plead facts supporting a plausible claim of deliberate indifference against defendants Walker, Roberts, Lewis, and Glynn. This is Plaintiff's third attempt to state a claim against these defendants. He is unable to do so and leave to amend would be futile. *See Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 879 (9th Cir.

---

[9] Although Plaintiff did not allege any medical expertise as to this group of defendants, based on defendant Walker's title as the Chief Physician and Surgeon at RJD, he appears to be a medically-trained professional. However, as with the other defendants Roberts, Lewis, and Glynn, Plaintiff has failed to allege that defendant Walker treated or examined Plaintiff or was otherwise actually aware of the alleged constitutional violation. Further, defendant Walker was justified in relying on the opinions of qualified medical staff in responding to Plaintiff's medical grievance. *See Peralta*, 744 F.3d at 1087 (finding no Eighth Amendment deliberate indifference claim arising from a physician's response to a grievance where they relied on the medical opinions of staff who investigated the plaintiff's "complaints and already signed off on the treatment plan."); *Doyle*, 2015 WL 5590728, at *9.

1999) (district court's discretion to refuse leave to amend "particularly broad" when court has previously granted leave to amend).

Therefore, the Court **RECOMMENDS** Defendants' Motion to Dismiss (ECF No. 20) as to Plaintiff's Eighth Amendment deliberate indifference claim against defendants Walker, Roberts, Lewis, and Glynn be **GRANTED without leave to amend**.

### iv. Defendant Nurse Busalacchi

Plaintiff claims that defendant Nurse Busalacchi was deliberately indifferent to his medical needs stemming from hearing his grievance between April to July 2015. (ECF No 10 at 13-20)  During June 2015, Nurse Busalacchi interviewed Plaintiff during his grievance process. (*Id.* at 19.)  As with defendants Walker, Roberts, Lewis, and Glynn, Defendants maintain that because Plaintiff's claim against Nurse Busalacchi only arises from her participation in the inmate grievance process, there can be no liability under section 1983. (ECF No. 20-1 at 8; ECF No. 32 at 6.)  However, unlike Plaintiff's allegations as to defendants Walker, Roberts, Lewis, and Glynn, his allegations as to Nurse Busalacchi demonstrate that she is a medically-trained individual who was personally involved with decision-making regarding Plaintiff's appropriate course of treatment. (*See* ECF No. 31 at 6 ["Busalacchi is a registered nurse who has the power to stop medication and give me new medication . . . ].)

As discussed above, liability is not imposed on a medical officer whose sole act was to review medical appeals. *See*, *e.g.*, *Peralta*, 744 F.3d at 1087; *Rapalo*, 2017 WL 931822, at *17.  However, a medically trained individual who is made aware of serious medical needs through reviewing a prisoner's appeal may be liable for a failure to treat those needs. *See, e.g.*, *Rapalo*, 2017 WL 931822, at *17-18; *Pogue v. Igbinosa*, No. 1:07CV-01577-GMS, 2012 WL 603230, at *9 (E.D. Cal. Feb. 23, 2012) ("The emerging consensus, therefore, is that a medically-trained official who reviews and denies an appeal is liable under the Eighth Amendment when a plaintiff can show that the official knew, at least in part, from reading the appeal that the plaintiff had a serious medical issue and nevertheless chose not to offer treatment."); *Nicholson v. Finander*, No. CV 12–9993–FMO (JEM),

17

2014 WL 1407828, at *7 (C.D. Cal. Apr. 11, 2014) ("a supervisor who learns about an unconstitutional denial of adequate medical care from a prisoner's grievance and fails to intervene *may* be found to have personally participated in the Eighth Amendment violation"); *Coleman v. Adams*, 2010 WL 2572534, at *7 (E.D. Cal. June 22, 2010) (allowing actions within an administrative interview to survive a motion to dismiss because "Plaintiff's claim is premised on the fact that Defendants were aware of a substantial risk to his safety and ignored it"); *Arreola v. Pomazal*, No. 215CV1179JAMDBP, 2017 WL 3149581, at *11 (E.D. Cal. July 25, 2017) (because defendant doctor who interviewed plaintiff in context of a medical appeal was medically trained, he "had the ability to determine whether plaintiff was receiving appropriate medical care and address plaintiff's complaint that he was receiving inadequate pain medication").  Therefore, the Court considers whether Nurse Busalacchi knew from Plaintiff's appeal that he had a serious medical issue and chose not to offer treatment in violation of the Eighth Amendment.

Plaintiff alleges that he recounted his detailed treatment history regarding his seizures and pain to Nurse Busalacchi during her June 2015 interview with him.  He informed her that since he had been placed back on Dilantin for seizures in April 2015, the following severe side effects were back:

> (1) It makes me dizzy which has cause me to fall; (2) dizziness and nausea, doesn't allow food to stay [i]n stomach because I vomit; (3) it doesn't allow[ ] me to be aware of my surrounding which is why I fall; (4) deprives me of sleep because it keeps waking me up due to a feeling of falling; (5) doesn't allow[ ] me to exercise, or stand without feeling or falling and nausea.

(ECF No. 10 at 15.)  Further, he allegedly told Nurse Busalacchi during the interview that pain medication Elavil caused him to have the following severe side effects: "(1) nausea; (2) deprivation of sleep; (3) deprivation of walking; (4) deprivation of able to eat and sustain food on my stomach; (5) falling and hurting myself due to dizziness of the side effect; (6) interfere with breathing, severe pain."  (*Id.* at 19-20.)  He also alleged she knew that he had been taken off of Elavil in March 2015 because it was "part of why [he] tried to commit suicide."  (*Id.* at 20.)

Despite this information, he alleges that Nurse Busalacchi *raised* his dosage of Elavil, a medication she knew had caused his suicidal thoughts in the past, and made no other requested modifications to his prescribed medication because: (1) she did not "feel like changing [the] prescription because although [Plaintiff has] fall[en] due to side effects, [he is] still alive without broken bones or in a coma"; (2) "all inmates lie," and (3) she had too much work and did not have the "strength and time to do paperwork." (*Id*. at 16, 20.) He claims that he had "many seizures" and pain from the date he met with Nurse Busalacchi until December 2015 when he was prescribed Neurontin by another doctor. (*Id*. at 19.)

Thus, Plaintiff alleges that Nurse Busalacchi purposefully ignored his complaints of significant side effects, including suicidal thoughts, from his medication and severe pain for the reasons stated above. Further, he alleges that Nurse Busalacchi knowingly increased his dosage for a medication which was ineffective and had made him suicidal. He had "many seizures" and pain until he was prescribed a different medication in December 2015 by another doctor. Accordingly, at this procedural posture, Plaintiff's allegations as to Nurse Busalacchi satisfy both the subjective and objective prongs of the Court's Eighth Amendment inquiry and Plaintiff sufficiently pleads a plausible claim for deliberate indifference to serious medical needs as to Nurse Busalacchi. *See, e.g.*, *Ahdom v. Lopez*, No. 109CV01874AWIBAMPC, 2015 WL 5922020, at *5 (E.D. Cal. Oct. 9, 2015) (denying motion to dismiss where plaintiff claimed "his complaints of severe pain and attempts to relay possible causes, as well as problems with side-effects from his medications, were ignored and untreated").

Therefore, the Court **RECOMMENDS** Defendants' Motion to Dismiss (ECF No. 20) as to Plaintiff's Eighth Amendment deliberate indifference claim against defendant Nurse Busalacchi be **DENIED**.

### 2. Additional Claims Against Dr. Sedighi

#### i. *Fourteenth Amendment Due Process*

Defendants seek dismissal of Plaintiff's Fourteenth Amendment due process claim. (ECF No. 20-1 at 9; ECF No. 32 at 4-5.) Plaintiff asserts that Dr. Sedighi has violated his

Fourteenth Amendment rights per *Sandin v. Conner*, 515 U.S. 472, 484 (1995). He alleges that because Dr. Sedighi did not prescribe him anti-seizure or pain medication, he was restrained from his "freedom in a manner not expected from sentence" as his seizures made him feel not "confident in walking or standing", and "severe pain cause[d him] not be able to walk, sleep, exercise." (ECF No. 10 at 12.) Plaintiff acknowledges in his Opposition that he failed to identify a regulation that Dr. Sedighi violated. (ECF No. 31 at 8-9.) However, he claims he can cure this deficiency by amending the SAC to state that "the regulations [Dr.] Sedighi broke were those on Title 15 C.C.R. § 3350(a)." (*Id.* at 9.) California Code of Regulations, title 15, section 3350(a) requires that

> The department shall only provide medical services for inmates which are based on medical necessity and supported by outcome data as effective medical care. In the absence of available outcome data for a specific case, treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists. Treatments for conditions which might otherwise be excluded may be allowed pursuant to section 3350.1(d).

Cal. Code Regs. tit. 15, § 3350(a). In his Opposition, Plaintiff asserts that the requisite outcome data at issue is that "[he] once was in this medication [gabapentin] and it was effective. . . . Data also supported that ever since 2011 I was tried on Elavil, Keppra, and it was just not effective." (ECF No. 31 at 9.)

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without the due process of a law." U.S. Const. amend. XIV, § 1. To state a cause of action for deprivation of procedural due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest.")

A state may create a liberty interest through statutes, prison regulations, and policies sufficient to invoke due process protection. *Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (citing *Wilkinson v. Austin*, 545 U.S. 209, 222, (2005)); *Meachum v. Fano*,

427 U.S. 564, 569 (1972). But a state-created liberty interest protected by statute or regulation is generally limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Thus, per *Sandin* state law creates a liberty interest warranting protection under the Fourteenth Amendment Due Process Clause when the depravation in question (1) restrains the inmate's freedom in a manner not expected from his sentence and (2) "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *see Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007). Existence of a liberty interest created by a prison regulation is determined by focusing on the "nature of the deprivation." *Sandin*, 515 U.S. at 481-84.

The Ninth Circuit has held that prisoners have a state-created liberty interest in few circumstances. *See, e.g.*, *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (holding labeling a prisoner a sex offender and mandating treatment gave rise to a liberty interest warranting Fourteenth Amendment protection); *Serrano v. Francis*, 345 F.3d 1071, 1078-79 (9th Cir. 2003) (holding a disabled prisoner has a protected liberty interest in being free from confinement in a non-handicapped accessible housing unit); *Myron*, 476 F.3d at 719 (holding California regulation governing prison publications did not create a liberty interest in publishing and distributing inmate publications); *Ramirez*, 334 F.3d at 860 (holding prisoners have no "separate constitutional entitlement to a specific prison grievance procedure").

Here, Plaintiff appears to allege that California Code of Regulations, title 15, section 3350(a), which states that inmates shall only receive medical services based on medical necessity and supported by outcome data as effective medical care, gives rise to a liberty interest warranting protection pursuant to the Fourteenth Amendment Due Process Clause. (ECF No. 31 at 9.) However, he offers no authority supporting this assertion, and the regulation does not appear to give rise to such a liberty interest. *See Sandin*, 515 U.S. at 483-84 (protected liberty interest created under state law is generally limited to freedom from a restraint which "imposes atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life"). This regulation does not involve a procedural requirement for imposing discipline as is normally at issue in typical *Sandin* claims. *See, e.g.*, *Sandin*, 515 U.S. at 484 (noting that liberty interests are generally limited to freedom from restraint); *Myron*, 476 F.3d at 718 (holding state regulations governing security classification of prisoners and prison placement did not give rise to protected liberty interest under *Sandin*); *Richardson v. Runnels*, 594 F.3d 666, 672-73 (9th Cir. 2010) (15-day stay in administrative segregation during gang investigation did not constitute atypical and significant hardship under *Sandin*).[10] Although Plaintiff attempts to characterize his claim against Dr. Sedighi as a due process deprivation, it is instead properly cognizable as identified above. Plaintiff therefore fails to state a claim under the Fourteenth Amendment for any due process violation.

Accordingly, as Plaintiff has failed to describe a protected liberty interest that he has been denied, he has failed to state a Fourteenth Amendment Due Process claim against Dr. Sedighi. Further, it does not appear Plaintiff could amend the SAC to identify an applicable protected liberty interest as required per *Sandin*. Accordingly, amendment is not warranted. *See Chaset*, 300 F.3d at ("no need to prolong the litigation by permitting further amendment" if a "basic flaw" in pleading cannot be cured by amendment).

---

[10] Further, Plaintiff has not even alleged a clear *violation* of California Code of Regulations, title 15, section 3350(a). Plaintiff asserts in his Opposition that Dr. Sedighi "broke" section 3350(a) by disregarding "data" that supported his allegation Gabapentin is the only medication that has been effective at treating his seizures. Specifically, the Plaintiff claims Dr. Sedighi ignored the requisite outcome data that "[Plaintiff] once was in this medication and it was effective. . . . Data also supported that ever since 2011 I was tried on Elavil, Keppra, and it was just not effective." (ECF No. 31 at 9.) However, per section 3350 outcome data is defined as "statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies." Cal. Code Regs. tit. 15, § 3350. Thus, the information Plaintiff asserts to be "outcome data" in his Opposition, does not clearly qualify as "outcome data" per the statutory definition.

Therefore, the Court **RECOMMENDS** Defendants' Motion to Dismiss (ECF No. 20) as to Plaintiff's Fourteenth Amendment procedural due process claim against Dr. Sedighi be **GRANTED without leave to amend**.

### ii. Americans with Disabilities Act

In the SAC, Plaintiff alleges that Dr. Sedighi violated his rights under the Americans with Disabilities Act ("ADA"). (ECF No. 10 at 12.) Plaintiff concedes in his Opposition that the SAC does not state sufficient facts to state a claim under the ADA and requests leave to do so. (ECF No. 31 at 9-10; ECF No. 32 at 5.) He states that if permitted to amend, he would allege he was discriminated against because Dr. Sedighi did not provide him with any medication for his seizures when he met with him five days prior to the March 25, 2015 incident, when other individuals with history of seizures received medication. (ECF No. 31 at 9-10.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. State prisons are covered public entities under Title II of the ADA. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998).

While the ADA prohibits discrimination based on disability, it does not mandate that the government provide treatment or medical care for a disability. *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability"); *see Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners . . . .The ADA does not create a remedy for medical malpractice.").

Further, a plaintiff is unable to bring a section 1983 action against "a State official in her individual capacity to vindicate rights created by Title II of the ADA . . . ." *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).

Here, Plaintiff admits that he has not sufficiently pled a claim under the ADA. (ECF No. 31 at 9.) Even if permitted to amend, Plaintiff would allege facts amounting at most to a claim that he was denied specific treatment for a disability[11] rather facts showing that he was discriminated against due to a disability. (*See id.* at 9-10.) Plaintiff would not set forth any facts from which to infer he was excluded from or discriminated against with regard to services, programs, or activities by reason of his disability. To the contrary, the incidents giving rise to this action appear related solely to medical decisions made regarding Plaintiff. The Court finds that these allegations are tantamount to alleging that plaintiff was provided with inadequate medical treatment for his condition, which is insufficient to state a claim under the ADA. *See Simmons*, 609 F.3d at 1022 (rejecting argument that county discriminated against an inmate on the basis of his depression in violation of the ADA by depriving inmate of "programs or activities to lessen his depression"); *see also Bryant*, 84 F.3d at 249.[12]

Thus, the new allegations he provides in his Opposition in an attempt to state a claim show that even if he were permitted to amend the SAC, amendment would be futile. *See*

---

[11] For purposes of assessing the sufficiency of Plaintiff's ADA claim, the Court has assumed that his history of seizures would qualify as a disability under the ADA.

[12] While some courts have suggested that a complete deprivation of necessary treatment may be "so unreasonable as to demonstrate that [the defendants] were discriminating against [plaintiff] because of his disability", *see Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal. Sept. 13, 2010), that is not what Plaintiff is alleging here. Based on Plaintiff's own allegations in the SAC, he was not completely denied medical care. When the seizure at issue occurred, Plaintiff was in the suicide infirmary being treated for suicidal thoughts he alleges were a result of medications he had been placed on to control his seizures and pain. (ECF No. 10 at 8-9, 20.) Further, Plaintiff has been provided with many types of anti-seizure and pain medications during the years he has been housed at RJD. (*Id.* at 7-8, 15, 27.) These allegations show that Plaintiff was receiving treatment for his condition. *See, e.g.*, *Payne v. Arizona*, No. CV-09-1195-PHX-NVW, 2010 WL 1728929, at *5 (D. Ariz. Apr. 26, 2010) ("That the State initially failed to diagnose [plaintiff's] diabetes amounts to no more than a negligent medical judgment. Furthermore, that [plaintiff] received any glucose tablets, insulin, and food, albeit sporadically, indicates that there was no outright and deliberate denial of access to care."); *Razon v. Cty. of Santa Clara*, No. 17-CV-00869-LHK, 2018 WL 405010, at *10 (N.D. Cal. Jan. 12, 2018) (that plaintiff "received any oxygen therapy, medication, and monitoring at all indicates that there was no outright and deliberate denial of access to care").

15-cv-02059-AJB-BGS

*Cato*, 70 F.3d at 1105-06 (if it is clear that a complaint cannot be cured by amendment dismissal without leave to amend is proper); *Chaset*, 300 F.3d at 1088 (no need to prolong litigation by allowing further amendment if a pleading's "basic flaw" cannot be cured by amendment).

Further, Plaintiff has alleged claims against Dr. Sedighi in his individual capacity. (ECF No. 10 at 3.)  He is precluded from holding Dr. Sedighi liable in his individual capacity for alleged violations of Plaintiff's rights under the ADA.  *See Vinson*, 288 F.3d at 1156.  Accordingly, Plaintiff has failed to plead facts supporting a plausible ADA claim Dr. Sedighi.

Therefore, for the reasons stated above, the Court **RECOMMENDS** Defendants' Motion to Dismiss (ECF No. 20) as to Plaintiff's ADA claim against Dr. Sedighi be **GRANTED without leave to amend**.

## V.     MOTION TO DISCLOSE NAME OF DOE #1

Plaintiff has also filed a Motion to Disclose Name of Doe #1 in which he requests to be provided the name of Doe #1, who Plaintiff alleges initially removed him from all seizure and pain medication during March 2015, because he is "beginning to think" that Dr. Sedighi is Doe #1.  (ECF No. 36.)  The Court previously dismissed Plaintiff's First Amended Complaint (ECF No. 8) and Plaintiff did not include Doe #1 as a defendant in the caption of the SAC.  (ECF No. 10.)  Civil Local Rule 15.1 requires that an amended complaint "be complete in itself without reference to the superseded pleading."  CivLR 15.1.  This requirement exists because, as a general rule, an amended complaint supersedes the original complaint.  *See Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.")

However, while not identified in the SAC's caption (ECF No. 10 at 1, 3), Plaintiff notes in an introductory section of the SAC that because "nothing was ever said about

why . . . Doe #1 didn't me[e]t the elements required . . . I didn't fix that much the facts stated on [that] defendant[ ]." (*Id.* at 6.) He then goes on to allege claims against Doe #1 within the body of the SAC. (*Id.* at 10.) Thus, when giving the SAC 'the benefit of any doubt," *Hebbe*, 627 F.3d at 342, it seems Plaintiff intended to plead claims against Doe #1, but simply failed to list him as a named party on the SAC's cover page.

Nonetheless, Plaintiff's Motion to Disclose Name of Doe #1 (ECF No. 36) is unnecessary. The identity of Doe #1 can be resolved by reviewing the contents of Plaintiff's medical records. Disclosure of such records is available upon Plaintiff's request via prison procedures as well as is within the scope of discovery. *See* Fed. R. Civ. P. 26(b)(1) ("parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . "); California Department of Corrections and Rehabilitation Operations Manual §§ 54090.1– 54090.4.4, *available at* https://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/DOM%202018/2018 %20DOM.pdf (updated Jan. 1, 2018) ("The written request process may be used when the inmate or parolee seeks a response to an issue related to his or her confinement or parole."); *Siegrist v. Johnson*, No. 110CV01976LJOSABPC, 2016 WL 1586922, at *2-3 (E.D. Cal. Apr. 20, 2016) (prison medical records provided to Plaintiff by defense counsel as a courtesy); *Fields v. Masiel*, No. 1:10-CV-01699-AWI, 2014 WL 467024, at *1 (E.D. Cal. Feb. 5, 2014) ("under prison policies and procedures . . . Plaintiff is permitted to inspect and review his medical file upon request"); *Singleton v. Hedgepath*, No. 1:08-CV-00095- AWI, 2011 WL 1806515, at *8 (E.D. Cal. May 10, 2011) ("Plaintiff's medical records and non-confidential parts of his central file are available to him for inspection and copying at the prison. Plaintiff should make a request pursuant to the procedures in place at the prison.").

Thus, upon review of his medical records Plaintiff would be able to ascertain the identity of Doe #1 through the normal course of discovery. Accordingly, the Court **RECOMMENDS** Plaintiff's Motion to Disclose Name of Doe #1 (ECF No. 36) be

15-cv-02059-AJB-BGS

**DENIED**.

## VI. CONCLUSION

For the reasons discussed, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) adopting this Report and Recommendation; (2) **GRANTING IN PART AND DENYING IN PART** the Motion to Dismiss (ECF No. 20) as to defendant Dr. Sedighi to the extent that (a) Plaintiff's Fourteenth Amendment claim and ADA claim against defendant Dr. Sedighi are dismissed in their entirety **without leave to amend**, and (b) Plaintiff's Eighth Amendment Claim against defendant Dr. Sedighi remains; (3) **GRANTING without leave to amend** the Motion to Dismiss (ECF No. 20) as to defendants Walker, Roberts, Lewis, and Glynn; (4) **DENYING** the Motion to Dismiss (ECF No. 20) as to defendant Nurse Busalacchi; and (5) **DENYING** Plaintiff's Motion to Disclose Name of Doe #1 (ECF No. 36).

**IT IS ORDERED** that no later than **March 13, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 20, 2018**. The parties are advised that failure to file objections within the specified time waive the right to raise those objections on appeal of the Court's order.

**IT IS SO ORDERED.**

Dated: February 27, 2018

Hon. Bernard G. Skomal
United States Magistrate Judge

15-cv-02059-AJB-BGS