1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9         SOUTHERN DISTRICT OF CALIFORNIA

10

11  Raul ARELLANO,                          Case No.:  15-cv-02059-AJB-BGS

12                           Plaintiff,
                                            **REPORT AND**
13  v.                                      **RECOMMENDATION:**

14  SEDIGHI, et al.,
                                            **(1) GRANTING DEFENDANTS'**
15                          Defendants.      **MOTION FOR SUMMARY**
                                            **JUDGMENT;**
16

17                                          **(2) DENYING PLAINTIFF'S CROSS-**
                                            **MOTION FOR SUMMARY**
18                                          **JUDGMENT;**

19
                                            **AND**
20

21                                          **(3) DENYING PLAINTIFF'S**
                                            **MOTION TO AMEND**
22

23                                          [ECF Nos. 80, 87, 94]

24

25

26         Plaintiff Raul Arellano ("Plaintiff"), a state prisoner proceeding *pro se* and *informa*

27  *pauperis*, filed a Third Amended Complaint ("TAC") on November 25, 2019, alleging civil

28  rights violations pursuant to 42 U.S.C. § 1983 against Defendants Dr. Sedighi and Nurse

Busalacchi ("Defendants").   (ECF No. 70.)[1]   Presently before the Court are Defendants' Motion for Summary Judgment (ECF No. 80), Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87), and Plaintiff's Motion for Doe #1 be Addressed as Dr. Silva and be Amended as Dr. Silva (ECF No. 94).   The Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.

After a thorough review of Plaintiff's TAC, the parties' motion papers, and all supporting documents, and for the reasons discussed below, the Court **RECOMMENDS** that the Defendants' Motion for Summary Judgment (ECF No. 80) be **GRANTED** as to Defendants Dr. Sedighi and Nurse Busalacchi; and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87) be **DENIED**.   Further, the Court **RECOMMENDS** that Plaintiff's Motion for Doe #1 be Addressed as Dr. Silva and be Amended as Dr. Silva (ECF No. 94) be **DENIED**.

## INTRODUCTION

The Court only briefly summarizes the allegations for reference and discusses the procedural history and evidence presented by the parties as necessary in addressing each issue or motion.

### A. Procedural History

Plaintiff initiated this action by filing a complaint on September 15, 2015.  (ECF No. 1.)  Plaintiff's initial complaint was dismissed during initial screening on February 1, 2016.  (ECF No. 3.)  Plaintiff's First Amended Complaint, filed April 6, 2016, was dismissed on August 22, 2016 as frivolous and for failing to state a claim.  (ECF Nos. 7–8.)  Plaintiff's Second Amended Complaint ("SAC") was filed, *nunc pro tunc*, on October 19, 2016, in which Plaintiff alleged civil rights violations as to Defendants: (1) Dr. Sedighi;

---

[1] All page number citations refer to the page numbers generated by the CM/ECF system.

(2) Walker; (3) Roberts; (4) Lewis; (5) Glynn; and (6) Nurse Busalacchi.  (ECF No. 10.)  On April 17, 2017, Defendants filed a Motion to Dismiss for Failure to State a Claim as to Plaintiff's SAC.  (ECF No. 20.)  The Court issued a Report and Recommendation ("R&R") regarding this Motion to Dismiss Plaintiff's SAC on February 27, 2018, which was adopted by the District Court Judge on March 20, 2018.  (ECF Nos. 43–44.)  The Court dismissed Plaintiff's Fourteenth Amendment claim and ADA claim against Defendant Sedighi and all claims against Defendants Walker, Roberts, Lewis, and Glynn with prejudice, as well as denied Plaintiff's Motion to Disclose Name of Doe #1.  (ECF Nos. 43–44.)

Plaintiff filed the operative TAC on November 25, 2019, in which he alleges civil rights violations by Defendants Dr. Sedighi and Nurse Busalacchi.  (ECF No. 70.)  Plaintiff alleges that the Defendants violated his Eight Amendment right to freedom from cruel and unusual punishment.  (*Id.*)  Defendants filed their Motion for Summary Judgment on April 13, 2020, which is presently before the Court.  (ECF No. 80.)  Plaintiff filed his Opposition on May 13, 2020.  (ECF No. 82.)  Defendants filed their Reply on May 18, 2020.  (ECF No. 32.)  Plaintiff also filed a Sur-Reply on June 3, 2020.[2]  (ECF No. 85.)

On June 3, 2020, Plaintiff filed a motion in which the Court interpreted as a Cross-Motion for Summary Judgment.  (*See* ECF No. 87.)  The Court accepted the motion, despite this motion being filed without permission from the Court and after the dispositive motion deadline set in the Court's Scheduling Order (ECF No. 72 at 5).  (*See* ECF Nos. 86, 87.)  The Court instructed for Defendants to file an Opposition to Plaintiff's Cross-Motion and indicated that "No further briefing will be accepted."  (ECF No. 88.)  On June 12, 2020, Defendants filed their Opposition to Plaintiff's Cross-Motion.  (ECF No. 90.)

Plaintiff's Motion for Leave to File a Reply to Defendants' Opposition to his Cross-Motion for Summary Judgment, filed *nunc pro tunc* on June 24, 2020, was denied on July

---

[2] The Court accepted Plaintiff's Sur-Reply despite Plaintiff not filing a Motion for Leave to File Sur-Reply.  (ECF No. 85.)

1, 2020 due to the extensive briefing already on file and raising the same arguments as in Plaintiff's Opposition and Sur-Reply. (*See* ECF Nos. 96, 97.) Plaintiff filed a Motion for Doe #1 be Addressed as Dr. Silva[3] and be Amended as Dr. Silva, *nunc pro tunc*, on June 24, 2020, which is presently before the Court. (ECF No. 94.)

**B. Plaintiff's Third Amended Complaint**

Plaintiff is a state prisoner currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego. (ECF No. 70 at 1.) Plaintiff suffers from seizures as well as nerve damage stemming from head trauma in 2010. (*Id.* at 6.) While at Calipatria State Prison from August 2011 until November 2011, Plaintiff was prescribed Gabapentin[4] for his symptoms. (*Id.*) On November 15, 2011, Plaintiff was transferred to RJD. (*Id.*) In February 2012, Plaintiff was placed on new medication after being taken off Gabapentin, which led to "more severe pain," and more frequent and aggressive seizures. (*Id.*) Plaintiff fell from his top bunk in March 2012 which led to a new lower back injury and symptoms of neuropathy. (*Id.* at 7.)

From 2012 to March 2015, Plaintiff alleges that he attempted to change his course of treatment, but was unsuccessful. (*Id.* at 7–8.) Plaintiff filed grievances requesting to change his seizure medication back to Gabapentin because the medication he was placed on was "ineffective to [his] symptoms" and gave him "severe side effects such as suicidal thoughts, vomiting" and "deprive[d him] of life necessities; eating, sleeping exercise." (*Id.* at 7.)

On March 1, 2015, Plaintiff claims to have been in the suicidal infirmary for pain and suicidal thoughts that "trigger out of nowhere." (*Id.* at 8.) On March 5, 2015, Dr.

---

[3] Plaintiff refers to Dr. Silva as "Dr. Sylva" and "Dr. Silva."

[4] Although not material to the Court's determination, the Court interprets Plaintiff's reference to "neurotens" to be a reference to Neurontin. Neurontin is the brand name for the generic drug Gabapentin. *See Neurotonin*, RxList, https://www.rxlist.com/neurontin-drug.htm (last visited September 15, 2020). The brand and generic names are both used interchangeably throughout the pleadings and exhibits.

Sedighi saw Plaintiff and prescribed Trileptal[5] for Plaintiff's pain and seizures, after Plaintiff claims that a psychiatrist discontinued Plaintiff's Elavil and Keppra prescriptions due to its alleged suicidal side effects.[6]  (*Id.*)

On March 11, 2015, Plaintiff was taken off of Trileptal due to an allergic reaction and placed on no other medication.  (*Id.*)  On March 13, 2015, Plaintiff talked with Dr. Bahro[7] regarding his course of treatment and indicated that he has not been put on any seizure or pain medication "which basically left [Plaintiff] to suffer in pain and put [Plaintiff's] life at risk due to no seizure med[ication]."  (*Id.*)  Dr. Bahro contacted the "M.D." and the Chief of Psychiatry, who reassured Dr. Bahro that Plaintiff was to stay off of seizure medications.  (*Id.*)  On or around March 16, 2015, Plaintiff states that he went to the suicidal infirmary because he was afraid to get a seizure since he was without seizure medication and he was experiencing such severe pain, that he was feeling suicidal.  (*Id.*)

Plaintiff states that Dr. Sedighi also treated him sometime between March 19–27, 2015.  (*Id.* at 9.)  Plaintiff allegedly told Dr. Sedighi about his medical needs, including that he was not on any pain or seizure medications.  (*Id.* at 9, 11.)  Plaintiff states that Dr. Sedighi knew that Gabapentin was effective, yet still decided to leave Plaintiff without any seizure or pain medication.  (*Id.*)  Plaintiff claims that "[Dr. Sedighi] didn't care he was putting [Plaintiff's] life at risk or harm, neither what [Plaintiff] was suffering. He was just not going to put [Plaintiff on] anything for no medical reason."  (*Id.* at 11.)

Approximately five days after seeing Dr. Sedighi, Plaintiff suffered an unwitnessed seizure and was transferred out to a hospital.  (*Id.* at 9, 11.)  From May 2015 to August

---

[5] Plaintiff references Trileptal as "Triliptol" in the TAC.

[6] Plaintiff has made conflicting statements as to who he claims discontinued Elavil and Keppra.  Plaintiff occasionally claims that Elavil and Keppra were discontinued by a psychiatrist "due to its suicidal side effects."  (ECF Nos. 70 at 8; 82 at 5; 85 at 1, 10.)  At other times, Plaintiff claims that it was Dr. Sedighi who discontinued Elavil and Keppra.  (ECF Nos. 70 at 8 n.1, 10 n.1; 87 at 4.)

[7] Plaintiff referred to Dr. Bahro as "Mental Health Bahro."

2015, Plaintiff states that he told the Defendants about his serious medical needs through grievances, but the Defendants still did not do anything to help and instead "left [Plaintiff] to suffer." (*Id.*)

Between April–July 2015, while Plaintiff was in solitary confinement, Nurse Busalacchi heard Plaintiff's claim in response to his grievance. (*Id.* at 13.) During his interview with Nurse Busalacchi, Plaintiff recounted his history of seizures and corresponding treatment. (*Id.* at 14–16.) Plaintiff claims that he told Nurse Busalacchi that Elavil was not effective at treating his pain and resulted in the following severe side effects: "(1) nausea; (2) deprivation of sleep; (3) deprivation of walking; (4) deprivation of able to eat and sustain food on my stomach; (5) falling and hurting myself due to dizziness of the side effect; (6) interfere with breathing, severe pain." (*Id.* at 19–20.) Plaintiff also claims that Nurse Busalacchi "knew Elavil was prescribed again 10/26/12. But it was taken off on March 2015 due to been part of why I try to commit suicide. [Nurse Busalacchi] knew that and still sustain Elavil, actually she raised dosage not caring it would put my life at risk, and medication was ineffective for my nerve pain." (*Id.*)

Regarding Dilantin,[8] Plaintiff claims to have told Nurse Busalacchi that it was discontinued in 2011 for causing the following severe side effects:

> (1) It makes me dizzy which has cause me to fall; (2) dizziness and nausea, doesn't allow food to stay [i]n stomach because I vomit; (3) it doesn't allow[ ] me to be aware of my surrounding which is why I fall; (4) deprives me of sleep because it keeps waking me up due to a feeling of falling; (5) doesn't allow[ ] me to exercise, or stand without feeling or falling and nausea.

(*Id.* at 15.) Plaintiff states that these side effects have returned after being prescribed Dilantin in 2015. (*Id.*) Further, Plaintiff told Nurse Busalacchi that the only medication

---

[8] Although not material to the Court's determination, Plaintiff sometimes refers to Dilantin as "Delantin" throughout his TAC and other pleadings. The Court interprets Plaintiff's reference to "Delantin" to be a reference to Dilantin. Dilantin is the brand name for the generic drug Phenytoin. *See Dilantin*, RxList, https://www.rxlist.com/dilantin-drug.htm (last visited September 15, 2020). The brand and generic names are both used interchangeably throughout the pleadings and exhibits.

that works for him is Gabapentin, a "known effective medication prescribed by a specialist." (*Id.* at 15–16.)  But Plaintiff indicates that he was "open for anything as long as [Dilantin] was taken off." (*Id.* at 18.)

After receiving the above information from Plaintiff, Nurse Busalacchi denied Plaintiff's grievance because allegedly: (1) she did not "feel like changing [the] prescription because although [Plaintiff has] fall[en] due to side effects, [he is] still alive without broken bones or in a coma," (2) "all inmates lie," and (3) she had too much work and did not have the "strength and time to do paperwork." (*Id.* at 16.)  Plaintiff states that Nurse Busalacchi continued his Dilantin prescription and increased his Elavil prescription despite being told that they are ineffective at treating Plaintiff's pain and seizures and they cause severe side effects. (*Id.* at 14–16, 20.)  In December 2015, Plaintiff was prescribed Neurontin by another doctor. (*Id.* at 19.)

### C. Defendants' Motion for Summary Judgment

Defendants brought their Motion for Summary Judgment, as well as submitted Plaintiff's medical records and a Declaration of Dr. Feinberg to support their initial burden of proof. (*See* ECF No. 80.)  Defendants claim that on March 24, 2015, Dr. Sedighi provided medically appropriate treatment in response to Plaintiff's complaints and never ignored Plaintiff's needs. (*Id.* at 16.)  Defendants state that Dr. Sedighi restarted Elavil in response to Plaintiff's complaints of being left without pain medication and did not prescribe seizure medication for a period of observation to determine whether Plaintiff was suffering from a seizure disorder, which was consistent with clinical decisions by other physicians eleven days earlier. (*Id.*)  Defendants state that Plaintiff's dispute with Dr. Sedighi is about a disagreement regarding the appropriate medication, which does not violate the Eight Amendment. (*Id.* at 17.)

As for Nurse Busalacchi, Defendants state that there is no evidence that she was deliberate indifferent to Plaintiff's serious medical needs on April 13, 2015 and that Plaintiff's dispute with Nurse Busalacchi only amounts to a difference of opinion over the appropriate course of treatment, i.e. wanting Neurontin or Morphine instead of the

medications that Plaintiff was already taking. (*Id.* at 17–18.)  Defendants explain that by the time Plaintiff met with Nurse Busalacchi, Plaintiff was already on anti-seizure and pain medications.[9]  (*Id.* at 18.)  Defendants claim that Nurse Busalacchi acted appropriately in increasing Plaintiff's Elavil dosage, checking Plaintiff's Dilantin blood level, and refusing to prescribe Neurontin or Morphine.  (*Id.*)

Additionally, Defendants state that there is no evidence of harm and that there is no evidence that Plaintiff would have had any better outcomes if Dr. Sedighi would have done anything differently.  (*Id.*)  Defendants state that there is no indication that Plaintiff's fall on March 24, 2015 was due to a seizure, since they claim that doctors have already expressed doubt as to the veracity of Plaintiff's seizures and that the Plaintiff took Elavil[10] prior to the fall.  (*Id.* at 18.)  Defendants state that Plaintiff cannot meet his burden in showing that Dr. Sedighi or Nurse Busalacchi violated a clearly established constitutional right and therefore, Qualified Immunity bars Plaintiff's claims against them.  (*Id.* at 21.)

### D. Plaintiff's Opposition to Defendants' Motion for Summary Judgment

In his Opposition, Plaintiff alleges that Dr. Sedighi was deliberately indifferent to his serious medical needs for restarting Elavil and not prescribing seizure medication on March 24, 2015. (ECF No. 82 at 3–4.)  Plaintiff alleges that Dr. Sedighi was deliberately indifferent to his severe pain by prescribing a pain medication that was ineffective and caused severe side effects. (*Id.* at 6, 10, 13.)  At the March 24, 2015 consultation, Plaintiff claims that he told Dr. Sedighi that he had severe pain and that Elavil makes him drowsy, dizzy, and have suicidal thoughts. (*Id.* at 3.)  Plaintiff states that Dr. Sedighi was still going to give him the medication because "he has to give [the Plaintiff] something even if [he] refuse such medication." (*Id.*)  Plaintiff questions Dr. Sedighi's decision to restart

---

[9] Dr. Sedighi restarted Plaintiff's pain medication (Elavil) on March 24, 2015 and emergency room physicians restarted Plaintiff's seizure medication (Dilantin) on March 25, 2015.  (ECF No. 80 at 18.)

[10] Defendants state that Elavil is generally prescribed at bedtime due to its sedating effects, leading to the inference that Plaintiff's fall was due to Elavil instead of a seizure.  (ECF No. 80 at 19.)

his Elavil prescription because he allegedly told Dr. Sedighi at the March 5, 2015 consultation that Elavil caused severe side effects and was also ordered by "psychiatry to take [him] off of [Elavil] because it gives [him] depression leading to suicidal thoughts and attempts." (*Id.* at 3–5.)  Plaintiff claims that Dr. Sedighi knew that Elavil had been discontinued multiple times, with the most recent time being March 5, 2015 for allegedly causing suicidal thoughts. (*Id.*)  Plaintiff told Dr. Sedighi that for the past year he had been making complaints to doctors that Elavil and Keppra gave him suicidal thoughts, but they still continued to give him the medication. (*Id.* at 6 n.1.)

Plaintiff also claims that Dr. Sedighi was deliberately indifferent for not prescribing any seizure medication on March 24, 2015. (*Id.* at 4.)  Plaintiff alleges that Dr. Sedighi said that he believes that Plaintiff's seizures happen, but was not going to just give any medication. (*Id.* at 4.)  Plaintiff claims that Dr. Sedighi "decide[d] to leave [him] without seizure medication, supposedly for observation, when actually what [Dr. Sedighi] did was take [him] off seizure med without no expert telling [Dr. Sedighi] to do this." (*Id.* at 7.)  Plaintiff argues that his seizures have been documented since 2011 and that it was unreasonable for Dr. Sedighi to leave him without any medication for his seizures. (*Id.* at 8–10.)  Plaintiff claims that from his personal knowledge, that taking a single dose of seizure medication would have prevented the alleged seizure that occurred on March 24, 2015. (*Id.* at 15.)

Plaintiff claims that he was left with no seizure medication despite telling Dr. Sedighi that "Gabapentin was the Most effective without side-effects To eliminate [his] partial seizures, and reduce [his] nerve pain and Grammal seizures." (*Id.* at 4.)  Plaintiff claims that Dr. Sedighi was deliberately indifferent for not prescribing known effective medication to his pain and seizures, Gabapentin, or for not prescribing other alternative medications that Plaintiff has not tried before. (*Id.* at 4, 6, 8, 10–11, 13.)  Plaintiff claims that Dr. Sedighi knew Gabapentin was effective and supports this argument by showing that he was prescribed Gabapentin in 2011 and in 2016. (*Id.* at 11.)

Plaintiff alleges that Nurse Busalacchi was deliberately indifferent on April 13, 2015

15-cv-02059-AJB-BGS

for continuing Plaintiff's Dilantin prescription and for increasing Plaintiff's Elavil prescription from 10 mg to 25 mg. (*Id.* at 14, 19.) Plaintiff claims that Nurse Busalacchi knew that Dilantin was ineffective for his seizures, deprived Plaintiff of life's necessities, and puts his health and life at risk. (*Id.*) Plaintiff states that he told Nurse Busalacchi that Gabapentin was effective but was willing to take other medications, yet Nurse Busalacchi allegedly "denie[d] [Plaintiff's requests] on non-medical reasons for which [he] described on complaint." (*Id.*) Plaintiff also claims that Nurse Busalacchi still raised Plaintiff's Elavil dosage despite telling her that Elavil was discontinued on March 5, 2015 for suicidal side effects and was erroneously put back on it on March 24, 2015. (*Id.*)

Regarding Qualified Immunity, Plaintiff states that Dr. Sedighi was on notice that Plaintiff's seizures were a serious medical condition. (*Id.* at 18.) Plaintiff claims that MRI and EEG exams coming back normal do not conclusively indicate that Plaintiff does not suffer from a seizure disorder. (*Id.*) Plaintiff states that "ceasing and not giving [him] any medication" is deliberate indifference and thus Dr. Sedighi is not subject to Qualified Immunity. (*Id.* at 18.) Additionally, Plaintiff states that Nurse Busalacchi is not subject to Qualified Immunity because she was on notice that Elavil at 75 mg was ineffective and caused severe side effects such as suicidal thoughts, yet still decided to raise the dosage from 10 mg to 25 mg. (*Id.* at 19.)

### E. Defendants' Reply to Plaintiff's Opposition

Defendants' claim that Plaintiff has not met his initial burden in demonstrating that there is a genuine issue of material fact as to whether Dr. Sedighi or Nurse Busalacchi were deliberately indifferent to his serious medical needs. (ECF No. 83 at 2–5.) Defendants argue that Plaintiff has not shown that Dr. Sedighi's medical treatment was medically unacceptable, that Plaintiff's new arguments do not demonstrate a triable issue of material fact, and that Plaintiff cannot show any evidence that supports the conclusion that Dr. Sedighi's conduct caused any harm. (*Id.* at 3–4.) Defendants argue that Plaintiff has not laid any foundation to establish that he is qualified to give his opinion on whether Plaintiff would have suffered a seizure had Dr. Sedighi given seizure medication. (*Id.*) Defendants

also state that there is no evidence establishing that Nurse Busalacchi's treatment was medically unacceptable. (*Id.* at 5.) Defendants claim that Plaintiff's dispute with Nurse Busalacchi only shows that the dispute is over the proper course of medication and is not deliberate indifference. (*Id.*) Finally, Defendants state that Plaintiff has not met his burden in showing that his rights were clearly established at the time of their alleged violation and Qualified Immunity therefore bars the suit. (*Id.* at 6.)

### F.  Plaintiff's Sur Reply

Plaintiff claims that Dr. Sedighi did not provide medically appropriate treatment by providing known ineffective pain medication that had severe side effects, after Plaintiff told him that Gabapentin was effective and that he was open to any alternative medications. (ECF No. 85 at 2–3.) The injuries that Plaintiff suffered were the "pain [he] went through for many months," anxiety, and "distress with depressive mood." (*Id.*) Plaintiff states that it was unreasonable for Dr. Sedighi to not prescribe seizure medication based on other physicians' clinical decisions, since Dr. Silva, Psychiatry, and Dr. Bahros only ordered to take Plaintiff off seizure medication for only seven days to "clean [Plaintiff's] system of Trileptal." (*Id.* at 3–4.) Even though he states that Dr. Silva's order was reasonable to "clean [his] system" of Trileptal, Plaintiff claims it was unreasonable for Dr. Sedighi not to prescribe any seizure medication on the eleventh day for additional observation when no one told him to do so. (*Id.* at 4.) Plaintiff states that the neurologists that have seen Plaintiff (Dr. Malhorta and Dr. Straga) both did not recommend discontinuing seizure medications and would like to see what diagnosis Dr. Sedighi relied on. (*Id.* at 4–5.)

As for Nurse Busalacchi, Plaintiff claims that she knew that Elavil and Dilantin were ineffective and caused severe side effects. (*Id.* at 7–8.) Plaintiff claims that Nurse Busalacchi could have switched to a more effective medication that did not have adverse side effects, like Gabapentin or something similar, but was deliberately indifferent for leaving Plaintiff on Dilantin and increasing Elavil. (*Id.* at 8–9.) Plaintiff claims that the harm that he suffered from Elavil was the pain as well as:

(1) it deprived[d] [Plaintiff] sleep or at times or at times eat; (2) it cause[d

him] to lose[sic] balance, caus[ing him] to fall due to neuropathy; (3) nerve damage that goes from beck to left side of head, due to head trauma in 2010; (4) low[er] back pain due to seizure fall in 2012 [. . . and] (5) chronic neck and back pain due to seizure fall on 3-24-15.

(*Id.* at 8.)  As for Dilantin, Plaintiff claims to have suffered from falls due to uncontrolled seizures and medication side effects, pain from those falls, anxiety, inability to sleep, and depression.  (*Id.* at 9.)  Plaintiff argues that Dr. Sedighi is not subject to Qualified Immunity for impeding the course of treatment that was put in place by Dr. Straga and Dr. Malhorta.  (*Id.*)  Plaintiff argues that Nurse Busalacchi is not subject to Qualified Immunity for continuing the current medication with severe side effects and not prescribing new medication.  (*Id.* at 10.)

**G. Plaintiff's Cross-Motion for Summary Judgment**

On June 3, 2020 the Court accepted Plaintiff's motion and interpreted it as Plaintiff's Cross-Motion for Summary Judgment.  (ECF No. 87.)  Plaintiff claims that there is no genuine issue of material fact and that summary judgment should be entered in his favor because Dr. Sedighi was deliberately indifferent for not prescribing seizure medication and not following the neurologists' course of treatment.  (*Id.* at 1, 3–4.)  Plaintiff claims that Dr. Sedighi was also deliberately indifferent for prescribing Elavil even though Dr. Sedighi knew it was ineffective to treat his pain and gave symptoms such as anxiety, stress, inability to sleep, "frighten [and] depressive [moods] with Tendency of Suicidal Ideation."  (*Id.* at 1, 4–5.)  Plaintiff claims that there is no evidence or diagnosis that would have instructed Dr. Sedighi to not prescribe any seizure medication.  (*Id.* at 3.)

Additionally, Plaintiff claims that there is no genuine issue of material fact and that summary judgment should be entered in his favor as to Nurse Busalacchi because she was deliberately indifferent for increasing Elavil despite knowing that the medication was ineffective to his pain and gave side effects.  (*Id.* at 2, 5.)  Plaintiff claims that Nurse Busalacchi could have prescribed Gabapentin or medications that he has not tried before, but still prescribed Elavil against his will and knowing it has side effects.  (*Id.* at 5–6.)  Plaintiff claims that the harm he suffered was "all the physical pain [. . . ] [a]nd mental

severeness [sic] symptoms" as well as being deprives of life's necessities such as inability to sleep because anxiety attacks and pain. (*Id.* at 6.)

### H. Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment

Defendants indicate that Plaintiff's motion is untimely and did not seek leave to amend the scheduling order, but also states that Plaintiff's Cross-Motion for Summary Judgment fails for substantive reasons. (ECF No. 90 at 2.) Defendants state that Plaintiff has not raised a triable issue of material fact supporting his claims, where he did not provide any evidence in support of his motion and relies entirely on evidence provided by the Defendants. (*Id.*) Defendants state that Plaintiff's own lay opinions do not conclusively refute Dr. Feinberg's declaration, thus not establishing that no reasonable trier of fact could find in Dr. Sedighi's favor. (*Id.* at 4.) Defendants point out that Plaintiff, in his TAC, only argued that Dr. Sedighi did not provide any pain medication and did not raise the argument regarding Dr. Sedighi restarting Elavil. (*Id.* at 6.) Even if considering the new argument, Defendants state that Plaintiff has not shown that restarting Elavil was medically inappropriate and ignores evidence indicating that Plaintiff showed interest in restarting Elavil. (*Id.* at 6–7.)

Defendants state that Plaintiff has failed to meet his burden in showing that Nurse Busalacchi was deliberately indifferent to his serious medical needs. (*Id.* at 7–8.) Defendants claim that it is not enough that Nurse Busalacchi "should have known" that her conduct was creating a serious risk of harm, but Plaintiff actually has to prove that Nurse Busalacchi did in fact know that she was creating a risk of harm and deliberately ignored the risk. (*Id.* at 7.) Defendants state that they are entitled to Qualified Immunity since Plaintiff has not met his burden or cited to any case law establishing that Defendants' conduct amounted to a constitutional violation. (*Id.* at 8.)

### I. Proffered Evidence

Plaintiff, to support his claims, submitted exhibits to his complaint and his Opposition, as well as his statements in his Opposition. The Defendants submitted as

exhibits Plaintiff's medical records and a Declaration of Dr. Feinberg to support their initial burden of proof.

### 1.  Both Parties' Medical Exhibits

In chronological order, the Court summarizes the medical exhibits presented by both parties as needed in order to address each issue or motion.  Plaintiff provides his medical records from the San Diego Sheriff's Department dating from March 18, 2011 to April 20, 2011, which states Plaintiff's medications and seizures that occurred within that time period.  (ECF No. 82 at 68–85.)  Plaintiff's Unit Health Record ("UHR") shows that he had been prescribed Dilantin, Elavil, Neurontin, and Keppra, among other medications on May 11, 2011.  (Id. at 47.)  On August 9, 2011, Plaintiff was still taking Dilantin, Elavil and Neurontin, among other medications.  (ECF No. 70 at 26.)  Plaintiff had a consultation with a neurologist, Dr. Straga, on August 23, 2011, where Dr. Straga noted that Plaintiff had recently arrived from San Diego County Jail taking Neurontin, Keppra and Dilantin, and that Plaintiff reported he developed seizures after being hit in the head with a baseball bat in Mexico in September 2010.  (ECF No. 80-1 at 17–18.)  Dr. Straga then tapered Plaintiff off of Dilantin, continuing only Neurontin and Keppra.  (ECF No. 82 at 25.)

On October 5, 2011, Dr. Straga followed up with Plaintiff, who noted that the MRI of Plaintiff's brain was normal and recommended continuing Keppra, gradually starting Lamictal, and discontinuing Neurontin after two weeks.  (ECF No. 80-1 at 20.)  Plaintiff was seen by Dr. Noonan, a Primary Care Provider ("PCP") on October 14, 2011.  (ECF Nos. 70 at 27; 80-1 at 22.)  Dr. Noonan indicated that Dr. Straga's notes were unavailable, that Plaintiff said that Dr. Straga had recommended a change in the Neurontin prescription, and that Dr. Noonan planned to obtain Dr. Straga's notes and order a change in Plaintiff's medication accordingly.  (Id.)  On October 17, 2011, Dr. Noonan signed a Medication Reconciliation directing the pharmacy to stop Neurontin in two weeks and begin Lamictal. (ECF No. 80-1 at 24.)

On December 15, 2011, Plaintiff had a PCP visit with Nurse Practitioner ("NP") Joshua Burgett, who noted that Plaintiff "agrees then refuses Keppra," was "focused on

Neurontin." (*Id.* at 26.)  In August, September and December of 2012, Plaintiff filed multiple "Patient/Inmate Health Care Appeal" Forms regarding his requests for stronger pain medication and for a lower bunk assignment.  (ECF No. 82 at 50–54.)  On October 26, 2012, Plaintiff's list of active medications indicated that he was on Keppra and Elavil, among other medications.  (ECF No. 70 at 24.)  On December 10, 2012, Nurse Velardi reviewed Plaintiff's labs and x-rays, indicating that the exam was normal and that Plaintiff had not been taking his medication, as his seizure drug levels were low.  (ECF No. 80-1 at 30.)

On March 13, 2014, Plaintiff's Medical Administration Record indicated that Plaintiff was taking 25 mg of Elavil. (*Id.* at 43.)  On July 22, 2014, Dr. Chau reviewed Plaintiff's chronic medical conditions and recommended increasing the dosage of Keppra. (*Id.* at 48–49.)  Plaintiff denied any worsening of his back pain and requested to stay at the same dose of Keppra.  (*Id.*)  Dr. Chau questioned "significant symptom presentations" as to Plaintiff's seizures and continued Plaintiff's current Elavil and Keppra dosages.  (*Id.* at 49.)  At Dr. Chau's August 7, 2014 medical consultation, Plaintiff only complained about Keppra not controlling his seizures and requested Gabapentin.  (*Id.* at 51–52.)  Dr. Chau indicated that Plaintiff's neurological and physical exams were unremarkable and that Plaintiff "denied any significant side effects so far." (*Id.*)  Dr. Chau increased Keppra's dosage and advised Plaintiff to go to the TTA[11] for blood tests after any seizure to allow for confirmation of his seizure disorder.  (*Id.*)  Dr Chau indicated that Plaintiff's seizure condition was "undocumented" and "questionable."  (*Id.*)  Plaintiff was taking 50 mg of Elavil for chronic pain at the time of this consultation.  (*Id.*)

On August 22, 2014, Dr. Chau saw Plaintiff in response to a 602 appeal.[12]  (*Id.* at

---

[11] Dr. Feinberg states that TTA is available in each CDCR prison and functions as an urgent care setting for inmates.  (ECF No. 80-1 at 6 n.7.)

[12] "602" relates to the appeal form number, which is the process for which an inmate can initiate a grievance.  (ECF No. 80-1 at 7 n.8.)

54–55.)  Dr. Chau noted that Plaintiff was taking 50 mg of Elavil and made no complaints. (*Id.*)  Dr. Chau's full physical exam came back unremarkable and noted that Plaintiff had not reported to the TTA after having alleged seizures and denied any side effects of Keppra. (*Id.*)  Dr. Chau noted that there is questionable adherence to medication and that he referred Plaintiff to the neurologist for evaluation.  (*Id.*)  On October 3, 2014, Dr. Chau noted Plaintiff's complaint of chronic pain, even though Dr. Chau noted he was "very vague and nonspecific" about his pain.  (*Id.* at 57–58.)  Dr. Chau indicated that Plaintiff was not compliant with seizure and pain medication, and that further seizure medication may not be appropriate.  (*Id.*)  Plaintiff reported no seizures since the last visit and acknowledged poor compliance with his seizure and pain medications.  (*Id.* at 58.)   Dr. Chau continued Plaintiff's prescription of Keppra, Tylenol, and the current "low-dose" of Elavil.  (*Id.* at 58.)

On November 4, 2014, Plaintiff had a Telemedicine Neurology Initial Consultation with Dr. Malhotra, a neurologist, who noted he thoroughly reviewed Plaintiff's medical records and took a history from him.  (*Id.* at 60–62.)  Dr. Malhotra indicated that there is no objective support or convincing eyewitness accounts for Plaintiff's presumed seizures and indicated that Plaintiff "wants" Neurontin.  (*Id.*)  At Dr. Chau's November 18, 2014 medical consultation with Plaintiff, Dr. Chau indicated that there was "no objective supportive convincing witnessed accounts" of Plaintiff alleged seizure.  (*Id.* at 64–65.)  Dr. Chau continued Plaintiff on Keppra and, at the Plaintiff's request, increased the dosage of Elavil to 75 mg until the neurologist evaluates whether Plaintiff has a seizure disorder. (*Id.*)  Dr. Chau noted that when they confronted Plaintiff regarding his non-compliance with his medications, "[Plaintiff] had no response."  (*Id.* at 64.)  Plaintiff also filed his "Patient/Inmate Health Care Appeal" Form on November 18, 2014, where Plaintiff claimed that Keppra was ineffective at treating his seizures and that the only medication that worked for him was Gabapentin.  (ECF No. 82 at 55–56.)  Plaintiff also indicated that Dr. Chau did not need to refer him to a Neurologist.  (*Id.*)  Plaintiff then filed additional appeals to

the First and Second Level responses regarding the same issues.  (*Id.* at 57 [March 11, 2015 Appeal]; 58 [December 18, 2014 Appeal and January 29, 2015 Appeal].)

At Dr. Malhotra's January 5, 2015 consultation, Plaintiff alleged that he was sitting on his bunk on December 20, 2014 and had a seizure, but did not notify staff at that time. (ECF No. 80-1 at 67.)  Plaintiff made no mention of any side effects from his seizure and pain medication and with regards to the cause of Plaintiff's fall, Dr. Malhotra stated "Presumed [Seizure]??"  (*Id.*)  On February 25, 2015, Plaintiff had a consultation with Nurse Paule.  (ECF Nos. 70 at 23; 80-1 at 69.)  Nurse Paule referred Plaintiff for a PCP visit after reviewing Plaintiff's Health Care Services Request Form, where Plaintiff complained that Elavil was not helping with pain and causing dizziness.  (*Id.*)  Nurse Paule counselled him on Elavil's side effects and it appears that Plaintiff was continued on Elavil while being referred to his PCP.  (*Id.*)

On March 5, 2015, Plaintiff had a medical consultation with Dr. Sedighi.  (ECF Nos. 70 at 39–40; 80-1 at 71–72.)  In this medical consultation, Psychiatrist Dr. Gorney referred Plaintiff for evaluation of Elavil's and Keppra's side effects with Dr. Sedighi, after Plaintiff was admitted to a crisis bed on March 1, 2015.[13]  (*Id.*)  Dr. Sedighi noted that Plaintiff stated that he has been on Elavil for one and a half years, claimed it makes him drowsy, depresses his mood further, and does not like these side effects.  (*Id.*)  At the time, Plaintiff was taking 75 mg of Elavil at bedtime.  (*Id.*)  In the "Assessment / Recommendations" section, Dr. Sedighi noted Plaintiff's complaints about his stated side effects and counselled Plaintiff.  (*Id.*)  Dr. Sedighi then wrote, "I will discontinue Amitriptyline and Keppra and I will start the patient on Trileptal [. . .] that can be used for seizures and chronic pain."[14]  (*Id.*)

_____

[13] Of note, in contradiction to his TAC allegation, the psychiatrist did not take Plaintiff off Elavil and Keppra due to suicidal side effects, rather referred him to Dr. Sedighi to evaluate the Plaintiff's complaint of side effects of Elavil and Keppra.  (*See* ECF Nos. 70 at 8; 80-1 at 71.)

[14] A Medication Reconciliation, dated on March 5, 2015, indicates that Dr. Sedighi stopped Elavil's prescription and prescribed Trileptal.  (ECF No. 70 at 42.)

On March 13, 2015, Nurse Boucher took Plaintiff off of Trileptal because it caused a rash, and contacted the physician to discuss discontinuation of any other medications. (ECF No. 80-1 at 75.)  On that same date, Plaintiff was interviewed by Dr. Bahro.  (ECF Nos. 70 at 43; 80-1 at 78.)  Plaintiff told Dr. Bahro that he was taken off of Keppra because it was causing side effects, including "getting more depressed."[15]  (*Id.*)  Dr. Bahro consulted with Nurse Boucher, the Chief of Psychiatry, and the Chief of Mental Health, whom all agreed upon the protocol in not prescribing any seizure medication.  (*Id.*)  The reason for this protocol was due to the information received from the Chief of Psychiatry that medical records (including Neuro) indicated there was a question to the veracity of Plaintiff's alleged seizures and decided to keep Plaintiff off seizure medications "for the time being." (*Id.*)  Plaintiff's concern during this consultation was having seizures since he would not be on any seizure medications for the next seven days.  (*Id.*)

Plaintiff submitted a Heath Care Request Form on March 17, 2015, indicating that he had a seizure the previous night and was in severe pain.  (ECF No. 82 at 101.)  Plaintiff was not on any pain medication and stated that he was having suicidal thoughts due to the pain.  (*Id.*)  Plaintiff indicates that he needs to see a doctor to be prescribed new seizure medication and specifically only requested pain medication, stating "Am in a 10 scale of pain (severe pain)" and "Am having suicidal thoughts due to this pain."  (*See id.*)  On March 18, 2015, NP Gysler met with Plaintiff for a medical evaluation prior to a mental health crisis bed transfer.  (ECF No. 80-1 at 80.)  NP Gysler indicated that Plaintiff was on a temporary medical hold until April 28, 2015 and "must not leave RJD."  (*Id.*)  NP Gysler wrote that Plaintiff denied any complaints at that time.  (*Id.*)  On March 19, 2015 Plaintiff had a consultation with Nurse Gavin because of headache pain.  (*Id.* at 82–83.)  Plaintiff complained about having seizures and chronic pain since Gabapentin was discontinued.

---

[15] During this consultation Plaintiff made no similar complaints about Elavil as having caused him to feel more depressed.  (ECF No. 80-1 at 78.)

(*Id.*)  Nurse Gavin prescribed Acetaminophen and advised Plaintiff to submit a request to restart Gabapentin.  (*Id.* at 83.)

On March 24, 2015, Dr. Sedighi saw Plaintiff to address his chronic headache.  (*Id.* at 85.)  At this consultation, Plaintiff stated he was having constant and sometimes severe pain, while requesting Morphine and Gabapentin.  (*Id.*)  Dr. Sedighi recounted Plaintiff's medical history and summarized Plaintiff's complaints as chronic headache and chronic lower back pain, along with a questionable history of seizures.  (*Id.* at 85–86.)  Dr. Sedighi found Plaintiff's physical examination unremarkable and did not show any neurological deficits.  (*Id.*)  Dr. Sedighi noted that Plaintiff was not compliant with his pain medication and was only taking Naproxen and Tylenol.  (*Id.*)  Plaintiff was given counselling about taking his pain medication and "showed interest in restarting amitriptyline."  (*Id.*)  Dr. Sedighi then restarted Plaintiff on 10 mg of Elavil at bedtime for chronic pain "that can help his chronic headache and chronic low back pain."  (*Id.*)  Dr. Sedighi indicated that there was no indication for narcotic pain medication and he would monitor Plaintiff for seizure activity before restarting any seizure medications.  (*Id.* at 85–87.)

After Plaintiff's meeting with Dr. Sedighi on March 24, 2015, Plaintiff had "subjective fall unwitnessed."  (*Id.* at 89.)  At 21:40, Dr. Sedighi saw Plaintiff, who was in a crisis bed.  (*Id.* at 91.)  Plaintiff told Dr. Sedighi that he blacked out and fell and hit the back of his neck.  (*Id.*)  Dr. Sedighi ordered Plaintiff be sent to the ER for possible cervical, spine and head trauma.  (*Id.*)  Plaintiff was then taken to Sharp Chula Vista Medical Center and eventually discharged.[16]  (*Id.* at 93–101.)  Staff at the hospital noted that there was no evidence of a seizure and restarted Dilantin.  (*Id.* at 93–94.)  On March 25, 2015 at 4:30

---

[16] Sharp's medical records reveal Plaintiff made no complaint about Elavil causing suicide thoughts or depressive moods.  (ECF No. 80-1 at 93–101.)  "[Plaintiff] is complaining of neck pain and headache. He said he took Elavil about a half an hour prior to this [seizure] happening. [. . .] [Plaintiff] was brought here by the medic.  No other associated symptoms."  (*Id.* at 95.)

a.m., Dr. Sedighi noted, as an addendum, that Plaintiff returned from the ER and had a negative workup. (*Id.* at 91.)

On March 25, 2015, Dr. Brown, PsyD, consulted with Plaintiff, where Plaintiff reported that Dr. Sedighi put him back on Elavil the day before and got dizzy/blacked out after taking it. (*Id.* at 103.) Dr. Brown stated that Plaintiff expressed frustration with not being prescribed pain or seizure medication and appeared to be "accentuating his physical symptoms (weakness, shaking, stiffness), possibly to prove that the event was a seizure." (*Id.*) Dr. Brown's assessment was that Plaintiff demonstrated progress regarding his depression and suicidal thoughts, and that Mental Health will continue to consult with medical regarding his physical symptoms. (*Id.*) Dr. Brown did note that Plaintiff was not being prescribed seizure medication at the moment because Plaintiff has never had a witnessed seizure and has met with neurology twice without being given a seizure disorder diagnosis. (*Id.*) Dr. Brown's notes indicated that Medical is trying to confirm the diagnosis before prescribing additional medications and the treatment team opted to ignore Plaintiff's attention-seeking behaviors to see if they cease. (*Id.*) Also dated March 25, 2015 was the sixth page of Plaintiff's Mental Health Treatment Plan that indicates that Dr. Sedighi ordered a "1:1" sitter to monitor for seizure activity and a wheel chair for moving out of the cell. (ECF No. 70 at 45.)

Plaintiff provides a partial Suicide Risk Evaluation taken of Plaintiff on April 1, 2015 by Dr. Brown as an exhibit, which appears to be a follow-up report regarding whether Plaintiff should be discharged from "MHCB." (*Id.* at 44.) Dr. Brown noted that Plaintiff was compliant with these medications, including Dilantin and Elavil, and showed substantial improvement. (*Id.*) Plaintiff denied being suicidal, having current depression, and made no complaints of any side effects concerning any of these medications. (*Id.*)

Plaintiff signed and submitted a 602 Appeal Form on March 29, 2015.[17]   (*See id.* at 34.)   On April 13, 2015, Nurse Busalacchi met with Plaintiff regarding his appeal to the denial of his 602 Form.   (ECF No. 80-1 at 105.)   Plaintiff was currently on Dilantin and reported that 10 mg of Elavil was not effective for his pain.   (*Id.*)   Plaintiff wanted Gabapentin and Morphine for his seizures and neuropathic pain.   (*Id.*)   Nurse Busalacchi noted that Plaintiff was currently on 10 mg of Elavil for pain and that Plaintiff reported having suicidal ideation when on Elavil at a high dose.   (*Id.*)   Nurse Busalacchi noted that Plaintiff was not compliant with Elavil at his last PCP visit.   (*Id.*)   During the consultation, Plaintiff confirmed that he was fine and denied having suicidal ideations.   (*Id.*)   Further, Plaintiff told Nurse Busalacchi that he placed the appeal because he is bored.   (*Id.*)   Nurse Busalacchi indicated that Plaintiff would not be placed on Gabapentin or Morphine at this time, increased Elavil to 25 mg, continued Dilantin, checked Plaintiff's Dilantin blood level, and referred Plaintiff to mental health for pain management.   (*Id.*)   Plaintiff understood and agreed with the plan.   (*Id.*)

On April 29, 2015, Plaintiff had a medical progress report conducted by Dr. Freyne. (*Id.* at 108–109.)   Plaintiff indicated that he is fully compliant with his medications, two being Elavil and Dilantin, and reported that he was doing well.[18]   (*Id.*)   Plaintiff also indicated he was compliant and pleased with the psychiatric medications.   (*Id.*)   Dr. Freyne indicated that Plaintiff's medical issues were stable and that Plaintiff agreed with the treatment plan.   (*Id.*)   On April 30, 2015, Plaintiff signed and submitted his Health Care Services Request Form, where Plaintiff complained that he was in pain and indicated that

---

[17] Plaintiff's 602 Form centered around a seizure he suffered which caused him to hit his head on the side of metal bed.   (ECF No. 70 at 34.)   Plaintiff blames that seizure on doctors from March 11–17, 2015 for taking him off his seizure and pain medications.   (*Id.*)   Plaintiff alleges that the doctors were motivated to take him off his medications because "[t]hey wanted to witness or see a seizure."   (*Id.*)   In his appeal, Plaintiff wanted the doctors to prescribe him Gabapentin or Morphine for his pain.   (*Id.*)   Plaintiff also attached the First, Second, and Director Level Decisions.   (*Id.* at 33, 36, 37.)

[18] Dr. Freyne noted that plaintiff claimed to not have had any seizures in greater than three months. (ECF No. 80-1 at 108–09.)

he was on Elavil, Tylenol, and Neuproxin to control his pain. (ECF No. 82 at 100.) Plaintiff stated that the pain was so severe and that he has been suicidal. (*Id.*) The Health Care Services Request Form indicates that a nurse saw Plaintiff on May 1, 2015 and that Plaintiff stated that his "[p]ain gets so bad sometimes that I felt suicidal, but I'm not suicidal now." (*Id.*) The nurse reported that Plaintiff stated, "Elavil is not helping me, even after increase." (*Id.*) Plaintiff wanted to discuss pain options and indicated that he has been denied the use of alternative pain medications in the past. (*Id.*) Based on Plaintiff's complaints about pain, the nurse referred him back to his PCP. (*Id.*)

On June 1, 2015, Nurse Bustamante treated Plaintiff in response to his Health Care Services Request Form, where Plaintiff requested stronger pain medication and medicated soap, and indicated that he is unable to sleep due to his pain. (ECF No. 82 at 99.) Dr. Goyal's PCP Progress Note dated July 9, 2015 indicated that Plaintiff requested Gabapentin for his nightly headaches. (ECF No. 80-1 at 111.) Dr. Goyal reported that Plaintiff's neuropathy pain is questionable in that he found inconsistencies with Plaintiff's history and objective findings that Dr. Goyal would consider "factitious disorder as high on differential."[19] (*Id.*) Dr. Goyal also indicated that Plaintiff is vague about his seizures and is asking for Gabapentin, while Plaintiff stated that Gabapentin numbs him up to allow him to do twice the number of push-ups he normally does. (*Id.*)

## 2. Dr. Bennett Feinberg's Declaration

Defendants also attached Dr. Bennett Feinberg's declaration, who states he is board certified in internal medicine with more than 20 years of experience in the field. (Declaration of Dr. Bennett Feinberg ¶ 2, ECF No. 80-1 at 1–15.) Dr. Feinberg is familiar with the policies and procedures regarding access to medical care within the prisons and facilities of the CDCR, having worked as a full-time primary care physician at Folsom State Prison and Mule Creek State Prison from January 2010 through January 2017. (*Id.*

---

[19] According to Defendants, this is a mental disorder in which a person acts as if he has a physical or mental illness when he has consciously created the symptoms. (ECF No. 80-1 at 13 n.11.)

¶¶ 4–5.) Dr. Feinberg reviewed Plaintiff's TAC and UHR, which documents the medical care he received.  (*Id.* ¶ 6.)

Based on this information, Dr. Feinberg opines it was medically appropriate for Dr. Sedighi to change Plaintiff's medication to Trileptal on Mach 5, 2015, in response to Plaintiff's concerns about Elavil and Keppra.  (*Id.* ¶ 40.)  Dr. Feinberg also states that it was medically appropriate for Dr. Sedighi to restart plaintiff on Elavil and not prescribe any seizure medication on March 24, 2015.  (*Id.*)  Dr. Fienberg indicates that Elavil was a clinically appropriate pain medication for the type of pain that Plaintiff was experiencing.  (*Id.*)  Dr. Feinberg also indicated that it was appropriate for Dr. Sedighi to observe Plaintiff before restarting seizure medications since Plaintiff's medical history and other physicians have supported the decision to observe, with nothing happening on March 24, 2015 to justify changing the treatment plan.  (*Id.*)  Dr. Feinberg states that Plaintiff's seizures have been unwitnessed despite their claimed frequency, and no tests at the time support Plaintiff's claim for a seizure disorder or brain trauma.  (*Id.*)  Dr. Feinberg states that it would have been medically inappropriate for Dr. Sedighi to have prescribed Gabapentin on March 24, 2015, especially for a medication with a known potential for abuse.  (*Id.* ¶¶ 7–8, 41.)  Dr. Feinberg also states that it was medically appropriate for Nurse Busalacchi to decline to prescribe Gabapentin and Morphine on April 13, 2015.  (*Id.* ¶ 42.)  Dr. Feinberg believes that using her medical judgment and discretion, there was no indication to Nurse Busalacchi that a change in medication was necessary or appropriate.  (*Id.*)

Finally, Dr. Feinberg also notes that there is no support within the medical records that show that Plaintiff suffered from any adverse outcome from being off seizure medication from March 13–24, 2015, nor from not receiving Gabapentin.  (*Id.* ¶ 43.)  Dr. Feinberg states that Plaintiff's descriptions of his seizures do not suggest that he is having the types of seizures that would cause someone to fall.  (*Id.*)  Dr. Feinberg states that Plaintiff's descriptions are similar to absence seizures, which do not cause falls.  (*Id.*)  Dr. Feinberg states that Plaintiff reported falling thirty minutes after taking Elavil, which is a medication that is prescribed at bedtime due to its known sedating effects.  (*Id.*)

### J.  Legal Standards

#### 1.  Motion for Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23.  The moving party can also satisfy this burden by showing that particular parts of materials in the record "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party has carried its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986)).  The nonmoving party may not rely on allegations in the complaint, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (emphasis in original) (internal citation omitted).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247–48 (1986) (emphasis in original).  "An issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.'"  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)).  If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 325.

At summary judgment, it is not the Court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 588.  Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).

A cross-motion for summary judgment requires the court to apply the same standard and rule on each motion independently.  *Creech v. N.D.T. Indus., Inc.*, 815 F. Supp. 165, 166–67 (D.S.C. 1993).  When both parties have moved for summary judgment, "[t]he granting of one motion does not necessarily warrant the denial of the other motion, unless the parties base their motions on the same legal theories and same set of material facts." *Stewart v. Dollar Fed. Sav. & Loan Ass'n*, 523 F. Supp. 218, 220 (S.D. Ohio 1981) (citing *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir. 1978)).

The factual allegations of a *pro se* inmate must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Accordingly, in a civil rights case, the Court must construe the pleadings of a *pro se* plaintiff liberally and afford him the benefit of any doubt. *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). "This rule is particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992). However, despite the liberal interpretation a court must give to *pro se* pleadings, it cannot provide "essential elements of the claim that were not initially pled." *Ivey v. Bd. Of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.* Even a *pro se* plaintiff must specify "with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim." *Jones v. Cmty. Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 649 (9th Cir. 1984).

The liberal standard applied to *pro se* plaintiffs does not relieve a plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment. *Veloz v. New York*, 339 F.Supp.2d 505, 513 (S.D.N.Y. 2004). Ordinary *pro se* litigants, like other litigants, must comply strictly with the summary judgment rules. *Thomas*, 611 F.3d at 1150. *Pro se* inmates are, however, expressly exempted from strict compliance with the summary judgment rules. *Id.* Courts should "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Id.* In addition, the Court may consider as evidence all contentions "offered [by a plaintiff] in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). This approach "exempts *pro se* inmates from strict compliance with the summary judgment rules, but it

does not exempt them from all compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013)).

### 2. Applicable Law

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, and human decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). A violation of the Eighth Amendment occurs when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104. To maintain a claim of deliberate indifference based on medical care in prison, a plaintiff must establish two requirements, one objective and one subjective. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, a plaintiff must "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks and citation omitted)).

As to the first requirement, "[a] medical need is serious if failure to treat it will result in significant injury or the unnecessary and wanton infliction of pain." *Peralta v. Dillard*, 744 F.3d 1076, 1081–82 (2014) (en banc) (internal quotation marks and citations omitted). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (citation and quotation marks omitted); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).

For the second requirement, the prison official must act with "deliberate indifference [. . .] only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cty. of Washoe, Nevada,* 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted). Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer,* 511 U.S. at 837. "If

a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson,* 290 F.3d at 1188.

For deliberate indifference, an inmate must allege sufficient facts to indicate that the prison official has a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). This second requirement is "satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. Defendants' acts/omissions must involve more than an ordinary lack of due care. *Snow*, 681 F.3d at 985. Defendant's conduct must be "'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Parks v. Blanchette*, 144 F. Supp. 3d 282, 315 (D. Conn. 2015) (citing *Estelle*, 429 U.S. at 102). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer,* 511 U.S. at 839.

To plead a claim involving alternative choices of medical treatment, a plaintiff must establish that the treatment chosen was both "medically unacceptable under the circumstances, and chosen in conscious disregard of an excessive risk to [the prisoner's] health." *Toguchi*, 391 F.3d at 1058 (citation omitted); *see also Thomas*, 611 F.3d at 1150–51 ("[T]he inmate must show that the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk."). Simply showing that a course of treatment proves to be ineffective, without showing that the medical professional's conduct was medically unacceptable under the circumstances and chosen in conscious disregard to Plaintiff's health, does not establish a claim for deliberate indifference. *Nicholson v. Finander*, No. CV 12-9993-FMO-JEM, 2014 WL 1407828, at *9 (C.D. Cal. 2014) (citing *Estelle*, 429 U.S. at 105; *Toguchi*, 391 F.3d at 1058).

Eighth Amendment doctrine makes clear that "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical

care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987, *overruled in part on other grounds* by *Peralta*, 744 F.3d at 1083; *Toguchi*, 391 F.3d at 1057, 1059–60. Further, inadvertent failure to provide adequate medical care, gross negligence, medical malpractice, or a mere delay in medical care are all insufficient to violate the Eighth Amendment. *See Estelle*, 429 U.S. at 105–07; *Wilhelm*, 680 F.3d at 1122; *Toguchi*, 391 F.3d at 1060; *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).

## DISCUSSION

### I.   Defendants' Motion for Summary Judgment (ECF No. 80)

#### A. Plaintiff's Eighth Amendment Claim against Dr. Sedighi and Nurse Busalacchi Regarding Elavil's Suicidal Side Effects

Plaintiff alleges that Defendants Dr. Sedighi and Nurse Busalacchi acted with deliberate indifference in violation of the Eighth Amendment. (ECF No. 70.)  Defendants move for entry of summary judgement against Plaintiff on these claims. (ECF No. 80.) This Section addresses Plaintiff's TAC allegations that Dr. Sedighi and Nurse Busalacchi were deliberately indifferent for prescribing Elavil, which allegedly had a side effect that caused suicidal thoughts and, in part, his alleged suicide attempt on March 1, 2015.  (ECF No. 70.)  The Court addresses in turn serious medical need and deliberate indifference to that need.

##### 1.   Objective Prong Analysis: Serious Medical Need

To establish an unconstitutional treatment of a medical condition, including a mental health condition, a prisoner must show deliberate indifference to a "serious" medical need. *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1992).  A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.*

In his Opposition, Plaintiff states that "[a] serious medical condition is considered when someone [tries] to commit suicide or has thoughts." (ECF No. 82 at 19.)  According to Plaintiff, his suicidal thoughts, which are brought on by taking Elavil, are a serious

medical need.  (ECF No. 70 at 8.)  The Ninth Circuit in *Conn v. City of Reno* recognized that a heightened risk of suicide or an attempted suicide is a serious medical need.  591 F.3d 1081, 1095 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915, (2011), and *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011) (citing *Torraco v. Maloney,* 923 F.2d 231, 235 & n. 4 (1st Cir. 1991)); *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1023 (3d Cir. 1991) ("A 'particular vulnerability to suicide' represents a 'serious medical need[.]'")); *see also In Kamakeeaina v. City & Cty. of Honolulu*, No. CIV. 11-00770-JMS, 2014 WL 1691611, at *7 (D. Haw. Apr. 2014), *aff'd sub nom. Kamakeeaina v. Maalo*, 680 F. App'x 631 (9th Cir. 2017) (citing to *Conn*, the Court found that the evidence presented clearly satisfied the objective component of a serious medical need, where witnesses told the officers when they arrived to the scene that Plaintiff was "ready to commit suicide" and they heard him threaten to jump from the balcony).

Plaintiff's Exhibit B to his Opposition is a March 1, 2015 Admission Assessment done on Plaintiff and signed by Nurse Guimbatan and Dr. Rodriguez.  (ECF No. 82 at 26–27.)  In the "Comments" section of this initial intake form, the Nurse provides in pertinent part that "[Plaintiff] is alert[, . . .] calm and cooperative with no current distress.  He claims he is still suicidal and depressed[. . . .] He plans to hang self but also states he cannot do it in CTC[. . . .]  He claims to have taken all his medications religiously.  [Plaintiff] was escorted to CTC-140 and was placed on suicide precautions."  (*Id.* at 26.)

Plaintiff's medical records establish that Plaintiff suffers from mental disorders that are the likely source of his suicidal ideations.  During a medical visit with Plaintiff on March 25, 2015, Dr. Brown listed Plaintiff's diagnosed disorders under Axis I as: "Adjustment Disorder with Mixed Anxiety and Depressed Mood," "Depressive Disorder," and "Psychotic Disorder."  (ECF No. 80-1 at 103.)  Dr. Brown's assessment was that

"[Plaintiff] demonstrated progress regarding his depression and suicidal thoughts."[20]  (*Id.*) Further, a Mental Health Treatment Plan dated March 25, 2015 recommended that Plaintiff would be ready for discharge when he no longer has suicidal ideations, his depression level is at "4/10" or below, there is a safety plan for suicidal ideations, at least 3 coping skills for suicidal ideations, and Plaintiff shows an increased ability to cope with his pain.  (ECF No. 70 at 45.)  The Mental Health Treatment Plan did note that ongoing suicidal ideation would pose as a barrier for discharge.  (*Id.*)

At the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, while drawing all inferences in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact precludes entry of judgment.  Plaintiff at this stage has established the he suffers from a serious medical condition of heightened suicide if left untreated.

### 2.  Subjective Prong Analysis: Dr. Sedighi

For a claim for deliberate indifference, Plaintiff must show that Dr. Sedighi was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he drew such inference.  *See Farmer,* 511 U.S. at 837.  Plaintiff must then present sufficient evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment was medically unacceptable under the circumstances, and that he chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson*, 90 F.3d at 332.

#### a.  Aware of Substantial Risk of Serious Harm

The issue presented is whether Dr. Sedighi was aware of facts from which the inference could be drawn that Elavil heightened Plaintiff's risk of suicide and/or suicidal thoughts, and that Dr. Sedighi drew such inference.  *See Farmer,* 511 U.S. at 837.  In his TAC, Plaintiff states in pertinent part, "[h]appen that on March 1st 2015 I was back to

---

[20] It appears from Dr. Brown's diagnosis that Plaintiff's suicidal thoughts and depression are conditions related to his Axis I Disorders.  (*See* ECF No. 80-1 at 103.)

suicidal infirmary.  On March 5th 2015 medication (Elavil; Keppra) was taken off after psychiatrist determined to be taken off due to suicidal side effects.  Dr. Sedighi decided to put me in [Trileptal] (pain med) to substitute Elavil[.]"  (ECF No. 70 at 8.)  In his Opposition, Plaintiff asserts that a Psychiatrist Phan stopped Keppra and Elavil on March 1, 2015 because of the side effects of suicidal thoughts/attempts, and ordered medical to give him an alternative.  (ECF No. 82 at 5.)  Plaintiff claims to have told Dr. Sedighi about Elavil's suicidal effects on March 5, 2015, the day that Dr. Sedighi prescribed Trileptal as an alternative to Elavil and Keppra.  (*Id.* at 5–6.)  Plaintiff states that "[. . .] [he] did told Dr. Sedighi on 3-5-15 that '[Elavil] and Keppra are giving [him] suicidal thoughts.  [He] told [Dr. Sedighi] that for the past year [he has] been saying this to Doctors but they continue sustaining medication.'"  (*Id.* at 6 n.1.)

The Court cannot make a credibility finding as to whether Plaintiff actually told Dr. Sedighi that Elavil caused him to have suicidal thoughts on March 1, 2015, leading to his attempt to commit suicide.  However, the record supports a reasonable inference that Dr. Sedighi was made aware of Plaintiff's complaint regarding Elavil.

Dr. Sedighi knew that Plaintiff had been admitted to a crisis bed on March 1, 2015 for his psychiatric issues and suicide ideation.  (ECF No. 80-1 at 71.)  Psychiatrist Dr. Gorney had referred the Plaintiff to Dr. Sedighi for an evaluation of the side effects of Elavil and Keppra.[21]  (*Id.*)  Dr. Gorney wrote, "spoke with Dr. Sedighi as IP reports his pain regimen of amitriptyline causes side effects, may worsen his mood when he takes, goal to consider alternatives. Sedighi to see [him] tomorrow."  (ECF No. 70 at 46.)  At Dr. Sedighi's March 5, 2015 Medical Consultation, Plaintiff informed Dr. Sedighi that Elavil made him drowsy and depressed his mood further.  (ECF No. 80-1 at 71.)  In the "Assessment / Recommendations" section of his Medical Consultation report, Dr. Sedighi

---

[21] A reasonable inference can be drawn from this referral that Dr. Gorney was concerned enough about Plaintiff's complaints regarding the side effects of Elavil and Keppra on Plaintiff's suicide ideations that he referred his case for subsequent evaluation by Dr. Sedighi.

counselled Plaintiff and noted Plaintiff's complaints about his stated side effects, that Elavil made Plaintiff drowsy and made his depressive symptoms worse. (*Id.* at 72.) Dr. Sedighi then replaced Elavil and Keppra with Trileptal for Plaintiff's seizures and chronic pain. (*Id.*) This conduct raises a reasonable inference that Dr. Sedighi gave some credence to Plaintiff's complaints about Elavil to the extent of replacing it. The Court finds Plaintiff has met his burden and raised a genuine and material factual dispute as to whether Dr. Sedighi was aware that Elavil had in part caused Plaintiff to have suicidal thoughts on March 1, 2015.

### b.  Deliberate Indifference

To demonstrate deliberate indifference, Plaintiff must show that Dr. Sedighi did a purposeful act or failed to adequately respond to Plaintiff's serious medical need, i.e. his suicidal thoughts, which Plaintiff alleged were caused by Elavil. *See McGuckin*, 974 F.2d at 1060. Plaintiff must show that Dr. Sedighi had a sufficiently culpable state of mind when he provided medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995).

Plaintiff's Eighth Amendment claim alleges that Elavil caused him to have attempted suicide on March 1, 2015. (ECF Nos. 70 at 8; 82 at 3, 5.) In addition, Plaintiff states that "[o]n March 5th 2015 medication (Elavil; Keppra) was taken off after psychiatrist determined to be taken off due to suicidal side effects. Dr. Sedighi decided to put me in [Trileptal] (pain med) to substitute Elavil." (ECF No. 70 at 8.) Further, Dr. Sedighi confirms that Psychiatrist Dr. Gorney referred Plaintiff for an evaluation of Elavil's and Keppra's side effects, and discontinued Elavil on March 5, 2015. (ECF No. 80-1 at 72.) Dr. Sedighi indicated that he counselled Plaintiff and noted, "[he] will discontinue Amitriptyline and Keppra and [he] will start [Plaintiff] on Trileptal [. . .] that can be used for seizures and chronic pain."[22] (*Id.*)

_____

[22] Plaintiff alleges in his Sur-reply that Dr. Sedighi took him off of Elavil because a Psychiatrist Phan told him that Plaintiff was getting suicidal thoughts due to its side effects. (ECF No. 85 at 1, 10.) Plaintiff provides no evidence that a Psychiatrist Phan took Plaintiff off Elavil due to suicidal thoughts, nor ordered Dr. Sedighi to do so. Furthermore, there is nothing in Plaintiff's medical records that

1    Since Dr. Sedighi did as Plaintiff had requested on March 5, 2015, i.e. to be taken

2    off Elavil, Plaintiff's claim is insufficient to prove Dr. Sedighi was deliberately indifferent

3    to Plaintiff's complaint about Elavil causing his suicidal thoughts.

c.  Plaintiff's Unpled Allegation of Deliberate Indifference

5        In his Opposition, Plaintiff adds an allegation that Dr. Sedighi was deliberately

6    indifferent at the March 24, 2015 consultation for restarting Plaintiff on Elavil.  (ECF No.

7    82 at 6.)  Plaintiff alleges for the first time that Dr. Sedighi was deliberately indifferent on

8    March 24, 2015 for prescribing Elavil at 10 mg, when he knew it was ineffective at 75 mg

9    and he knew it had put him in a suicidal crisis bed due to its side effects.  (*Id.* at 13.)

10       This allegation is not in Plaintiff's TAC.  Plaintiff has not offered any justification

11   for his failure to raise this claim in his TAC.  Therefore, the Court finds it is not properly

12   raised.  *See Wasco Products v. Southwallx Techs.,* 435 F.3d 989, 992 (9th Cir. 2006)

13   ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate

14   pleadings."); *Brass v. Cty. of Los Angeles,* 328 F.3d 1192, 1197–98 (9th Cir. 2003)

15   (upholding the district court's finding that plaintiff had waived § 1983 arguments raised

16   for first time in summary judgment motion where nothing in amended complaint suggested

17   those arguments, and plaintiff offered no excuse or justification for failure to raise them

18   earlier); *see also James v. Dependency Legal Grp.*, 253 F. Supp. 3d 1077, 1091 (S.D. Cal.

19   2015) ("Ninth Circuit precedent is clear: neither new factual allegations nor new claims

20   presented in opposition to summary judgment are properly considered."); *Williams v.*

21   *Rodriguez,* No. C 10–2715-RMW-PR, 2012 WL 1194160 at *9 (N.D. Cal. 2012) (declining

22   to consider plaintiff's attempt to transform his claim against a defendant doctor from one

23   instance of cancelling a morphine prescription to a claim that the defendant doctor denied

24   him pain medication for years).

---

27   indicates that Dr. Gorney made such a finding either.  Dr. Gorney only requested that Dr. Sedighi
28   evaluate the side effects of Elavil and Keppra.  (*See* ECF Nos. 70 at 39–40, 46; 80-1 at 71–72.)

34

Notwithstanding, the Court will address the merits of the March 24, 2015 medical consultation with Dr. Sedighi.  For a claim of deliberate indifference, Plaintiff needs to present specific evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment on March 24, 2015 was medically unacceptable under the circumstances, and that Dr. Sedighi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson*, 90 F.3d at 332.

### i.   Medically Unacceptable Treatment

Plaintiff has to present specific evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment on March 24, 2015 was medically unacceptable under the circumstances.  *See Jackson*, 90 F.3d at 332.  A mere difference in medical opinion is insufficient to meet the high bar to establish deliberate indifference. *Toguchi*, 391 F.3d at 1058.  And Plaintiff is not entitled to request the prescription of a specific medication.  *Id.* Further, medical malpractice or negligence falls short of meeting the high bar for establishing deliberate indifference.  *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

In his Opposition, Plaintiff claims he told Dr. Sedighi that he has been telling doctors for the past year about Elavil's suicidal effects, but the doctors still continued to provide the medication.  (ECF No. 82 at 6 n.1.)  The Court's review of Plaintiff's medical records regarding Elavil, specifically the year prior to the March 24, 2015 consultation, shows that doctors continuously prescribed dosages of Elavil ranging 25 mg to 75 mg for Plaintiff's severe pain.  (ECF Nos. 80-1 at 48–49, 51, 54–55, 57–58, 64–65, 71, 85–86; 82 at 23, 49–58.)  Plaintiff's medical history does not support his allegation that he has been telling doctors for the past year about the suicidal side effects of Elavil.  There is no indication in his medical records that Plaintiff complained that Elavil caused him to suffer side effects which heightened Plaintiff's risk of suicide.  In fact, Plaintiff's medical records indicate that Plaintiff was satisfied with Elavil, compliant with the doses, and even requested Dr. Chau to increase Elavil from 50 mg to 75 mg.  (*See* ECF Nos. 80-1 at 65.)  Plaintiff's

medical history with Elavil supports Dr. Sedighi's course of treatment on March 24, 2015 for Plaintiff's severe pain, i.e. prescribing 10 mg of Elavil.

Further, the Defendants provided Dr. Feinberg's declaration, who summarized in chronological order the medical records of consultations the Plaintiff had with the Defendants, as well as other doctors and nurses. (*Id.* at 1–15.) Based on his review of these records, Dr. Feinberg declares that Dr. Sedighi's treatment of Plaintiff on March 5, 2015 and March 24, 2015 were medically appropriate. (*Id.* at 13.) Dr. Feinberg declares that Dr. Sedighi responded to Plaintiff's concerns about Keppra and Elavil by prescribing an alternative appropriate medication, Trileptal, to treat Plaintiff's pain and seizures on March 5, 2015. (*Id.*) Then on March 24, 2015, Dr. Feinberg maintains that Dr. Sedighi responded to Plaintiff's complaint of pain by restarting him on Elavil, which is a neuropathic pain medication clinically appropriate for Plaintiff's complaint of pain. (*Id.*)

In contrast, Plaintiff has not provided any evidence in which a medical professional opined that Elavil enhanced his risk of suicidal thoughts. Plaintiff's claim that a Psychiatrist Phan determined that Elavil's and Keppra's side effects caused Plaintiff to go to the crisis bed and then ordered Dr. Sedighi to give him an alternative is not supported by the record. (*See* ECF Nos. 82 at 5; 85 at 1, 10.) As has been made clear, it was Dr. Gorney who referred Plaintiff to Dr. Sedighi for an evaluation of Elavil's and Keppra's side effects. (ECF No. 80-1 at 71.) Dr. Gorney, the staff psychiatrist, did not order Dr. Sedighi to change Plaintiff's prescription of Elavil. Dr. Gorney asked Dr. Sedighi to consider alternatives. (ECF No. 70 at 46.) Further, Plaintiff has not produced any evidence indicating that any psychiatrist mandated Dr. Sedighi to replace Elavil due to its suicidal side effects.

In support of his TAC, Plaintiff provided his appeal level decisions stemming from his March 29, 2015 Patient Inmate Health Care Appeal in which Plaintiff requested Morphine and Gabapentin for his pain. (*Id.* at 33–37.) Plaintiff was taking 10 mg of Elavil when he filed these appeals, which Dr. Sedighi had prescribed, yet Plaintiff made no reference to Elavil nor of having suicidal thoughts. (*Id.*) At all three levels of his appeals,

Plaintiff was specifically requesting Morphine and Gabapentin for his neuropathy. (*Id.* at 33, 36–37.)   The Director's Level Decision denied his appeal, finding that Plaintiff was prescribed pain medication per California Correctional Health Care Services ("CCHCS") Pain Management Guidelines and that Plaintiff did not meet the CCHCS Formulary criteria for non-formulary pain medications or narcotics at that time due to his functional capacity. (*Id.* at 33.)   Plaintiff's exhibits provide additional evidence that Elavil's prescription was a medically acceptable treatment for Plaintiff, whereas Morphine and Gabapentin were not.

In both his TAC and his Opposition, Plaintiff wants a specific medication, Gabapentin for pain.   However, a mere difference in medical opinion is insufficient to meet the high bar to establish deliberate indifference. *Toguchi*, 391 F.3d at 1058.   And Plaintiff is not entitled to request the prescription of a specific medication. *Id.*   The Court finds that, at most, Plaintiff disagrees with Dr. Sedighi's medical treatment plan for his severe pain. But Plaintiff has not established that Dr. Sedighi's 10 mg prescription of Elavil for pain was medically unacceptable.

Plaintiff also appears to be alleging medical malpractice or negligence when Dr. Sedighi restarted Plaintiff on Elavil.   In his Opposition, Plaintiff states that,   "[a]s to pain medication [(Elavil)], well [he] told [Nurse Busalacchi] it was discontinue[d] on 3-5-15 for suicidal side effects. *Erroneously* [he] was put back on 3-24-15." (ECF No. 82 at 14) (emphasis added).   Plaintiff indicates that "[he] told [Nurse Busalacchi] that Sedighi *erroneously* [prescribed] such medication[. . . .]" (*Id.* at 19) (emphasis added).   However, medical malpractice or negligence falls short of meeting the high bar for establishing deliberate indifference. *Hamby*, 821 F.3d at 1092.   Inadequate medical treatment, medical malpractice, or even gross negligence by itself does not rise to that level, as "the Eighth Amendment proscribes 'the unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citation omitted).

In addition, Plaintiff's pleadings reveal inconsistencies as to what he believed caused suicidal thoughts. Plaintiff blames Elavil, Keppra, and his severe pain as being the cause of them. (*See* ECF Nos. 70 at 7, 8, 15; 82 at 6 n.1, 10.) Further, in his TAC, Plaintiff claims that his suicidal thoughts "trigger out of nowhere." (ECF No. 70 at 8.) Such contradictions support the inference that Plaintiff does not know what caused his suicidal thoughts. And as has been previously addressed, Plaintiff suffers from Axis I disorders that are the likely cause of depression and suicidal ideation. (*See* Sec. I(A)(1).)

In sum, whereas the Defendants have met their burden to show that Dr. Sedighi's treatment was medically acceptable, Plaintiff has not met his burden in coming "forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587.

### ii.  Conscious Disregard of an Excessive Risk to Plaintiff's health

Plaintiff has failed to show that Dr. Sedighi's treatment was medically unacceptable. Nonetheless, the Court will address whether Dr. Sedighi had a sufficiently culpable state of mind when he provided medical care. *Wallis,* 70 F.3d at 1076.

In his Opposition, Plaintiff alleges that Dr. Sedighi was deliberately indifferent for restarting Plaintiff on Elavil when "he knew [Elavil] had put him in a suicidal crisis bed." (ECF No. 82 at 6, 13.) Plaintiff's allegation that Dr. Sedighi knew Elavil was the reason Plaintiff was put in suicidal precaution on March 1, 2015 is not supported by the record. As previously discussed, the Admission Assessment done on Plaintiff on March 1, 2015 contains no mention whatsoever of Elavil playing any role in Plaintiff's desire to hang himself. (*Id.* at 26–27.) Further, Plaintiff's claim that Psychiatrist Phan, or any other psychiatrist, determined that Elavil's and Keppra's side effects caused Plaintiff to go the crisis bed and ordered Dr. Sedighi to give Plaintiff an alternative medication is not supported by the record. (*See id.* at 5.) In fact, the sole purpose for Plaintiff's March 24, 2015 consultation with Dr. Sedighi was to address his chronic headache pain, which Plaintiff complained of during a March 19, 2015 consultation with Nurse Gavin. (*See* ECF No. 80-1 at 82–83, 85.) It was not about suicidal thoughts.

On March 24, 2015, Dr. Sedighi attended to Plaintiff's complaints of pain and prescribed Elavil to treat his pain. (*See id.* at 86–87.) Dr. Sedighi gave a full summary of his previous, March 5th consultation with the Plaintiff, while noting that at that time Plaintiff complained that Elavil and Keppra were causing side effects and made him drowsy. (*Id.*) Dr. Sedighi fully recorded all of Plaintiff's pain complaints and that Plaintiff wanted Morphine and Gabapentin. (*Id.*)

In the "Assessment / Recommendations" section, Dr. Sedighi wrote that Plaintiff was not compliant with his prescriptions of Tylenol and Naproxen.[23] (*Id.* at 86.) Dr. Sedighi counselled Plaintiff on the importance of compliance with his medications and indicated that the Plaintiff showed interest in restarting Elavil. (*Id.* at 86.) Dr. Sedighi then restarted the Plaintiff on 10 mg of Elavil for his severe pain, which could also help his chronic headache and chronic lower back pain. (*Id.*) Dr. Sedighi noted that there was no indication for narcotic pain medication and indicated that he will continue to monitor Plaintiff for seizure activity and his pain. (*Id.*) Plaintiff verbalized that he understood. (*Id.*)

Such conduct on the part of Dr. Sedighi does not support a reasonable inference that Dr. Sedighi harbored a reckless state of mind, which entails more than lack of due care. *See Snow*, 680 F.3d at 985. To the contrary, it supports the inference that Dr. Sedighi did not purposely disregard Plaintiff's complaint of chronic pain. This conclusion is also supported by Plaintiff's own conduct after the consultation. Plaintiff not only did not refuse to take Elavil, but during a follow up consultation with Dr. Freyne on April 29, 2015, Plaintiff indicated that he was doing well and even agreed with the treatment plan that included Elavil.[24] (ECF No. 80-1 at 108–09.)

---

[23] Plaintiff was prescribed these pain medications when he was taken off of Trileptal due to a rash. (*See* ECF No. 80-1 at 75–76.)

[24] As an exhibit to his Complaint, Plaintiff provided the second page of a two-page report titled "Suicide Risk Evaluation" by Dr. Brown, dated April 1, 2015. (ECF No. 70 at 44.) This report indicates that after Plaintiff's admission to the "MHCB" on March 19, 2015, he was sent out to hospital after a seizure

Plaintiff also contradicts himself as to how Dr. Sedighi was deliberately indifferent on March 24, 2015. In his Opposition, Plaintiff claims, "[o]n March 24, 2015 [he saw] Dr. Sedighi again [and he] explain the severeness of [his] pain, [Dr. Sedighi] then wants to prescribe [him] [Elavil]. [Plaintiff] tell [Dr. Sedighi] that such medication makes [him] drowsy, dizzy w/suicidal thoughts. [Dr. Sedighi] says he knows but he still is going to added because he has to give [Plaintiff] something even if [he] refuse such medication. [He] explain why can't he give [Plaintiff] what [he] know works for [his] neuropathy and nerve damage pain (Gabapentin) [Dr. Sedighi] just didn't want to." (ECF No. 82 at 3.)

Whereas in his TAC, Plaintiff alleges that Dr. Sedighi saw him when he was isolated in suicidal from March 19 to 27, 2015.[25] (ECF No. 70 at 9.) Among other things, Plaintiff wanted Gabapentin or something for pain. (*Id.* at 11.) Plaintiff claims that he told Dr. Sedighi that the pain was severe whenever he was not taking any medication at all. (*Id.*) Plaintiff claims Dr. Sedighi did not give him any pain medication, which led to the pain depriving him of "sleep, eat, exercise, walk and it interferes with [his] breathing." (*Id.*) Plaintiff alleges that Dr. Sedighi said "he didn't care he was putting [his] life at risk. [Dr. Sedighi] was just not going to put [the Plaintiff] on anything." (*Id.*)

Although the Court cannot make credibility findings, by such direct contradictions Plaintiff impeaches his own credibility. And in the backdrop is Dr. Sedighi who reports that Plaintiff, not Dr. Sedighi, showed interest in restarting Elavil for his chronic headache on March 24, 2015. (*See* ECF No. 80-1 at 86.) This behavior by Plaintiff is consistent

---

he suffered. (*Id.*) Dr. Brown noted that Plaintiff was placed on Dilantin for seizure and Elavil for pain along with other medications for depression. (*Id.*) Dr. Brown wrote that Plaintiff was compliant with these medications and showed substantial improvement over his stay. (*Id.* at 44.) Plaintiff denied being suicidal or having current depression. (*Id.*) During this consultation, Plaintiff made no complaints of any side effects concerning any of these medications. (*See id.*)

[25] This visit has to be the March 24, 2015 consultation, because there is no record of another visit by Dr. Sedighi between March 19, 2015 and March 27, 2015 wherein Plaintiff discussed his pain and/or suicidal thoughts.

with his past conduct, in which Plaintiff was consistently satisfied with Elavil being used for treating his pain.

Later on March 24, 2015, Plaintiff had a "subjective fall unwitnessed." (*Id.* at 89–91.)  At 21:40, Dr. Sedighi saw Plaintiff at his crisis bed who told Dr. Sedighi that "he blacked out and fell and hit the back of his neck." (*Id.* at 91.)  Dr. Sedighi ordered Plaintiff to be sent to the ER for possible cervical, spine and head trauma. (*Id.* at 91.)  Plaintiff was then taken to Sharp Chula Vista Medical Center and later discharged.[26] (*Id.* at 93–94.)

On March 25, 2015, Dr. Sedighi noted in an addendum that Plaintiff returned from the ER and had negative workup. (*Id.* at 91.)  Further, after Plaintiff returned from the ER, Dr. Sedighi ordered a "1:1" sitter to monitor Plaintiff's seizure activity and provided a wheel chair to assist the Plaintiff with out-of-cell movement. (ECF No. 70 at 45.)  This incident sheds light on Dr. Sedighi's state of mind towards Plaintiff.  Such thoughtful conduct by Dr. Sedighi towards Plaintiff's medical needs contradicts Plaintiff's claim that Dr. Sedighi did not care and purposefully disregarded his medical needs.

In sum, as to Elavil's suicidal side effects, Plaintiff has failed to show that Dr. Sedighi's chosen course of medical treatment on March 24, 2015 was medically unacceptable under the circumstances. *See Jackson,* 90 F.3d at 332.  Further, Plaintiff has failed to present specific evidence that Dr. Sedighi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health. *See id.*

### 3.  Subjective Prong Analysis: Nurse Busalacchi

#### a.  Aware of Substantial Risk of Serious Harm

The issue presented is whether Nurse Busalacchi was not only "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that

---

[26] Sharp medical records reveal that Plaintiff made no complaint about Elavil causing suicide thoughts or depressive moods. (*See* ECF No. 80-1 at 93–101.)  The treating physician at Sharp noted that "[Plaintiff] is complaining of neck pain and headache.  [Plaintiff] said he took Elavil about a half an hour prior to this [seizure] happening. [. . .] [Plaintiff] was brought here by the medic.  No other associated symptoms[. . . .]" (*Id.* at 95.)

she "also [drew] the inference." *See Farmer,* 511 U.S. at 837.  The Court must draw all reasonable inferences on behalf of the nonmoving party.

In his TAC, Plaintiff claims that he told Nurse Busalacchi that "[o]n or about the beginning of March 2015 Keppra was discontinue due to the many side effects, and for being part of why I try to commit suicide (suicide thoughts are a side effect of Keppra)." (ECF No. 70 at 15.)  Plaintiff states that "[Nurse Busalacchi] also knew Elavil was prescribed again 10/26/12. But it was taken off on March 2015 due to been part of why [he] try to commit suicide. [Busalacchi] knew that and still sustain Elavil, actually she raised dosage not caring it would put [his] life at risk, and medication was ineffective for [his] nerve pain." (*Id.* at 20.)  Plaintiff claims that Nurse Busalacchi decided to deny his request for something other than Elavil, on the basis that "(1) she don't feel like changing prescription because although I have falling due to side effects, am still alive without broken bones or in a coma. (2) all inmates lie. (3) has too much work, don't got the strength and time to do paperwork." (*Id.* at 16, 20.)

In his Opposition, Plaintiff supports his claim that Nurse Busalacchi knew Elavil gave him suicidal ideations by referring to Nurse Busalacchi's PCP Progress Note, which she wrote from her visit with Plaintiff on April 13, 2015.[27]  (ECF No. 80-1 at 105.) According to her report, Plaintiff told Nurse Busalacchi that he has suicide ideations when he is on Elavil at a high dose.  (*Id.*)  Plaintiff does not dispute that he made this statement. (*See* ECF No. 82 at 19.)

Based on Nurse Busalacchi's report, Plaintiff has met his burden that Nurse Busalacchi was made aware from Plaintiff that Elavil causes suicidal thoughts at a high dose.  However, Plaintiff has provided insufficient evidence that Nurse Busalacchi was aware that Elavil at any dose contributes to his suicidal ideation.  For instance, Plaintiff

---

[27] In his Opposition, Plaintiff swears under penalty of perjury that everything in pleadings, motions, complaint are all true according to his personal knowledge.  (ECF No. 82 at 14.)  The Court includes all of his attached exhibits under this declaration by Plaintiff, unless otherwise objected to by Plaintiff.

argues that Nurse Busalacchi also "knew [that Elavil] got taken off on 3-5-15 due to [him] ending up in a crisis bed for suicide attempts." (ECF No. 85 at 7.) Plaintiff also claims that Nurse Busalacchi already knew that a psychiatrist took the Plaintiff off of Elavil while he was in suicide crisis due to its suicidal side effects. (*Id.* at 8.)

As previously noted in Section I(A)(2)(c)(ii), Plaintiff's allegation that he was taken off Elavil by a psychiatrist due to his alleged March 1, 2015 suicide attempt is not supported by his medical history. In fact, had Nurse Busalacchi reviewed Plaintiff's medical history as presented, she would not have found any medical report in which a psychiatrist or physician opined that Elavil caused Plaintiff's alleged suicidal thoughts at any dosage, much less at a high dosage.

Plaintiff also alleges that ever since 2011, "nurses wrote many reports of what [he] told them" about the suicidal side effects and he submitted about twenty medical request forms complaining of the side effects and ineffectiveness. (ECF No. 85 at 10.) Plaintiff's medical history does not support this claim. According to the submitted medical records, the first time Plaintiff connected Elavil with depression was on February 25, 2015 in which Plaintiff had a consultation with Nurse Paule. (ECF Nos. 70 at 23; 80-1 at 69.) During this interview, Plaintiff made several complaints about Elavil. (*See id.*) Among a list of side effects Plaintiff blamed on Elavil, he told the Nurse that "[a]ctually this Elavil makes me feel more depressive." (*Id.*) Nurse Paule counselled him on Elavil's side effects and, although it is difficult to read the handwriting, it appears that Nurse Paule continued Plaintiff on Elavil at 75 mg and referred him to his Primary Care Provider.[28] (*Id.*) Further, nothing in Plaintiff's medical history prior to Nurse Busalacchi's interview shows Plaintiff making any complaints regarding Elavil causing suicidal thoughts. (*See* ECF Nos. 70 at

---

[28] At the time of Dr. Sedighi's March 5, 2015 medical consultation, Plaintiff was currently on 75 mg of Elavil. (ECF No. 80-1 at 71.) Given the close proximity in dates and no record showing Elavil was discontinued after the visit with Nurse Paule, the clear inference was that Nurse Paule continued Plaintiff on 75 mg of Elavil.

24, 26, 28; 80-1 at 17–18, 20, 28, 32, 34, 43, 48–49, 51, 55, 57–58, 64–65; 82 at 23, 47, 55, 57, 58, 100.)  Of note, even Plaintiff's appeal to which Nurse Busalacchi responded to would not have led her to actually draw the inference that Elavil at any dose was causing Plaintiff to have suicide ideations.[29]  (*See* ECF No. 70 at 34.)

Given the lack of specific evidence that Nurse Busalacchi was aware that Elavil at any dosage caused him suicidal thoughts, the Court finds in the light most favorable to the Plaintiff and not making any credibility findings, that Nurse Busalacchi was aware from Plaintiff that Elavil at a high dose caused suicidal thoughts.

### b.  Deliberate Indifference

#### i.  *Medically Unacceptable Treatment*

The Court adopts its findings in Section I(A)(2)(c)(i), in which the Court found that there was insufficient evidence to show that Dr. Sedighi's course of medical treatment for Plaintiff's severe pain was medically unacceptable.  Whereas Dr. Sedighi restarted Plaintiff on Elavil at 10 mg, Nurse Busalacchi increased Elavil's dosage to 25 mg.  Given Plaintiff's medical history of being prescribed Elavil for pain by doctors for the past year, Plaintiff's compliance with the doses, and his desire to increase the dose from 50 mg to 75 mg, the only reasonable inference to be drawn from his medical history is that Elavil for pain is a medically acceptable treatment.  (*See* ECF No. 80-1 at 48–49, 51, 54–55, 57–58, 64–65 [increasing Elavil from 50 mg to 75 mg], 71, 85–86, 95, 103.)  Plaintiff's allegation that a

---

[29] Plaintiff's appeal grievance centered around a seizure he suffered which caused him to hit his head on the side of metal bed.  (ECF No. 70 at 34.)  Plaintiff blames the alleged seizure he had on March 24, 2015, on the doctors that took him off his seizure and neuropathy pain medications between March 11th to March 17th.  (*Id.*)  Plaintiff alleges that the doctors' motive for taking him off his medications were because "[t]hey wanted to witness or see a seizure."  (*Id.*)  In his appeal, Plaintiff wanted the doctors to prescribe him Gabapentin or Morphine for his pain.  (*Id.*)  Plaintiff made no mention of having suicidal thoughts being a side effect of Elavil in his appeal.

psychiatrist determined Elavil was causing suicidal thoughts is not born out by any submitted exhibits.[30]

The Court similarly views Plaintiff's request for Morphine and Gabapentin as a situation wherein Plaintiff wants his specific course of treatment. Plaintiff is not entitled to request a prescription for a specific medication. *See Toguchi*, 391 F.3d at 1058. Further, on March 24, 2015, Dr. Sedighi determined there was no indication for narcotic pain medication. (ECF No. 80-1 at 86.) It happens that Plaintiff was also seeking Morphine and Gabapentin during that visit. (*Id.*) This medical consultation is further evidence that Elavil for Plaintiff's pain was medically acceptable, and the requested narcotics were not indicated. (*See e.g.* ECF No. 70 at 33) ("[Plaintiff] [did] not meet the CCHCS Formulary criteria for non-formulary pain medications or narcotics at this time due to [his] functional capacity."). In fact, Plaintiff did not provide any medical records wherein Elavil was found to be medically unacceptable under the circumstances.

Defendants' expert Dr. Feinberg declared that Elavil is a neuropathic pain medication clinically appropriate for Plaintiff's complaint of pain. (ECF No. 80-1 at 13.) Further, Dr. Feinberg opined that it was medically appropriate for Nurse Busalacchi to decline to prescribe Gabapentin and Morphine when Plaintiff requested on April 13, 2015. (*Id.*) At the time, Dr. Feinberg indicates that Plaintiff had been restarted on medically appropriate medications to treat his neuropathy and seizure disorder, with no medical indication that a change in medication was necessary or appropriate. (*Id.* at 14.)

In sum, Plaintiff has failed to show that Nurse Busalacchi's treatment was medically unacceptable and did not meet his burden in coming "forward with specific facts showing that there is a genuine issue for trial." *See Matsushita,* 475 U.S. at 587.

///

---

[30] The only record that Plaintiff submits is an admission intake form, dated March 1, 2015, in which Plaintiff never mentions Elavil as playing any role in his suicidal thoughts. (*See* ECF No. 82 at 26–27.)

*ii.   Conscious Disregard of an Excessive Risk to Plaintiff's health*

Apart from the above analysis that Plaintiff has failed to show Nurse Busalacchi's increase of Elavil to 25 mg was a medically unacceptable treatment, the Court also finds that there is insufficient evidence that Nurse Busalacchi purposefully disregarded Plaintiff's serious medical condition by prescribing Elavil for his severe pain.  During the April 13, 2015 consultation with Nurse Busalacchi, Plaintiff's complaint about Elavil was that he has suicidal ideations when he is on Elavil at a high dose.  (*See* ECF No. 80-1 at 105.)  As previously indicated, for the past year prior to his visit with Nurse Busalacchi, Plaintiff was continuously prescribed Elavil between 25 mg to 75 mg.  (ECF Nos. 70 at 44; 80-1 at 48–49, 51, 54–55, 57–58, 64–65, 71, 85–86, 95, 103; 82 at 23.)  For instance, on October 3, 2014, Dr. Chau described 50 mg of Elavil as a low dose.  (ECF No. 80-1 at 57–58.)  Based on Dr. Chau's medical opinion that 50 mg was a low dose, an increase from 10 mg to 25 mg is still a lower dosage.  In fact, Plaintiff himself concedes this point in his Opposition, stating that "10 mg dosage [of Elavil,] a very low dosage[.]"  (ECF No. 82 at 10.)  Therefore, even assuming Elavil at a high dose causes suicidal thoughts, Nurse Busalacchi did not disregard Plaintiff's serious medical condition because she gave him a very low dose for his severe pain.  By Plaintiff's own admission, such a dosage would not have caused suicidal thoughts.

Further, in her medical report, Nurse Busalacchi detailed Plaintiff's complaints, including suicide ideation.  (ECF No. 80-1 at 105.)  Nurse Busalacchi noted at the time Plaintiff was fine and was not having suicidal ideations.  (*Id.*)  Regarding his appeal, Nurse Busalacchi noted that Plaintiff will not be placed on Neurontin or Morphine at this time.  (*Id.*)  Nurse Busalacchi indicated that she will increase Elavil to 25 mg and refer Plaintiff to mental health for pain management.  (*Id.*)  Plaintiff understood and agreed with the plan.  (*Id.*)

After his consultation with Nurse Busalacchi, Plaintiff's only complaint about the increase dosage of Elavil occurred during a medical consultation on April 30, 2015.  (ECF No. 82 at 100.)  Plaintiff's sole complaint regarding Elavil was about his pain.  (*Id.*)

Plaintiff made no mention of it causing suicidal thoughts, stating "Elavil is not helping me, even after increase."  (*Id.*)

In contrast, the day earlier at Dr. Freyne's consultation, Plaintiff reported that he was doing well and being compliant with his medications, which included Elavil at 25 mg. (ECF No. 80-1 at 108–09.)  Such contradictory conduct may best be explained by Dr. Goyal's July 9, 2015 consultation with Plaintiff.  (*Id.* at 111.)  In his progress note, Dr. Goyal reported that Plaintiff requested Gabapentin for his nightly headaches and that Plaintiff's headaches appeared to be a complex migraine of some sort.  (*Id.*)  Dr. Goyal indicated that he would try Sumatriptan for his headaches and opined that Plaintiff's neuropathy pain is questionable in that he found inconsistencies with his history and objective findings.  (*Id.*)  Dr. Goyal viewed Plaintiff's neuropathy as a "factitious disorder as high on differential."[31]  (*Id.*)

In sum, as to Elavil's suicidal side effects, Plaintiff has failed to show that Nurse Busalacchi's chosen course of medical treatment was medically unacceptable under the circumstances and presents insufficient evidence that Nurse Busalacchi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson,* 90 F.3d at 332.

### B. Plaintiff's Eighth Amendment Claim Against Dr. Sedighi as to Plaintiff's Pain and Seizures

Plaintiff alleges that Defendant Dr. Sedighi acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  (ECF No. 70.)  Defendants move for entry of summary judgement against Plaintiff on this claim.  (ECF No. 80.)  This Section addresses Plaintiff's allegations in his TAC that Dr. Sedighi did not prescribe any pain or seizure medication on March 24, 2015.  (*See* ECF No. 70.)

---

[31] According to Defendants, this is a mental disorder in which a person acts as if he has a physical or mental illness when he has consciously created the symptoms.  (ECF No. 80-1 at 13 n.11.)

1.   <u>Objective Prong Analysis: Serious Medical Need as to Plaintiff's Pain and Seizures</u>

To establish an unconstitutional treatment of a medical condition, including a mental health condition, a prisoner must show deliberate indifference to a "serious" medical need. *McGuckin,* 974 F.2d at 1059.   A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.*

 As for his pain and seizures, Plaintiff claims that they are both serious medical conditions. (ECF No. 82 at 18–19.)  In his TAC, Plaintiff's alleges that "[Dr. Sedighi] saw the medical chart and seeing I did and was prescribed gabapentin by neurologist before. [Dr. Sedighi] also knew through me that gabapentin didn't give me side effects as how the current or prior medication were. And that it work for my pain to a point that it would reduce my pain to where it didn't deprive me of life necessity's. [Dr. Sedighi] knew all of this and he still decided to leave me without any seizure or pain medication."  (ECF No. 70 at 9.)  Plaintiff claims that he told Dr. Sedighi about his medical needs, including that he was not on any pain or seizure medications.  (*Id.* at 9, 11.)  Plaintiff also told Dr. Sedighi that "without any pills [his] seizures become very aggressive and severe to points where my tongue rolls back and I can't breathe" and that he "needed to be put on Gabapentin or something similar."  (*Id.* at 11.)  Plaintiff states that Dr. Sedighi knew that Gabapentin was effective, yet still decided to leave Plaintiff without any seizure or pain medication.  (*Id.*)  Plaintiff claims that "[Dr. Sedighi] didn't care he was putting [Plaintiff's] life at risk or harm, neither what [Plaintiff] was suffering. He was just not going to put [Plaintiff on] anything for no medical reason."  (*Id*. at 11.)

a.  Serious Medical Need: Pain

Pain that is so severe that a person is unable to fulfill his or her basic needs of eating, sleeping, and going to the bathroom is considered a serious medical need.  *See McGuckin*, 974 F.2d at 1060 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337–41 (9th Cir. 1990); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989)).  Plaintiff has presented

evidence that on March 24, 2015 he was suffering from such severe pain that deprived Plaintiff of life's necessities, such as "sleep, eat, exercise, walk and interferes with [Plaintiff's] breathing," which is a serious medical condition.  (*See* ECF No. 80-1 at 85.) Further, Plaintiff's medical history corroborates that he suffers from chronic and severe pain and has consistently been prescribed pain medication.  Therefore, the Court considers Plaintiff's severe pain as a serious medical need.

### b.  Serious Medical Need: Seizures

Alleged seizures are considered a serious medical condition regardless if "they occur as a result of a diagnosed condition, such as epilepsy [ ] or from an unknown or undiagnosed condition."  *Mellender v. Larson*, No. 06-C-547-C, 2006 WL 3091111, at *4 (W.D. Wis. 2006) (citing *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir.1998)).  Plaintiff has presented evidence that on March 24, 2015 he was suffering from a seizure disorder, which is a serious medical condition.  His medical history establishes this medical need in that he has consistently been prescribed seizure medication.  Therefore, the Court considers Plaintiff's alleged seizure disorder as a serious medical need.

### 2.  Subjective Prong Analysis: Dr. Sedighi's Treatment for Plaintiff's Pain

### a.  Aware of Substantial Risk of Serious Harm

In his TAC, Plaintiff alleges that on March 24, 2015 he told Dr. Sedighi that he had been taken off seizure and pain medication two weeks prior "for no reason."  (ECF No. 70 at 11.)  Plaintiff states that he told Dr. Sedighi that he needed "to be put back to nerve pain medication. [He] told him that the pain of [his] head is not the only issue of pain. [He] also have pain on [his] lower back due to a injury of March 2012 and Neuropathy. This type of pain deprives [Plaintiff] of life necessities [. . .] It's severe whenever [he is] not taking no medication at all."  (*Id.*)

During the March 24, 2015 medical consultation, Dr. Sedighi summarized Plaintiff's complaints as chronic headache and chronic lower back pain that were constant and sometimes severe.  (ECF No. 80-1 at 85–86.)  Dr. Sedighi restarted Plaintiff on Elavil at bedtime to "help [Plaintiff's] chronic headache and chronic low back pain," after Plaintiff

showed interest in restarting the medication. (*Id.* at 86.) Dr. Sedighi noted that the main reason for Plaintiff's visit was his chronic headache and lower back pain. (*Id.* at 85.)

These facts support the inference that Dr. Sedighi was aware that Plaintiff suffered from neuropathic pain, chronic head pain, and chronic lower back pain. Therefore, the Court finds that Plaintiff has met his burden and raised a genuine and material factual dispute as to whether Dr. Sedighi was aware of Plaintiff's severe pain on March 24, 2015.

### b. Deliberate Indifference for Not Prescribing Pain Medication on March 24, 2015

To demonstrate this second prong, Plaintiff must provide specific facts outside of his TAC allegations to show that Dr. Sedighi did a purposeful act or failed to adequately respond to Plaintiff's serious medical need by not prescribing any pain medication on March 24, 2015. *See Estelle*, 429 U.S. at 106. Plaintiff also needs to provide specific facts that Dr. Sedighi had a sufficiently culpable state of mind when he provided medical care. *Wallis*, 70 F.3d at 1076. This burden also includes the need to provide sufficient evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment was medically unacceptable under the circumstances, and that Dr. Sedighi chose this course of treatment in conscious disregard of an excessive risk to plaintiff's health. *See Jackson*, 90 F.3d at 332. A mere difference in medical opinion is insufficient to meet the high bar to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058. Additionally, Plaintiff is not entitled to request the prescription of a specific medication. *Id.* Medical malpractice or negligence falls short of meeting the high bar for establishing deliberate indifference. *Hamby*, 821 F.3d at 1092.

In his TAC, Plaintiff's Eighth Amendment claim alleges that Dr. Sedighi failed to provide any pain medication on March 24, 2015. (*See* ECF No. 70 at 8–11.) Plaintiff has not provided any evidence to support this claim that Dr. Sedighi "did nothing to help" from May 2015 to August 2015. (*See id.* at 9.) There is no evidence showing that Dr. Sedighi saw Plaintiff after March 24–25, 2015. Additionally, Plaintiff's allegation regarding not being prescribed any pain medication is directly contradicted by his medical records.

Contrary to Plaintiff's assertions, the evidence indicates that Dr. Sedighi did give Plaintiff pain medication on March 24, 2015. (*See* ECF No. 80-1 at 85–86.)

According to Plaintiff's medical history, Dr. Sedighi prescribed pain medication at the two medical consultations he had with Plaintiff. On March 5th, Dr. Sedighi replaced Elavil with Trileptal in order to treat Plaintiff's seizures and pain. (*Id.* at 71–72.) Dr. Sedighi's March 24th medical consultation report indicates that Plaintiff was interested in restarting Elavil and was counselled on adhering to his medication, since there was an indication that Plaintiff was not compliant with taking his medication. (*Id.* at 85–86.) Dr. Sedighi then prescribed Elavil to help with Plaintiff's chronic headache and lower back pain, while indicating that there is no need for narcotic pain medication. (*Id.* at 86.) In sum, the record establishes that Dr. Sedighi did not purposefully ignore Plaintiff's serious medical need by failing to treat his pain.

Additionally, Plaintiff argues that Dr. Sedighi should have prescribed Gabapentin, or any other medication that he has not tried. (ECF Nos. 70 at 10–11; 82 at 4, 6; 85 at 3, 5.) Plaintiff believes these medications would treat his symptoms without any side effects, as opposed to Dr. Sedighi's choice of treatment. (ECF Nos. 82 at 4; 85 at 3, 5.) Plaintiff claims that Dr. Sedighi should have prescribed Gabapentin in 2015 since the evidence Plaintiff provided indicates that Gabapentin was prescribed in 2011 and 2016. (ECF No. 82 at 8, 11, 38–39, 41, 47, 56, 58, 65, 104.)

However, Dr. Feinberg declared that Gabapentin is only approved for postherpetic neuralgia and partial seizures, and not approved to treat any other types of seizures or pain. (ECF No. 80-1 at 3.) Dr. Feinberg states that the CCHCS has removed Gabapentin from its formulary due to growing evidence that it carries a risk of dependence, abuse, and misuse. (*Id.*) Further, failure to provide Plaintiff with the specific medication he requested or to follow another doctor's advice does not amount to deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *Womack v. Bakewell*, No. 2:10-CV-2778-GEB-DAD, 2013 WL 3148467, at *9 (E.D. Cal. June 2013) (finding that other doctors subsequently choosing to prescribe treatment that plaintiff requested does not necessarily show that the previous care

provided by the defendants was medically unacceptable, may have constituted a mere difference of opinion, neglect, or medical malpractice); *Christy v. Robinson*, 216 F. Supp. 2d 398, 415 (D.N.J. 2002) (finding that defendant was not deliberate indifferent for not agreeing with previous doctors and using defendant's own professional judgment).  Dr. Sedighi was not required to agree with prior medical providers or give the specific course of treatment that Plaintiff requested.

The record, viewed in the light most favorable to the Plaintiff, indicates that Dr. Sedighi's decision to not prescribe Gabapentin does not rise to the high standard for deliberate indifference.  In fact, Plaintiff's medical history supports Dr. Sedighi's choice of pain medication.  Therefore, Plaintiff has failed to raise a genuine and material factual dispute as to whether Dr. Sedighi was deliberately indifferent to Plaintiff's serious medical condition on March 24, 2015.

### c. Plaintiff's Unpled Allegation of Deliberate Indifference for Restarting Elavil

In his Opposition, Plaintiff alleges that on March 24, 2015 he informed Dr. Sedighi of his severe pain and that Elavil made him drowsy, dizzy, with suicidal thoughts.  (ECF No. 82 at 3.)  Yet, Plaintiff claims that Dr. Sedighi still prescribed Elavil after being told this by the Plaintiff.  (*Id.*)  Plaintiff alleges that Dr. Sedighi was deliberately indifferent for prescribing Elavil at 10 mg, claiming that 10 mg is a very low dosage that is considered as no treatment at all to control his severe nerve pain.  (*Id.* at 10.)  Plaintiff then goes on to allege that Dr. Sedighi also knew that Elavil was ineffective for his pain even at 75 mg. (*Id.*)  Plaintiff confirms his serious medical condition is severe pain that causes suicidal ideation and deprives him of life's necessities.  (*Id.* at 13.)

This claim is not in Plaintiff's TAC.  The Court finds it is not properly raised and Plaintiff has not offered any justification for his failure to raise it in his TAC.[32] *See Wasco*

---

[32] In fact, this new allegation directly contradicts Plaintiff's TAC wherein he alleged that Dr. Sedighi refused to prescribe him any pain medication.  (*See* ECF No. 70 at 10–11; *Cf.* ECF No. 82 at 4–6, 10.)

*Products*, 435 F.3d at 992 ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings"); *Brass*, 328 F.3d at 1197–98 (upholding the district court's finding plaintiff had waived § 1983 arguments raised for first time in summary judgment motion where nothing in amended complaint suggested those arguments, and plaintiff offered no excuse or justification for failure to raise them earlier); *see also James*, 253 F. Supp. 3d at 1091 n.3 ("Ninth Circuit precedent is clear: neither new factual allegations nor new claims presented in opposition to summary judgment are properly considered."); *Martin v. Rubalcava*, No. 2:12-CV-2232-EFB P, 2014 WL 794342, at *6 (E.D. Cal. Feb. 2014) ("Plaintiff may not, however, add new claims against defendant by way of his opposition to defendant's motion for summary judgment."); *Williams*, 2012 WL 1194160 at *9 n.3 (declining to consider plaintiff's attempt to transform his claim against a defendant doctor from one instance of cancelling a morphine prescription to a claim that the defendant doctor denied him pain medication for years).

The Court will nonetheless address the merits of this unpled and contradictory claim against Dr. Sedighi. As previously noted, Plaintiff may not rely on the allegations in the complaint to meet his burden, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Gonzales v. Carrillo*, No. EDCV 11-1028-JAK-JPR, 2013 WL 1700964, at *8 (C.D. Cal. Mar. 2013), *report and recommendation adopted,* No. EDCV11-1028-JAK-JPR, 2013 WL 1738422 (C.D. Cal. Apr. 2013) (granting defendant's motion for summary judgment when plaintiff failed to set forth specific facts or evidence demonstrating the existence of a triable issue that he was subject to an objectively substantial risk of harm while in the general population, despite plaintiff's subjective fear of imminent harm); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("[S]ummary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."); *Funk v. Schriro*, No. CV08-0739-PHXGMSJCG, 2009 WL 4898262, at *7 (D. Ariz. Dec. 2009) (granting summary judgment because Plaintiff failed to present specific facts or evidence

demonstrating that his placement in a certain prison unit exposed him to an objectively intolerable risk of harm).

Since this March 24, 2015 deliberate indifference allegation was not raised in Plaintiff's TAC, the Court applies this standard to Plaintiff's allegation in his Opposition. Accordingly, apart from his allegations in his Opposition, Plaintiff must come forward with specific facts indicating that Dr. Sedighi was deliberately indifferent on March 24, 2015 for restarting Plaintiff on 10 mg of Elavil.

Plaintiff's claim that Dr. Sedighi knew Elavil was ineffective at 75 mg for Plaintiff's pain is not supported by the record. Plaintiff has been on Elavil since he was in Calipatria state prison, at doses ranging from 25 mg to 75 mg. (*See* ECF Nos. 70 at 24, 26, 28; 80-1 at 17–18, 20, 32, 48–49, 51, 55, 57–58, 64–65; 82 at 23, 47.) None of Plaintiff's medical records indicate that Elavil was ineffective for his pain at 75 mg. Plaintiff's medical records actually support the opposite inference since Plaintiff has been consistently on Elavil from 25 mg to 75 mg for the past year. (*See* ECF Nos. 80-1 at 48–49, 51, 54–55, 57–58, 64–65, 71, 85–86; 82 at 23, 49–58.) In fact, on November 18, 2014, Dr. Chau increased Plaintiff's Elavil dosage after the Plaintiff stated that he "would like to increase the dose for the amitriptyline [to 75 mg]." (*Id.* at 65.)

Apart from Plaintiff's unsupported allegation that Dr. Sedighi knew Elavil was ineffective for his pain at 75 mg, Plaintiff alleges that on March 24, 2015 he told Dr. Sedighi the severeness of his pain and that Elavil made him drowsy, dizzy, with suicidal thoughts. (*See* ECF No. 82 at 3.) However, in his Opposition, Plaintiff does not allege that he told Dr. Sedighi that Elavil was also ineffective for his pain. (*See id.*) Dr. Sedighi's medical consultation on March 24, 2015 confirms that Plaintiff did not complain about Elavil being ineffective for pain. (*See* ECF 80-1 at 85–86.) Plaintiff has failed to raise a factual dispute as to whether Dr. Sedighi was made aware that Elavil was ineffective for pain. The Court will nonetheless address whether Dr. Sedighi was deliberately indifferent to Plaintiff's severe pain by prescribing 10 mg of Elavil.

///

1

*i.   Medically Unacceptable Treatment*

2

The issue presented is whether Plaintiff has presented sufficient facts to show that

3

the course of treatment chosen by Dr. Sedighi on March 24th, i.e. restarting Elavil for pain,

4

was medically unacceptable under the circumstances.  *See Jackson,* 90 F.3d at 332.

5

The Court adopts its findings in Section I(A)(2)(c)(i), in which the Court found that

6

there was insufficient evidence to show that Dr. Sedighi's course of treatment for Plaintiff's

7

severe pain on March 24th, i.e. prescribing Elavil, was medically unacceptable.  Whereas

8

Section I(A)(2)(c)(i) dealt with Dr. Sedighi restarting Plaintiff on Elavil wherein Plaintiff

9

alleged it caused him suicidal thoughts, this section deals with Dr. Sedighi restarting

10

Plaintiff on Elavil wherein Plaintiff alleges it was ineffective to Plaintiff's serious medical

11

need, severe pain.  (*See* ECF No. 80-1 at 86, 105.)

12

As analyzed above, Plaintiff's medical history supports Defendants' position that

13

Elavil for pain was a medically acceptable treatment for Plaintiff.  Plaintiff has been

14

prescribed Elavil throughout the years, even while at Calipatria state prison, with no

15

indication that Elavil was inappropriate for treating Plaintiff's pain.  (*See* ECF Nos. 70 at

16

24, 26, 28; 80-1 at 17–18, 20, 32, 48–49, 51, 55, 57–58, 64–65; 82 at 23, 47.)  On July 22,

17

2014, Dr. Chau noted that Plaintiff "denied any worsening of his back pain" while on Elavil

18

and continued its prescription.  (ECF No. 80-1 at 48–49.)  On November 18, 2014, Dr.

19

Chau increased Plaintiff's Elavil dosage after the Plaintiff stated that he "would like to

20

increase the dose for the amitriptyline [to 75 mg]." (*Id.* at 65.)

21

In support of their position, Defendants also provided Dr. Feinberg's declaration.

22

(*See id.* at 1–15.)  Based on his review of Plaintiff's medical records, Dr. Feinberg opined

23

that the treatments Dr. Sedighi provided Plaintiff were medically appropriate.  (*Id.* at 13.)

24

Dr. Feinberg stated that Dr. Sedighi responded to Plaintiff's complaint of pain on March

25

24, 2015 by restarting him on Elavil, which is a neuropathic pain medication clinically

26

appropriate for Plaintiff's complaint of pain.  (*Id.*)  Plaintiff, for his burden, has not

27

provided specific evidence to support his opinion that Elavil was inappropriate to treat his

28

pain.

Plaintiff's belief that he should have been prescribed something other than Elavil is at best, a difference of opinion, and does not rise to the level of deliberate indifference. *See Garcia v. Sleeley*, No. 314CV01525JLSPCL, 2018 WL 3303013, at \*11 (S.D. Cal. July 2018) (finding no deliberate indifference, only a difference of medical opinion, where defendants' "underprescribed" Plaintiff with a combination of "weak" pain relieving medications, where medications did not alleviate Plaintiff's severe pain, but rather enhanced the pain by causing serious side effects. Court held that defendants "responded to Plaintiff's medical needs in a way they saw fit" by making modifications to treatment.), *report and recommendation adopted as modified*, No. 14-CV-1525-JLS-PCL, 2018 WL 5134281 (S.D. Cal. Oct. 2018); *Rodriguez v. Kroxton*, No. CV 17-9231-DMG-KK, 2018 WL 339936, at \*4 (C.D. Cal. Jan. 2018) (finding that it is not deliberate indifference, only a difference of opinion, for the doctor prescribing different "ineffective" medications than requested); *Parlin v. Sodhi*, No. 10–6120-VBF-MRW, 2012 WL 5411710 at \*4 (C.D. Cal. Aug. 2012) ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication . . . represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation."); *Lua v. LAC CSP Med. Officials*, No. CV 10–3548-DOC-JCG, 2011 WL 1743260, at \*2–\*3 (C.D. Cal. March 2011) (finding prisoner who was placed on "lesser medications" instead of prisoner's requested pain relief medications, merely alleged a difference of medical opinion as to his preferred pain medication rather than an actionable claim of deliberate indifference). Also, Plaintiff is not entitled to request the prescription of a specific medication. *See Toguchi*, 391 F.3d at 1058.

In sum, Plaintiff has failed to provide evidence to support his unpled claim that it was medically unacceptable for Dr. Sedighi to restart Elavil. Therefore, viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has failed to establish that there is a material factual dispute and the Court finds that there is insufficient evidence

to show that Dr. Sedighi's course of treatment on March 24, 2015 for Plaintiff's severe pain, i.e. restarting Elavil, was medically unacceptable.

> ## ii.    Conscious Disregard of an Excessive Risk to Plaintiff's health

In his Opposition, Plaintiff alleges that Dr. Sedighi was deliberately indifferent for prescribing Elavil at 10 mg, which Plaintiff considers as a very low dosage that was the same as no treatment at all to control his severe pain.  (ECF No. 82 at 10.)  However, outside of his Opposition, Plaintiff has not provided any specific evidence supporting this claim.

Plaintiff's medical history shows that Dr. Sedighi took steps to address Plaintiff's complaints during his two medical consultations.  During Dr. Sedighi's March 5, 2015 consultation, Plaintiff indicated that Elavil only made him drowsy and depressed his mood further.  (ECF No. 80-1 at 71–72.)  Even though Dr. Sedighi replaced Elavil on March 5, 2015, there was no indication from this consultation that Elavil was ineffective for Plaintiff's pain.  (*See id.*)  During Dr. Sedighi's March 24, 2015 consultation, Plaintiff stated that he was having constant, and sometimes severe pain and indicated that Morphine and Gabapentin helped his headache and backpain in county jail.  (*Id.* at 85–86.)  Dr. Sedighi recounted Plaintiff's medical history, including his March 5th complaints, and noted that Keppra and Elavil were replaced by Trileptal for Plaintiff's seizure and chronic pain.  (*Id.* at 85.)  Dr. Sedighi counselled Plaintiff on taking his pain medication and noted that "[Plaintiff] showed interest in restarting amitriptyline. [And that he] will restart [Plaintiff] on amitriptyline 10 mg at bedtime for chronic pain that can help his chronic headache and chronic low back pain."  (*Id.* at 86.)  Dr. Sedighi found there was no indication for narcotic pain and that he will continue to monitor the Plaintiff.  (*Id.*)  Plaintiff verbalized his understanding.  (*Id.*)  At no time during either consultation did Plaintiff ever indicate that Elavil was ineffective at treating Plaintiff's pain, only that it caused drowsiness and depressed his mood further.

Such conduct by Plaintiff is consistent with his medical history, in which he was prescribed Elavil at varying doses, was compliant with taking the doses, and did not

complain about it being ineffective.  In fact, after being prescribed Elavil, Plaintiff had a medical consultation with Dr. Freyne.  (*Id.* at 108–09.)  Dr. Freyne noted that Plaintiff stated that he was fully compliant with his medications, one being Elavil, and reports doing well.  (*Id.*)  Dr. Freyne assessed Plaintiff and indicated that he is doing well, his medical issues were stable, and Plaintiff agreed with a treatment plan that included Elavil.  (*Id.* at 108.)

Dr. Sedighi's medical consultation provides specific evidence that he did not purposefully disregard Plaintiff's serious medical need, his severe pain, by prescribing Elavil.  Plaintiff's sole purpose for the March 24, 2015 consultation with Dr. Sedighi was to address his chronic headache pain.  (*Id.* at 85.)  Dr. Sedighi addressed Plaintiff's complaint of severe pain by prescribing a pain medication to which Plaintiff was accustomed to taking for his pain, Elavil.  Plaintiff even showed interest in restarting that specific pain medication. (*Id.* at 86.)  Additionally, Plaintiff has not brought forth evidence exhibiting Dr. Sedighi's intent to consciously disregarded Plaintiff's medical needs by restarting Elavil.

Ultimately, Plaintiff has failed to show that Dr. Sedighi's chosen course of treatment at Plaintiff's March 24, 2015 consultation to address his severe pain was medically unacceptable under the circumstances.  *See Jackson,* 90 F.3d at 332.  Further, Plaintiff presents insufficient evidence that Dr. Sedighi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *Id.*

### 3. Subjective Prong Analysis: Dr. Sedighi's Course of Treatment for Plaintiff's Seizures

Plaintiff must show that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and drew such inference.  *See Farmer,* 511 U.S. at 837.  Additionally, Plaintiff must present sufficient evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment was medically unacceptable under the circumstances, and that he chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson*, 90 F.3d at 332.

### a. Aware of Substantial Risk of Serious Harm

The issue presented is whether Dr. Sedighi was aware of a substantial risk of serious harm by not prescribing any seizure medication during the March 24, 2015 consultation. *See Farmer,* 511 U.S. at 837. Plaintiff alleges that Dr. Sedighi did not prescribe any seizure medication despite Plaintiff's complaints that it was discontinued for no reason and without further instructions on putting him on a different seizure treatment plan. (ECF No. 70 at 11.) Plaintiff claims that even though Dr. Sedighi knew that Plaintiff needed to be put back on seizure medication, Dr. Sedighi still decided to leave him without any seizure medication despite knowing that Gabapentin was effective at treating his seizures. (*Id.*)

Plaintiff's medical history shows that Plaintiff has been prescribed seizure medication before even being transferred to RJD. (ECF Nos. 70 at 26, 28; 80-1 at 17–18, 20, 24; 82 at 25, 69–71, 73–74, 78–80, 84.) Even before Dr. Sedighi's medical consultation, doctors at RJD had continuously treated Plaintiff for possible seizures and responded to Plaintiff's complaints. (ECF Nos. 70 at 27–28, 39–40, 43; 80-1 at 26, 30, 41, 48–49, 51–52, 54–55, 57–58, 60–62, 64–65, 67, 71–72; 82 at 44–46.) Additionally, Plaintiff has filed Health Care Service Request Forms, complaining of seizures and his seizure medication. (ECF No. 82 at 37, 53–58, 101.)

Further, Dr. Sedighi previously treated Plaintiff for his alleged seizures. (*See* ECF Nos. 70 at 39–40; 80-1 at 71–72.) On March 5, 2015, Dr. Sedighi's medical consultation notes indicate that Dr. Gorney referred Plaintiff to Dr. Sedighi for an evaluation of the side effects of Elavil and Keppra. (*See id.*) Dr. Sedighi noted that Plaintiff was taking Keppra for his seizure disorder. (*Id.*) Dr. Sedighi also indicated that Plaintiff claimed to have had a seizure the night before his admission to the crisis bed, but did not notify the medical staff. (ECF Nos. 70 at 39; 80-1 at 71.) Dr. Sedighi noted that Plaintiff has been seen by neurology twice and had two negative EEG exams. (*Id.*) Dr. Sedighi's notes indicate that Plaintiff's MRI on his brain was normal and there have been no eye witness reports regarding Plaintiff's seizure history. (*Id.*) Regardless, Dr. Sedighi changed Plaintiff's medication to Trileptal for his seizures and pain. (ECF Nos. 70 at 40; 80-1 at 72.)

However, on March 24, 2015, Dr. Sedighi was asked to evaluate Plaintiff's complaint of a chronic headache. (ECF No. 80-1 at 85.) According to his medical consultation notes, Dr. Sedighi summarized Plaintiff's pain complaints, noting that he was started on Trileptal for his chronic pain syndrome and seizures. (*Id.* at 85–86.) Plaintiff also claimed to have had a seizure a few nights prior, but Dr. Sedighi noted that there was no report of any witnessed seizure activity. (*Id.* at 85.) According to Dr. Sedighi's report, Plaintiff never asked for seizure medication nor complained about not being prescribed it. (*See id.* at 85–86.) Dr. Sedighi did note that Plaintiff's seizure history was questionable and that he would continue to observe Plaintiff for any seizure activity before restarting medication. (*Id.* at 86.)

Nevertheless, Plaintiff's medical history and interactions with Dr. Sedighi would have led Dr. Sedighi to be aware that Plaintiff may suffer from a substantial risk of harm by not being prescribed seizure medication. Despite multiple physicians questioning the veracity of Plaintiff's seizure activity, these physicians, including Dr. Sedighi, were still observing Plaintiff to determine the true diagnosis for these alleged seizures. A reasonable inference can be made that Dr. Sedighi was concerned with whether Plaintiff was suffering from these alleged seizures. Thus, the Court finds that Plaintiff has met his burden and raised a genuine material factual dispute as to whether Dr. Sedighi was aware of a substantial risk of serious harm to Plaintiff's health by not prescribing seizure medication on March 24, 2015.

### b. Deliberate Indifference for Not Prescribing Seizure Medication on March 24, 2015

#### i. *Medically Unacceptable Treatment*

In his TAC, Plaintiff alleges that Dr. Sedighi did not prescribe seizure medication despite Plaintiff's complaints that it was discontinued for no reason and without further instructions on putting him on a different seizure treatment plan. (ECF No. 70 at 11.) Plaintiff claims that he told Dr. Sedighi that he needed to be put back on seizure medication and recommended Gabapentin, but was willing to take other ones, because "something is

better than nothing." (*Id.*)  Plaintiff claims to have told Dr. Sedighi that "without any pills [his] seizures become very aggressive and severe to points where my tongue rolls back and I can't breathe." (*Id.*)  Plaintiff states that Dr. Sedighi knew that Gabapentin was effective, yet still decided to leave Plaintiff without any seizure medication.  (*Id.*)  Plaintiff states that Dr. Sedighi stated "he didn't care he was putting [Plaintiff's] life at risk of harm, neither what I was suffering.  He was just not going to put me in anything for no medical reason." (*Id.*)

Plaintiff must provide specific evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment on March 24, 2015 regarding Plaintiff's seizures, i.e. not prescribing seizure medication and observing Plaintiff for seizure activity, was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332.  A mere difference in medical opinion is insufficient to meet the high bar to establish deliberate indifference and Plaintiff is not entitled to request the prescription of a specific medication. *See Toguchi*, 391 F.3d at 1058.  Further, a showing of medical malpractice or negligence falls short of establishing deliberate indifference. *See Hamby*, 821 F.3d at 1092.

On March 24, 2015, Dr. Sedighi opined that Plaintiff's history of seizure was questionable and most possibly a psuedoseizure. (ECF No. 80-1 at 86.)  In support, Dr. Sedighi noted that "[Plaintiff] claims he has a seizure but there is no report of witnessed seizure activity. [Plaintiff] was seen by neurologist on 11/04/2014 and for follow up on 01/05/2015.  [Plaintiff] had a negative EEG x2 in 2011 and 2012, and his brain MRI was normal back in September 2011." (*Id.* at 85.)  Dr. Sedighi then decided to continue observing Plaintiff for any possible seizure activity before starting seizure medication. (*Id.*)

Regarding whether Dr. Sedighi's above course of treatment was medically acceptable, multiple physicians prior to Dr. Sedighi's March 24th medical consultation had questioned the veracity of Plaintiff's seizures.  On August 7, 2014, Dr. Chau stated that Plaintiff's seizure disorder was "questionable" and is waiting for an evaluation to confirm Plaintiff's seizure diagnosis. (*Id.* at 51–52.)  On October 3, 2014, Dr. Chau noted in his

15-cv-02059-AJB-BGS

assessment section that "[a]dditional further [seizure] medication may not be appropriate." (*Id.* at 57–58.)  On November 4, 2014, Dr. Malhorta stated that Plaintiff's alleged seizure was a "presumed seizure but there is no objective support & no convincing eyewitness account." (*Id.* at 61.)  On November 18, 2014, Dr. Chau stated that he will continue Keppra while the neurologist attempts to determine Plaintiff's seizure diagnosis.  (*Id.* at 65.)

Importantly, before Dr. Sedighi's March 24, 2015 consultation, a group of medical personnel had already decided that Plaintiff was to be placed on observation with no additional seizure medication.   On March 13, 2015**,** Dr. Bahro contacted the Chief of Mental Health and the Chief of Psychiatry regarding Plaintiff's treatment plan as to his seizures.  (*Id.* at 78.)  According to Dr. Bahro's notes, the Chief of Psychiatry told her that "medical indicates that per records (including neuro) there is a question to the veracity of the seizure dx and thus they want [Plaintiff] to be kept off anti-seizure meds for the time being." (*Id.*)  Further, when examining Plaintiff for a crisis bed transfer on March 18, 2015, NP Gysler noted that Plaintiff denied any complaints at that time and indicated that Plaintiff was on a temporary medical hold until April 28, 2015 and cannot leave RJD.  (*Id.* at 80.)

The above cited medical records support Dr. Sedighi's course of treatment as being medically acceptable.  Dr. Sedighi's report also indicates that he was following the medical treatment plan decided on March 13, 2015, stating "[p]er recommendation from neurologist [Plaintiff] has order for blood draw for prolactin level 20–30 minutes after possible seizure activity. We will continue to monitor [Plaintiff]." (*Id.* at 86.)

Moreover, physicians after Dr. Sedighi's March 24, 2015 medical consultation continued to question Plaintiff's alleged seizure disorder and acknowledged that Medical was trying to determine Plaintiff's condition before prescribing medication.  On the night of March 24th, the treating physicians at Sharp Chula Vista Medical Center noted that Plaintiff had "no evidence of seizures." (*Id.* at 93–101.)  On March 25, 2015, Dr. Brown also indicated that Plaintiff was not being prescribed seizure medication because Plaintiff has never had a witnessed seizure and met with neurology twice without being given a seizure disorder diagnosis. (*Id.* at 103.)  Dr. Brown noted that "Medical is trying to confirm

the diagnosis before prescribing additional [seizure] medications." (*Id.*)  This further provides additional circumstantial evidence that observing Plaintiff before restarting seizure medication was a medically acceptable treatment under the circumstances.

Other physicians, before and after the March 24, 2015 consultation, following the same course of treatment as Dr. Sedighi provides corroboration that Dr. Sedighi did not depart from the accepted professional standards in treating Plaintiff.  *See Davis v. Ghosh*, No. 13-CV-4670, 2015 WL 3396805, at *5 (N.D. Ill. May 2015) (finding that the defendant was not deliberately indifferent when defendant continuously treated plaintiff and found that the treatment was not a substantial departure from the accepted professional standards when other treating physicians pursued nearly identical treatment plans); *see also Brown v. Mace-Liebson*, 779 F. App'x 136, 142 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 1304 (2020) (finding that the doctor was not deliberately indifferent in denying plaintiff's request for an MRI or surgery, where evidence shows doctor exercised professional judgment during treatment, did not suggest denial or delay of treatment was due to non-medical reasons, and other physicians pursued similar course of treatment); *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (holding that the plaintiff "did not submit evidence from which a jury reasonably could find that [the doctor's] exercise of medical judgment departed significantly from accepted professional norms" where doctor's denial of treating plaintiff with a MRI was endorsed by other doctors that treated plaintiff as well, thus not establishing plaintiff's claim for deliberate indifference).  In fact, these physicians were trying to accurately diagnose Plaintiff's condition before prescribing any medication since Plaintiff continued to have unwitnessed seizures after trying multiple different types of seizure medications.

Additionally, Dr. Feinberg declared that Dr. Sedighi's decision to continue to observe Plaintiff for seizure activity before restarting seizure medication was medically appropriate under the circumstances.  (ECF No. 80-1 at 13–14.)  Dr. Feinberg stated that other physicians had already determined that it was appropriate to observe Plaintiff before restarting seizure medication and there was no reason on March 24, 2015 for Dr. Sedighi

to change that treatment plan.  (*Id.* at 13.)  Dr. Feinberg declared that there were multiple aspects of Plaintiff's medical history which supported the decision to observe Plaintiff for seizure activity before restarting medication, such as being unwitnessed despite their frequency and no objective tests at the time supported Plaintiff's claim of seizure disorder. (*Id.* at 13–14.)

Plaintiff has not provided specific facts that cast doubt on Defendants' expert testimony regarding whether Dr. Sedighi's chosen course of treatment for Plaintiff's seizures was medically unacceptable under the circumstances.  *See Barkley v. California Corr. Health Care Servs.*, No. 216CV01386KJMCKDP, 2018 WL 6508052, at *10 (E.D. Cal. Dec. 2018) (finding that plaintiff's deliberate indifference claim fails since "Plaintiff has not submitted any evidence to cast doubt on defendants' unrefuted expert testimony which establishes that prescribing Sulindac was medically appropriate under the circumstances and within the standard of care and skill ordinarily exercised by reputable members of the medical profession at that time.")

Plaintiff argues that Dr. Sedighi should have prescribed Gabapentin, or any other medication that he has not tried, as opposed to Dr. Sedighi's choice of treatment.  (ECF Nos. 70 at 10–11; 82 at 4, 6; 85 at 5.)  Plaintiff claims that Gabapentin was an appropriate medication, since it has been prescribed in 2011 and 2016.[33]  (ECF No. 82 at 8, 10–12.) However, Plaintiff's belief that he should have been given a different course of treatment does not rise to the level of deliberate indifference and is at best, a difference of opinion. And a mere difference in opinion is insufficient to meet the high bar to establish deliberate indifference.  *See Toguchi*, 391 F.3d at 1058.  Also, Plaintiff is not entitled to request the

---

[33] In a follow up Neurology Note dated October 8, 2011, Dr. Straga reported that Plaintiff claimed he had a seizure on September 28, 2011.  (ECF No. 80-1 at 20.)  Dr. Straga noted that at the time of the seizure, Plaintiff was taking 300 mg of Neurontin and 500 mg of Keppra.  (*Id.*)  Plaintiff's October 14, 2011 Medication Reconciliation reveals Neurontin was ordered to be stopped in two weeks.  (*Id.* at 24.) Further, Dr. Noonan's October 14, 2011 PCP Progress Note indicated that neurology recommended discontinuing Neurontin.  (ECF No. 70 at 27.)  These medical reports directly contradict Plaintiff's position about the effectiveness of Gabapentin in 2011.

prescription of a specific medication and failure to follow another doctor's advice does not amount to deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *Christy*, 216 F. Supp. 2d at 415 (finding that the defendant was not deliberate indifferent for not agreeing with previous doctors and using defendant's own professional judgment). Dr. Sedighi was not required to give the specific course of treatment that Plaintiff requested or agree with prior medical providers.

Plaintiff has not presented sufficient evidence to allow a jury to reasonably infer that Dr. Sedighi's course of treatment was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332. Dr. Sedighi's decision to observe Plaintiff for seizure activity and not prescribe seizure medication is corroborated by multiple other physicians that also treated Plaintiff. These physicians, including the Chief of Psychiatry and the Chief of Mental Health, questioned Plaintiff's seizure disorder and had already determined that no seizure medication be provided to the Plaintiff until there is a true diagnosis for the seizure disorder. (*See* ECF No. 80-1 at 41, 49, 51, 57–58, 60–61, 64–65, 67, 72–73, 78, 85–86, 93, 95, 103.) On March 24, 2015, Dr. Sedighi followed the medical treatment plan already put in place by these physicians. Therefore, the Court finds that Plaintiff has failed to show a material factual dispute as to whether Dr. Sedighi's course of treatment on March 24, 2015, observing Plaintiff for seizure activity and not prescribing seizure medication, was medically unacceptable under the circumstances.

           ii.     *Conscious Disregard of an Excessive Risk to Plaintiff's health*

Aside from the analysis above finding that Plaintiff failed to show that Dr. Sedighi's course of treatment regarding Plaintiff's seizures was medically unacceptable, the Court also finds that there is insufficient evidence that Dr. Sedighi consciously disregarded an excess risk to Plaintiff's health. In his TAC, Plaintiff alleges that Dr. Sedighi knew that Gabapentin was effective, yet still decided to leave Plaintiff without any seizure medication. (ECF No. 70 at 11.) Plaintiff states that "[Dr. Sedighi] didn't care he was putting [Plaintiff's] life at risk of harm, neither what I was suffering. [Dr. Sedighi] was just not going to put me in anything for no medical reason." (*Id.*)

Despite Plaintiff's allegation that Dr. Sedighi disregarded his serious medical need by not prescribing seizure medication, Plaintiff's medical history shows that Dr. Sedighi continuously took care of Plaintiff's needs.  On March 5, 2015, Dr. Sedighi had a consultation with Plaintiff regarding an evaluation of Elavil's and Keppra's side effects. (ECF No. 80-1 at 71.)  At this consultation, Plaintiff complained that Elavil and Keppra made him feel drowsy and more depressed and wanted them to be changed because he did not like those effects. (*Id.*)  Dr. Sedighi changed Plaintiff's medications to Trileptal, stating "that [it] can be used for seizure and chronic pain management." (*Id.* at 71–72.)

Then on March 24, 2015, Dr. Sedighi saw Plaintiff in order to treat his chronic headache, which Plaintiff complained of during his March 19, 2015 consultation with Nurse Gavin. (*Id.* at 82–83, 85.)  At the consultation, Plaintiff complained about his chronic headache and chronic lower back pain. (*Id.* at 85.)  Dr. Sedighi prescribed Elavil for Plaintiff's pain and stated there is no indication for narcotic pain medication. (*Id.* at 86.)  Further, Dr. Sedighi indicated that he will continue to monitor Plaintiff as to his seizure activity. (*Id.*)  Plaintiff verbalized that he understood. (*Id.*)  Even after Plaintiff's alleged seizure on the night of March 24th, Dr. Sedighi was there to treat Plaintiff before sending him to the ER and was there to treat the Plaintiff when he returned.[34] (*Id.* at 91.)

In sum, Dr. Sedighi's conduct towards Plaintiff demonstrates that Dr. Sedighi sought to care and treat Plaintiff's medical needs, not disregarded them.  The records do not support Plaintiff's allegation that he had a sufficiently culpable state of mind when providing his care. *See Wallis*, 70 F.3d at 1076.  Plaintiff's two medical consultations with Dr. Sedighi show that Dr. Sedighi was responsive to Plaintiff's complaints and did not purposefully disregarded them.  Both March 5th and March 24th Medical Consultation reports included detailed notes of Plaintiff's recent medical history, Plaintiff's complaints,

---

[34] Dr. Sedighi ordered a one-on-one sitter to monitor Plaintiff for seizure activity and a wheel chair to assist Plaintiff in moving around outside of his cell.  (ECF No. 70 at 45.)

and Dr. Sedighi's assessment and recommendations. (ECF No. 80-1 at 71–72, 85–86.) Dr. Sedighi did not omit any important information from his Medical Consultation reports, thereby allowing subsequent medical personnel to be able to properly evaluate Plaintiff. On the other hand, Plaintiff has not brought forth evidence exhibiting Dr. Sedighi's intent to consciously disregarded Plaintiff's medical needs.

Therefore, viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has failed to show that Dr. Sedighi's chosen course of treatment for Plaintiff's seizures on March 24, 2015 was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332. Further, Plaintiff failed to present sufficient evidence indicating that Dr. Sedighi chose this course of treatment was in conscious disregard of an excessive risk to Plaintiff's health. (*Id.*)

### 4. Plaintiff's Eighth Amendment Claim against Dr. Doe #1 for Discontinuing His Pain and Seizure Medication

In his TAC, Plaintiff alleges an Eighth Amendment claim against "Dr. Doe #1" for taking him off of seizure and pain medication.[35] (ECF No. 70 at 10.) In a footnote, Plaintiff makes the unsupported allegation that he learned that Dr. Doe #1 was Dr. Sedighi. (*Id.* at 10 n.1.) According to Plaintiff, he complained to Dr. Bahro on March 13, 2015 that he was not prescribed any pain or seizure medication. (*Id.*) Plaintiff states that "[he] asked [Dr.] Bahro [. . .] to call a head doctor. She sent an e-mail to doctor, and doctor send Dr. Bahro an email stating [he] wont be getting anything." (*Id.*) Plaintiff claims that it was Dr.

_____

[35] Plaintiff further alleges that his pain and seizure medications were discontinued on or about April 11–18, 2015 and cites to page 548 of Exhibit E in his TAC. (ECF No. 70 at 10.) Plaintiff attached Dr. Bahro's Interdisciplinary Progress Notes dated March 13, 2015 with a handwritten "548" in the upper right corner of the page. (*Id.* at 43.) It can be inferred that Plaintiff is citing to Dr. Bahro's Interdisciplinary Progress Notes, since this is only document in Exhibit E that displays the number "548." Additionally, when he summarizes his medical history, Plaintiff states that he was taken off of pain and seizure medication on March 13, 2015 and states that it was Dr. Sedighi who discontinued Plaintiff's seizure medication. (*Id.* at 8, 8 n.1.) Therefore, the Court interprets Plaintiff's allegation that it was Dr. Sedighi, not Dr. Doe #1, who discontinued Plaintiff's pain and seizure medications which occurred on March 13, 2015.

Sedighi who was the doctor that ordered the discontinuation of Plaintiff's pain and seizure medication. (*Id.* at 8 n.1, 10 n.1.)

Plaintiff's unsupported claim in his TAC, alleging that Dr. Sedighi was the one to discontinue Plaintiff's pain and seizure medication, is directly contradicted by his medical records. Plaintiff's medical history shows that Dr. Sedighi was not the person that took Plaintiff off of his pain and seizure medication on March 13, 2015. (*See* ECF No. 80-1 at 75–78.) On that date, Nurse Boucher addressed Plaintiff's complaint regarding a rash all over his neck, chest and back that caused discomfort. (*Id.* at 75.) Nurse Boucher wrote that there were no previous episodes and indicated that Plaintiff was previously prescribed Trileptal. (*Id.*) Nurse Boucher completed the "MD referral" and noted that Plaintiff was to discontinue Trileptal.[36] (*Id.*) Nurse Boucher then contacted a physician to discuss the discontinuation of other medications and indicated that they are to schedule a follow-up appointment with a physician if Plaintiff does not show improvement after three days. (*Id.*) Although it is difficult to interpret what Nurse Boucher wrote in the "Additional Comments" section, it appears that Nurse Boucher indicated that Plaintiff is to be admitted if there is any increase in Plaintiff's seizures and to contact medical immediately. (*Id.* at 76.) Then Nurse Boucher wrote that Plaintiff understood in his own words that he is to utilize urgent/emergency system, if seizures occur. (*Id.*) Nurse Boucher then noted that Plaintiff is to take Vistaril as prescribed to treat his rash and to seek medical attention if the rash worsens. (*Id.*)

Later that same day, Dr. Bahro met with Plaintiff due to his concerns about his health and not being on any seizure medication. (ECF Nos. 70 at 43; 80-1 at 78.) After Plaintiff complained that he had not been prescribed any seizure medication, Dr. Bahro consulted with Nurse Boucher, the Chief of Psychiatry, and the Chief of Mental Health, whom all agreed upon the protocol in not prescribing Plaintiff any seizure medication. (*Id.*) This

---

[36] Trileptal was prescribed for Plaintiff's pain and seizures. (*See* ECF No. 80-1 at 72.) As such, it was Nurse Boucher who discontinued Plaintiff's pain and seizure medication, not Dr. Sedighi.

decision was based on the information received from the Chief of Psychiatry, who decided that Plaintiff's medical records indicated there was a question to the veracity of Plaintiff's alleged seizures and decided to keep Plaintiff off seizure medications "for the time being." (*Id.*)

In sum, the record establishes that Dr. Sedighi did not discontinue Trileptal, Plaintiff's pain and seizure medication, on March 13, 2015. Plaintiff's medical records also establish Dr. Sedighi did not play a part in deciding to not prescribe any seizure medication. In sum, Plaintiff has failed to provide sufficient evidence showing that Dr. Sedighi was the one who discontinued Plaintiff's pain and seizure medications on March 13, 2015. Therefore, Plaintiff's deliberate indifference claim against Dr. Sedighi for discontinuing his pain and seizure medications fails.

Therefore, based on everything stated above, the Court finds that Dr. Sedighi was not deliberately indifferent to Plaintiff's medical needs. The Court **RECOMMENDS** Defendants' Motion for Summary Judgment (ECF No. 80) as to Plaintiff's Eighth Amendment claim against Dr. Sedighi be **GRANTED**.

### C. Plaintiff's Eighth Amendment Claim Against Nurse Busalacchi as to Plaintiff's Pain and Seizures

Plaintiff alleges that Defendant Nurse Busalacchi acted with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment. (ECF No. 70.) Defendants move for entry of summary judgement against Plaintiff on this claim. (ECF No. 80.) This Section addresses Plaintiff's allegations in his TAC that Nurse Busalacchi was deliberately indifferent for increasing Plaintiff's pain medication and continuing Plaintiff's seizure medication on April 13, 2015. (*See* ECF No. 70.)

1. Objective Prong Analysis: Serious Medical Need as to Plaintiff's Pain and Seizures

The objective prong requires a prisoner to show deliberate indifference to a "serious" medical need in order to establish an Eighth Amendment claim for a prison official being deliberately indifferent to a prisoner's serious medical needs. *McGuckin,* 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* As discussed in Section I(B)(1), Plaintiff claims that his pain and seizures are a serious medical condition. (ECF Nos. 70 at 13; 82 at 13, 18–19.)

### a. Serious Medical Need: Pain

Pain that it is so severe that he has been unable to fulfill his basic needs of eating, sleeping, and going to the bathroom is considered a serious medical need. *See McGuckin*, 974 F.2d at 1060 (citing *Wood*, 900 F.2d at 1337–41; *Hunt*, 865 F.2d at 200–01). In his TAC and pleadings, Plaintiff claims he suffers from severe pain and that Elavil is ineffective for his pain, causing him to have suicidal thoughts and other severe side effects that deprives Plaintiff of life's necessities. (*See* ECF Nos. 70 at 13; 82 at 13; 85 at 7.) Severe pain that causes such effects is a serious medical condition. Further, Plaintiff's medical history corroborates that he suffers from chronic pain and has consistently been prescribed pain medication. The Court finds that Plaintiff has established a material issue of fact as to whether he has a serious medical condition, i.e. severe pain. Therefore, the Court considers Plaintiff's severe pain as a serious medical need.

### b. Serious Medical Need: Seizures

Alleged seizures are considered a serious medical condition regardless if "they occur as a result of a diagnosed condition, such as epilepsy [ ] or from an unknown or undiagnosed condition." *Mellender*, 2006 WL 3091111, at *4 (citing *Hudson*, 148 F.3d at 864). Plaintiff has presented evidence that on April 13, 2015 he was suffering from an alleged seizure disorder. (*See* ECF Nos. 70 at 13; 82 at 18.) In her report, Nurse Busalacchi noted that Plaintiff indicated that his last seizure was on March 24, 2015 and was currently on Dilantin to treat his seizures. (*See* ECF No. 80-1 at 105.) Plaintiff's medical history also establishes this medical need, in that Plaintiff has consistently been prescribed seizure medication. Therefore, the Court considers Plaintiff's alleged seizure disorder as a serious medical need.

///

2.   Subjective Prong Analysis: Increasing Elavil for Plaintiff's Pain

In his TAC, Plaintiff alleges that on April 13, 2015 he told Nurse Busalacchi that "Elavil was once prescribed to [Plaintiff] in 2011 but months after was taken off due to the Elavil was ineffective to [the] 3 symptoms [Plaintiff] had (1) Neuropathy; (2) Head nerve damage; (3) Top back and neck nerve damage. It was also taken off because the side effects were severe enough to what the 8th Amendment has consider to be a violation of its right." (ECF No. 70 at 19–20.)  Plaintiff also alleges that Elavil was taken off due to causing severe side effects, such as "(1) nausea; (2) deprivation of sleep; (3) deprivation of walking; (4) deprivation of able to eat and sustain food on my stomach; (5) falling and hurting myself due to dizziness of the side effect. (6) interfere with breathing, severe pain."  (*Id.* at 20.) Plaintiff states that Nurse Busalacchi knew Elavil "was taken off on March 2015 due to been part of why [he] try to commit suicide" and that "the medication did work for [his] neuropathy & head nerve damage was Neurontin" but was willing try something else other than Elavil.  (*Id.*)  Plaintiff states that after telling Nurse Busalacchi all of this, she "still sustain Elavil, actually she raised dosage not caring it was putting [his] life at risk and medication was ineffective for [his] nerve pain."  (*Id.*)

For a claim for deliberate indifference, the Plaintiff must show that Nurse Busalacchi was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and drew such inference.  *See Farmer,* 511 U.S. at 837.  Plaintiff must then present sufficient evidence for a jury to reasonably infer that Nurse Busalacchi's course treatment was medically unacceptable under the circumstances, and that Nurse Busalacchi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson*, 90 F.3d at 332.

a.   Aware of Substantial Risk of Serious Harm

The issue presented is whether Nurse Busalacchi was aware that a substantial risk of serious harm existed by raising Elavil's dose, and drew such inference.  *See Farmer,* 511 U.S. at 837.  In his TAC, Plaintiff alleges that he told Nurse Busalacchi on April 13, 2015 that Elavil was taken off in 2011 for being ineffective to his severe pain.  (*See* ECF No. 70

71

at 19.)  This allegation is unsupported by the record.  Although Plaintiff's medical history shows that Elavil was discontinued in 2011, no explanation was given for its discontinuation.  (*See* ECF No. 80-1 at 17–18.)  Dr. Straga's Neurological Consultation dated August 23, 2011 indicated that Plaintiff had been taken off Elavil once he arrived to Calipatria State Prison, but no explanation was given for why it was taken off.  (*Id.*)  Nothing in Plaintiff's medical history would have led Nurse Busalacchi to draw the inference that Elavil was discontinued in 2011 due to being ineffective for his severe pain.

Plaintiff's medical records show an extensive medical history in which he was continuously prescribed Elavil between 25 mg and 75 mg for chronic pain, yet Plaintiff had not made any complaints that Elavil was ineffective or caused severe side effects.  (*See* ECF Nos. 70 at 24, 26, 28; 80-1 at 17–18, 20, 24, 30, 32, 48–49, 51, 54–55, 57–58, 64–65, 71, 85–86, 95, 103; 82 at 23, 47, 49–58.)  On December 19, 2012, a Medical Administration Record shows that Plaintiff was prescribed 25 mg of Elavil.  (ECF No. 80-1 at 34.)   On April 10, 2014, a Medical Administration Record indicates that Plaintiff was still taking 25 mg of Elavil.  (*Id.* at 34.)  On July 22, 2014, Dr. Chau's Medical Progress Note indicates that Plaintiff's Elavil prescription was continued after Plaintiff denied any worsening of his back pain.  (*Id.* at 48.)  Dr. Chau's August 7, 2014 Medical Progress Note indicates that Plaintiff was now on 50 mg of Elavil.  (*Id.* at 51.)  Dr. Chau's August 22, 2014 Medical Progress Note shows that Plaintiff was not in any acute distress and made no complaints that 50 mg of Elavil was ineffective to his severe pain.  (*Id.* at 55.)  In fact, Plaintiff sought to increase his Elavil dosage from 50 mg to 75 mg on November 18, 2014.  (*Id.* at 64.)  In sum, Plaintiff's medical history would not have made Nurse Busalacchi aware that Elavil was ineffective for Plaintiff's severe pain.  These records support the opposite conclusion and provide a justification for increasing Plaintiff's dose from 10 mg to 25 mg in response to Plaintiff's complaint about pain.

In his Opposition, Plaintiff refers to Nurse Busalacchi's PCP Progress Note regarding her consultation with Plaintiff on April 13, 2015 to support his claim that Nurse Busalacchi knew that Elavil was ineffective for Plaintiff's severe pain.  (*See* ECF Nos. 80-

1 at 105; 82 at 14.)  Nurse Busalacchi was assigned to follow up on Plaintiff's 602 Form appealing the denial of his request to switch to Gabapentin or Morphine.  (ECF No. 80-1 at 105.)  In his 602 Form dated March 29, 2015, Plaintiff claims that "on or about March 11–17, 2015 doctors took me off of seizure and neuropathy pain med. They wanted to witness or see a seizure. I told them that 'They were playing with my health,' they didn't care. [. . .] Requesting Gabapentin or morphine for such pain and also for my neuropathy pain." (ECF No. 70 at 34.)  Of note, Plaintiff made no complaints regarding Elavil in his 602 Form.  (*See id.*)  Plaintiff's 602 Form did not provide notice to Nurse Busalacchi that Plaintiff was making any complaint about Elavil being ineffective to his pain or causing severe side effects.  In fact, it appears that Plaintiff was still under the impression that he had not been provided any pain medication.

On April 13, 2015, Nurse Busalacchi saw Plaintiff regarding his 602 From and provided detailed notes in her PCP Progress Note.  (ECF No. 80-1 at 105.)  Nurse Busalacchi noted that Plaintiff was currently on Elavil, while noting Plaintiff's complaint that 10 mg of Elavil was ineffective.  (*Id.*)  Nurse Busalacchi also indicated that Neurontin and Morphine will not be prescribed.  (*Id.*)  Plaintiff then agreed to Nurse Busalacchi's plan on increasing Elavil to 25 mg and being referred for pain management.  (*Id.*)  Plaintiff does not dispute that he made these statements.  (*See* ECF No. 82 at 19.)  A reasonable inference can be made from this April 13th PCP Progress Note that Nurse Busalacchi was made aware by Plaintiff that Elavil was ineffective to Plaintiff's pain at a dosage of 10 mg.

This reasonable inference is also corroborated by Plaintiff's medical history of being prescribed Elavil at dosages of 25 mg to 75 mg for pain.  An increase from 10 mg to 25 mg was consistent with the prior year's prescriptions.  It was not until Plaintiff was seen by Nurse Manning on May 1, 2015 that Plaintiff indicated that Elavil was not helping him at 25 mg.  (*Id.* at 100.)  Nurse Manning noted that Plaintiff stated, "[p]ain gets so bad sometimes that I felt suicidal, but I'm not suicidal now." (*Id.*)  The Nurse reported that on April 13, 2015, Plaintiff was referred to "M.H." for pain management and had his Elavil dosage increased.  (*Id.*)  At this consultation, Plaintiff stated, "Elavil is not helping me,

even after increase." (*Id.*)  Such a statement provides circumstantial evidence that, at most, Nurse Busalacchi was only aware that a 10 mg dose of Elavil was ineffective for Plaintiff's pain.

In his Sur-reply, Plaintiff alleges that Nurse Busalacchi knew that "on 3-5-15 Amitriptyline got taken off when it was at 75 mg due to its ineffectiveness and life-threatening side effect. [. . .] [Nurse Busalacchi] should have known it will be ineffective." (ECF No. 85 at 8.)  Plaintiff's allegation that Elavil was discontinued on March 5, 2015 due to being ineffective to his severe pain is unsupported by the record.  (*See* ECF Nos. 70 at 39, 42; 80-1 at 71–73.)  On March 5, 2015, Dr. Sedighi saw Plaintiff after Dr. Gorney referred Plaintiff to him for an evaluation of Elavil's and Keppra's side effects.  (ECF No. 80-1 at 72.)  Regarding Elavil, Plaintiff stated that it made him drowsy, depressed his mood further, and did not like those effects.  (*Id.*)  At the time, Plaintiff was taking 75 mg of Elavil.  (*Id.* at 71.)  In response to Plaintiff's complaints, Dr. Sedighi replaced Elavil with Trileptal to treat Plaintiff's pain.  (*Id.* at 72.)  Plaintiff made no complaints to Dr. Gorney or Dr. Sedighi that Elavil was ineffective to his pain.  Further, neither Dr. Gorney nor Dr. Sedighi made any finding or even a suggestion that Elavil might be ineffective to treat Plaintiff's pain.  These facts support a reasonable inference that Dr. Sedighi changed Plaintiff's Elavil prescription on March 5, 2015 because Plaintiff did not like feeling drowsy and having it depress his mood further, not because it was ineffective for his pain.

Therefore, based on Nurse Busalacchi's PCP Progress Note, the Court finds that in the light most favorable to the Plaintiff, while not making any credibility findings, that Nurse Busalacchi was aware that Elavil was ineffective to Plaintiff's pain at 10 mg.  (*See id.* at 105.)

### b.  Deliberate Indifference for Increasing Elavil on April 13, 2015

#### i.  *Medically Unacceptable Treatment*

The Court adopts its findings in Sections I(A)(2)(c)(i) and I(A)(3)(b)(i), wherein the Court found that both Dr. Sedighi prescribing Elavil and Nurse Busalacchi increasing Elavil for Plaintiff's pain were medically acceptable course of treatments.  Plaintiff has

failed to provide sufficient evidence showing that such treatment was medically unacceptable for his pain. Given Plaintiff's medical history as detailed in these sections, along with Plaintiff's lack of complaints about Elavil, the only reasonable conclusion is that Elavil has been a medically acceptable treatment plan for Plaintiff and with Plaintiff's approval.

Plaintiff has not provided any medical professional's opinion that Elavil was ineffective and/or otherwise medically unacceptable for treating Plaintiff's severe pain. The Defendants have provided Dr. Feinberg's declaration, wherein he declared that Elavil is a neuropathic pain medication clinically appropriate for Plaintiff's complaint of pain and that it was medically appropriate for Nurse Busalacchi to decline to prescribe Plaintiff Gabapentin and Morphine on April 13, 2015. (*See* ECF No. 80-1 at 13.) Dr. Feinberg stated that Plaintiff had recently been restarted on medically appropriate medications to treat his neuropathy and that there was no medical indication that a change in medication was necessary or appropriate. (*Id.* at 14.)

As detailed in the above cited sections, the Court finds that Plaintiff's request for Morphine and Gabapentin portrays a situation wherein Plaintiff wants his specific course of treatment. However, failure to provide Plaintiff with the specific medication he requested does not amount to deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *see also Parlin*, 2012 WL 5411710 at *4 ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication [. . .] represents precisely the type of difference in medical opinion between lay prisoner and medical personnel that is insufficient to establish a constitutional violation."). Further, both Dr. Sedighi and the Director who decided Plaintiff's last appeal found that narcotic medication was inappropriate. (*See* ECF Nos. 70 at 33; 80-1 at 86.)

Nothing in Plaintiff's medical history indicates that Elavil was a medically unacceptable treatment for his severe pain. Furthermore, Plaintiff has failed to provide specific facts showing that Nurse Busalacchi's increase of Plaintiff's Elavil dosage was medically unacceptable under the circumstances. Therefore, viewing the evidence in the

light most favorable to the Plaintiff, the Court finds that there was insufficient evidence to show that Nurse Busalacchi's course of medical treatment for Plaintiff's severe pain, i.e. increasing Elavil to 25 mg, was medically unacceptable.

           *ii.*   *Conscious Disregard of an Excessive Risk to Plaintiff's health*

Aside from the analysis above, the Court also finds that Plaintiff has provided insufficient evidence indicating that Nurse Busalacchi consciously disregarded Plaintiff's serious medical need of severe pain.

Plaintiff's medical records shows an extensive history of being prescribed Elavil for his pain by treating physicians for the past year and a half, his compliance with his Elavil doses, and even his desire to increase its dosage. (*See* ECF Nos. 70 at 24, 26, 28; 80-1 at 17–18, 20, 24, 30, 32, 48–49, 51, 54–55, 57–58, 64–65, 71, 85–86, 95, 103; 82 at 23, 47, 49–58.) Plaintiff's medical history shows that he has continuously been given 25 mg to 75 mg of Elavil with no complaints that it was ineffective to his pain or that it caused severe side effects. In addition, nothing from the submitted exhibits supports Plaintiff's allegation that Elavil was discontinued due to being ineffective to his pain or causing severe side effects. (*See* ECF No. 70 at 19–20; *see also* ECF Nos. 70 at 39, 42; 80-1 at 17–18, 71–72.) Nurse Busalacchi raising Plaintiff's Elavil prescription to 25 mg was consistent with the minimum dosage for Elavil that Plaintiff had been given for at least the past year and a half. The only reasonable inference the Court draws from Nurse Busalacchi's conduct is that she was trying to help Plaintiff's serious medical need because it had worked for Plaintiff in the past.

Nurse Busalacchi's PCP Progress Note did not omit any of the significant details of the consultation with Plaintiff. It included detailed notes of Plaintiff's complaints and addressed Plaintiff's issues listed in his 602 Form. (ECF No. 80-1 at 105.) As to Plaintiff's pain, Nurse Busalacchi indicated that Plaintiff complained that he was unable to sleep due to the pain and that 10 mg of Elavil was ineffective to treating this pain. (*Id.*) Nurse Busalacchi noted that she told him that Gabapentin and Morphine will not be prescribed. (*Id.*) For his pain, Nurse Busalacchi indicated that she will increase Elavil to 25 mg to treat

Plaintiff's pain and refer him to pain management.  (*Id.*)  Plaintiff understood and agreed with this plan.  (*Id.*)

Plaintiff claims that Nurse Busalacchi denied his request to change his Elavil prescription to Neurontin for three reasons: "(1) [Nurse Busalacchi] don't feel like changing prescription because although [Plaintiff] have falling due to side effects, [Plaintiff] is still alive without broken bones or in a coma, (2) all inmates lie, [and] (3) [Nurse Busalacchi] has [too] much work, don't got the strength and time to do paperwork."[37]  (ECF No. 70 at 16.)  But failure to provide Plaintiff with the specific medication he requested and differences in judgment regarding an appropriate medical treatment is not enough to establish deliberate indifference.  *See Jackson*, 90 F.3d at 332; *Toguchi*, 391 F.3d at 1058.

Further, Plaintiff has not brought forth any specific evidence to support his allegations about Nurse Busalacchi's intent to consciously disregard his serious medical need.   In fact, his alleged comments are contradicted by his subsequent medical consultation with Dr. Freyne on April 29, 2015.  (*See* ECF 80-1 at 108–109.)  Plaintiff reported that he was doing well and was compliant with his medications, which included Elavil at 25 mg.  (*Id.* at 108.)  Plaintiff even agreed with this treatment plan.  (*Id.* at 109.)

Even if the Plaintiff sufficiently showed that Nurse Busalacchi consciously disregarded an excess risk to his health, Plaintiff's claim for deliberate indifference still fails because he did not provide specific facts showing Nurse Busalacchi's course of treatment was medically unacceptable.  *See Alexander v. Williams*, 683 F. App'x 582, 582–83 (9th Cir. 2017) (affirming district court's decision granting summary judgment when plaintiff failed to show that the challenged treatment was medically inappropriate); *see also Torlucci v. Norum*, No. C 08-4124-SBA-PR, 2011 WL 13142507, at *10 (N.D. Cal. Sept. 2011) (showing that the court did not even need to decide whether defendants' course of

---

[37] Defendants do not dispute, or address, Plaintiff's representations regarding Nurse Busalacchi's statements.  (*See* ECF Nos. 80, 83, 90.)

treatment was in conscious disregard of an excessive risk to plaintiff's health when plaintiff had not shown treatment was medically unacceptable), *aff'd*, 509 F. App'x 636 (9th Cir. 2013); *Cf. Righetti v. Richman*, 654 F. App'x 337, 338 (9th Cir. 2016) (finding that appellant did raise a genuine dispute of material fact as to whether appellee was deliberate indifferent by providing evidence that showed the challenged care was medically unacceptable and that the doctor was in conscious disregard of excessive risk to appellant's serious medical needs); *Romero v. Vargo*, 687 F. Supp. 2d 1202, 1213 (D. Or. 2009) (stating that defendant was not entitled to summary judgment when prisoner provided evidence indicating that (1) defendant knew of and disregarded an excessive risk to plaintiff's health and (2) the chosen treatment was medically unacceptable under the circumstances), *aff'd*, 471 F. App'x 584 (9th Cir. 2012).

In sum, viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has failed to show that Nurse Busalacchi's chosen course of treatment to address Plaintiff's severe pain was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332. Further, Plaintiff failed to present sufficient evidence indicating that Nurse Busalacchi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health. *Id.*

### 3. Subjective Prong Analysis: Continuing Dilantin for Plaintiff's Seizures

In his TAC, Plaintiff alleges that on April 13, 2015 he told Nurse Busalacchi that "[b]y [August 9, 2011] Dilantin & Keppra was stop due to side effects putting [his] health & life at risk" and claims that he told Nurse Busalacchi "on or about January–March 2012 Doctors from a different institution (R.J. Donavon Prison) had erroneously switch [his] [Neurontin prescription] for Keppra." (ECF No. 70 at 14–15.) Plaintiff states that his medical history reveals that in 2011, only Gabapentin was sustained by a specialist because Keppra and Dilantin caused side effects and were ineffective to Plaintiff's seizures. (*Id.* at 15–16.) Plaintiff states that he told Nurse Busalacchi that "[he has] been in Dilantin in 2011 but was discontinue for severe side effects. And now that [Plaintiff] was prescribed Dilantin again the side effects are back." (*Id.* at 15.) Plaintiff indicates that Dilantin's

78

"side effects put [his] health & life at risk for the following reasons (1) it makes [him] dizzy which has cause [him] to fall. (2) dizzynes & nausea, doesn't allow food to stay on stomach because [he] vomit. (3) It doesn't allowed [him] to be aware of [his] surrounding which is why [he] fall. (4) deprives [him] of sleep because it keeps waking [him] up due to a feeling of falling. (5) doesn't allowed [him] to exercise or stand without feeling of falling & nausea." (*Id.*) Plaintiff states that he told Nurse Busalacchi that Gabapentin was the only medication that worked for him in the past. (*Id.*) Plaintiff then states that "Busalacchi knew Dilantin was ineffective and put [his] health and life at risk, Busalacchi still sustain Dilantin, and didn't give [him] a effective medication like the one prescribed Neurontin." (*Id.* at 18.)

Plaintiff must show that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and drew such inference. *See Farmer,* 511 U.S. at 837. Additionally, Plaintiff must present sufficient evidence for a jury to reasonably infer that Nurse Busalacchi's course of course of treatment was medically unacceptable under the circumstances, and that she chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health. *See Jackson*, 90 F.3d at 332.

a. Aware of Substantial Risk of Serious Harm

The issue presented is whether Nurse Busalacchi was aware of a substantial risk of serious harm by continuing Plaintiff's Dilantin prescription. *See Farmer,* 511 U.S. at 837. Plaintiff claims in his TAC that he told Nurse Busalacchi that Dilantin was taken off in 2011 due to being ineffective for his seizures and caused severe side effects. (ECF No. 70 at 15–16, 18.) Plaintiff alleges that Nurse Busalacchi still continued Dilantin, despite knowing that a neurologist discontinued Dilantin in the past and that it put his "life & health at risk." (*Id.* at 18.) In his Opposition, Plaintiff claims that he told "[Nurse] Busalacchi all reasons of why [Dilantin is] ineffective; reasons why it deprives [him] of life necessity's and puts health and life at risk. [He] told [Nurse Busalacchi] how Dilantin has been prescribed twice before but got taken off due to its side effects. [He] told [Nurse

Busalacchi] how gabapentin was the only effective and [he] was willing to take other options, [Nurse Busalacchi] denies [him]on non-medical reasons for which [he] describes on complaint." (ECF No. 82 at 14.)

Plaintiff's allegation that Nurse Busalacchi knew that he was taken off of Dilantin in 2011 because it was ineffective and gave rise to severe side effects is not supported by the record. (ECF No. 70 at 16, 18.)  Nothing in Plaintiff's medical history indicates that Dilantin was discontinued for being ineffective to his seizures nor for causing severe side effects. (*See* ECF Nos. 70 at 26, 28; 80-1 at 17–18, 20; 82 at 25, 47, 73, 79.)  The only evidence that involves Dilantin's discontinuation was Dr. Straga's Physician Request for Service Form dated August 10, 2011 and Dr. Straga's Neurological Consult Form dated August 23, 2011. (*See* ECF Nos. 80-1 at 17–18; 82 at 25.)  They both indicate that Plaintiff was to be tapered off of Dilantin. (*See id.*)  Dr. Straga does not provide any explanation in either document for why Dilantin was discontinued.  In fact, in a follow up Neurology Note dated October 8, 2011, Dr. Straga reported that Plaintiff claimed he had a seizure on September 28, 2011. (ECF No. 80-1 at 20.)  Dr. Straga noted that at the time of the seizure, Plaintiff was taking 300 mg of Neurontin and 500 mg of Keppra, but had already been taken off of Dilantin. (*Id.*)  Plaintiff's October 14, 2011 Medication Reconciliation reveals Neurontin was ordered to be stopped in two weeks. (*Id.* at 24.)  Further, Dr. Noonan's October 14, 2011 PCP Progress Note indicated that neurology recommended discontinuing Neurontin. (ECF No. 70 at 27.)  These reports establish the reasonable inference that Neurontin, not Dilantin, was ineffective for Plaintiff's seizures.

Plaintiff's claim that Dilantin had been taken off twice due to its side effects is unsupported by the record. (ECF No. 82 at 14.)  Nothing in Plaintiff's medical history would have made Nurse Busalacchi aware that continuing him on Dilantin would pose a substantial risk of serious harm to the Plaintiff.  There is no indication that Dilantin was ineffective to Plaintiff's seizures nor were there any complaints regarding Dilantin in the past regarding side effects. (*See* ECF Nos. 70 at 26, 28; 80-1 at 17–18, 20, 51, 60, 93–94; 82 at 23, 25, 37, 44, 47, 73, 79.)  In fact, Dr. Brown noted in a Suicide Risk Evaluation,

dated April 1, 2015, that Plaintiff was placed on Dilantin and indicated that "[Plaintiff] was compliant with [his] medications and showed substantial improvement over the course of his stay." (ECF No. 70 at 44.) Nothing in Plaintiff's medical history shows that a treating physician opined that Dilantin was ineffective to treat Plaintiff's seizures or caused severe side effects. This evidence establishes that Plaintiff's medical history would not have made Nurse Busalacchi aware that continuing Dilantin would cause a substantial risk of serious harm.

Furthermore, Nurse Busalacchi did not prescribe Dilantin, rather the treating physicians from Sharp Chula Vista Medical Center on March 24, 2015 did so. (*See* ECF No. 80-1 at 93.) On March 29, 2015, Plaintiff submitted his 602 Form appealing the denial of his request to switch to Gabapentin or Morphine. (*Id.* at 105.) Plaintiff claimed that "on or about March 11–17 2015 doctors took me off of seizure and neuropathy pain med. They wanted to witness or see a seizure. I told them that 'They were playing with my health,' they didn't care. [. . .] Requesting Gabapentin or morphine for such pain and also for my neuropathy pain." (ECF No. 70 at 34.) Of note, Plaintiff made no complaints regarding Dilantin in his 602 Form. (*See id.*) It appears from his 602 that Plaintiff was under the impression he was not prescribed any medication for seizures or pain.

Plaintiff refers to Nurse Busalacchi's PCP Progress Note to support his claim that Nurse Busalacchi knew that Dilantin was ineffective to his seizures and caused severe side effects. (*See* ECF Nos. 80-1 at 105; 82 at 14.) Nurse Busalacchi saw Plaintiff on April 13, 2015 in response to his 602 Form and provided detailed notes in her PCP Progress Note. (ECF No. 80-1 at 105.) In this PCP Progress Note, Nurse Busalacchi indicated that Plaintiff was currently on Dilantin. (*Id.*) Nurse Busalacchi noted that Plaintiff claimed that Keppra was not helpful and only wanted Neurontin. (*Id.*) Nurse Busalacchi then checked Plaintiff's blood levels, continued Dilantin, and indicated that Neurontin and Morphine will not be prescribed. (*Id.*) Plaintiff agreed to this plan. (*Id.*) Of note, Plaintiff does not dispute that he made these statements. (*See* ECF No. 82 at 19.) A reasonable

inference can be made from this PCP Progress Note that Nurse Busalacchi was not aware of a substantial risk of serious harm to the Plaintiff by continuing Dilantin.

Plaintiff may not rely on the allegations in the complaint to meet his burden, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587. Plaintiff has failed to do so. Plaintiff's medical history and the records provided do not support Plaintiff's allegations in his TAC that Nurse Busalacchi was aware of facts giving rise to an inference that continuing him on Dilantin would pose a substantial risk of serious harm, and that Nurse Busalacchi drew such an inference. *See Farmer,* 511 U.S. at 837.

                    b.  Deliberate Indifference for Continuing Dilantin on April 13, 2015

                        *i.*  *Medically Unacceptable Treatment*

Assuming arguendo that Nurse Busalacchi was aware of facts giving rise to an inference that continuing Plaintiff on Dilantin would pose a substantial risk of serious harm, Plaintiff would still need to show that Nurse Busalacchi was deliberately indifferent to his serious medical need. Plaintiff alleges that Nurse Busalacchi was deliberately indifferent for continuing him on Dilantin, which was prescribed by the treating physicians from Sharp Chula Vista Medical Center on March 24, 2015. (ECF No. 70 at 16–18; *see* ECF No. 80-1 at 93–94.) Plaintiff must present sufficient evidence for a jury to reasonably infer that Nurse Busalacchi's course of treatment on April 13, 2015 was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332.

Plaintiff's claim that Dilantin was ineffective and caused side effects, such as nausea and the inability to sleep or walk, is unsupported by the record. (*See* ECF No. 70 at 15.) Plaintiff has taken Dilantin throughout the years leading up to Nurse Busalacchi's interview without making any complaints regarding Dilantin being ineffective to his seizures or causing his alleged side effects. (ECF Nos. 70 at 26, 28, 44; 80-1 at 17–18, 20, 51, 60, 93–94; 82 at 23, 25, 44, 47, 73, 79.) The treating physicians at Sharp Chula Vista Medical Center on March 24, 2015 were the ones that restarted Plaintiff on Dilantin, not Nurse Busalacchi. (ECF No. 80-1 at 93–101.) Even after restarting it, Plaintiff made no

complaints regarding Dilantin.  Plaintiff's 602 Form dated March 29, 2015 did not make any reference or complaints regarding Dilantin.  (*See* ECF No. 70 at 33–37.)  On April 1, 2015, Dr. Brown noted that Plaintiff was placed on Dilantin and indicated that "[Plaintiff] was compliant with [his] medications and showed substantial improvement over the course of his stay."  (*Id.* at 44.)

The April 13, 2015 interview was the only time Nurse Busalacchi saw Plaintiff.  (*See* ECF Nos. 70, 80, 82.)  Plaintiff's 602 Form indicates that the reason for the interview was due to Plaintiff trying to change his medication to Gabapentin or Morphine for his severe pain.  (ECF No. 70 at 34.)  In her PCP Progress Note, Nurse Busalacchi stated that Plaintiff was currently on Dilantin, while noting that Plaintiff claimed that Keppra was not helpful and only wanted Gabapentin.  (ECF No. 80-1 at 105.)  Nurse Busalacchi then checked Plaintiff's blood levels, continued Dilantin, and indicated that Gabapentin and Morphine will not be prescribed.  (*Id.*)  Plaintiff agreed to this plan.  (*Id.*)  Of note, Plaintiff made no complaints about Dilantin.

Even after Nurse Busalacchi's April 13, 2015 interview, Plaintiff did not make any complaints regarding Dilantin.  On April 29, 2015, Dr. Freyne saw Plaintiff for a PCP Follow-Up and due to Plaintiff's compliance with his medication.  (*Id.* at 108–09.)  Dr. Freyne indicated that Plaintiff was fully compliant with all of his medication, including Dilantin, and reported that he is doing well.  (*Id.* at 108.)  Plaintiff indicated that he was eating, sleeping, and exercising without difficulty.  (*Id.*)  Dr. Freyne stated that Plaintiff's medical issues were stable and continued Dilantin.  (*Id.*)  Plaintiff also filed multiple Health Service Request Forms after Nurse Busalacchi's interview.  (ECF No. 82 at 98 [July 24, 2015], 99 [June 1, 2015], 100 [April 30, 2015].)  Nowhere in these Health Service Request Forms did Plaintiff make any complaints that Dilantin was ineffective to his seizures or caused severe side effects.

After reviewing all of Plaintiff's medical records regarding Dilantin, the Court finds that at no point did any treating physician indicate that Dilantin was medically ineffective for treating Plaintiff's seizures nor did they find that it caused severe side effects.

Plaintiff's medical history establishes that Nurse Busalacchi continuing Plaintiff's Dilantin prescription was medically acceptable for treating Plaintiff's seizures

The Defendants support their position by providing Dr. Feinberg's declaration. (ECF No. 80-1 at 1–15.) Dr. Feinberg declared that at the time of Nurse Busalacchi's interview, Plaintiff was already on medically appropriate medication to treat his seizures, and that there was no medical indication at the time that a change in medication was necessary or appropriate. (*Id.* at 14.) Plaintiff has not provided evidence to cast doubt on Defendants' expert testimony. *See Barkley*, 2018 WL 6508052, at *10 (finding that plaintiff's deliberate indifference claim fails since "Plaintiff has not submitted any evidence to cast doubt on defendants' unrefuted expert testimony which establishes that prescribing Sulindac was medically appropriate under the circumstances and within the standard of care and skill ordinarily exercised by reputable members of the medical profession at that time.") Further, Plaintiff has not produced any evidence showing that a medical professional opined that Dilantin was ineffective to Plaintiff's seizures or caused severe side effects.[38]

The Court finds that at most, Plaintiff disagrees with Nurse Busalacchi's course of treatment. Plaintiff's belief that he should have been prescribed something else other than Dilantin is at best, a difference of opinion from Nurse Busalacchi, and does not rise to the level of deliberate indifference. *See Garcia*, 2018 WL 3303013, at *11; *Rodriguez*, 2018 WL 339936, at *4 (C.D. Cal. Jan. 2018) (finding that it was not deliberate indifference, only a difference of opinion, for the doctor to prescribe different "ineffective" medications than requested); *Nicholson*, 2014 WL 1407828, at *9; *Parlin*, 2012 WL 5411710 at *4 ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication [. . .] represents

---

[38] The record indicates that in 2011, Gabapentin was ineffective for Plaintiff's seizures and was ordered to be discontinued by neurology. (*See* ECF No. 80-1 at 20, 22, 24.) These records support the inference that Gabapentin, not Dilantin, was medically unacceptable treatment for his seizures.

precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation."); *Lua*, 2011 WL 1743260, at *2–*3 (finding prisoner who was placed on "lesser medications" instead of prisoner's requested pain relief medications, merely alleged a difference of medical opinion as to his preferred pain medication rather than an actionable claim of deliberate indifference).

Plaintiff "must come forward with specific facts showing that there is a genuine issue for trial" and cannot rely on the allegations in the complaint to meet his burden. *See Matsushita,* 475 U.S. at 587.  Here, Plaintiff has not provided any evidence to support his own medical opinion that Dilantin was ineffective or inappropriate to treat his seizures. Viewing the evidence in the light most favorable to the nonmoving, Plaintiff has provided insufficient evidence indicating that there is a genuine issue of material fact as to whether Nurse Busalacchi's course of treatment was medically unacceptable under the circumstances.

### ii. Conscious Disregard of an Excessive Risk to Plaintiff's health

Aside from the analysis above, the Court also finds that there is insufficient evidence that Nurse Busalacchi consciously disregarded an excess risk to Plaintiff's health.  In his TAC, Plaintiff alleges that Nurse Busalacchi continued Plaintiff's Dilantin prescription when she knew it "was ineffective and put [Plaintiff's] health and life at risk. [Nurse] Busalacchi still sustain Dilantin, and didn't give [him] a effective medication like the one prescribed Neurontin."  (ECF No. 70 at 18.)  Plaintiff supports his allegations that Nurse Busalacchi consciously disregarded him when she denied his request to change his Dilantin prescription and said that she "didn't care of [Plaintiff's] severe pain conditions" and that "(1) she don't feel like changing prescription because although [Plaintiff] have falling due to side effects, [Plaintiff] is still alive without broken bones or in a coma, (2) all inmates lie, [and] (3) [she] has [too] much work, don't got the strength and time to do paperwork." (*Id.* at 16, 20.)

Plaintiff must point to specific facts which supports his allegation that Nurse Busalacchi had a sufficiently culpable state of mind when she provided this medical care. *See Wallis*, 70 F.3d at 1076. As indicated above, Plaintiff has been prescribed Dilantin throughout his medical history. (*See* ECF Nos. 70 at 26, 28, 44; 80-1 at 17–18, 20, 51, 60, 93–94; 82 at 23, 25, 37, 44, 47, 51, 73, 79.) There was no indication from these records that Dilantin was ineffective to Plaintiff's seizures or caused severe side effects. Even after Nurse Busalacchi's interview, Dr. Freyne saw Plaintiff for a PCP Follow-Up on April 29, 2015. (ECF No. 80-1 at 108–09.) Dr. Freyne indicated that Plaintiff was fully compliant with all of his medication including Dilantin, reported that Plaintiff is doing well, and continued Plaintiff's Dilantin prescription. (*Id.* at 108.) This is all circumstantial proof that Nurse Busalacchi's subjective intent was not to consciously disregard an excessive risk to Plaintiff's health, but to treat Plaintiff with medication that seemed to have worked in the past and restarted by other physicians. Plaintiff has not brought forth evidence exhibiting Nurse Busalacchi's intent to consciously disregarded Plaintiff's medical needs.

Plaintiff's medical history shows that Nurse Busalacchi only saw Plaintiff once, in response to his 602 Appeal Form where Plaintiff requested Gabapentin or Morphine for his severe pain. (ECF No. 70 at 34.) Nurse Busalacchi's PCP Progress Note included detailed notes of Plaintiff's complaints and addressed Plaintiff's issues listed in his 602 Form. (ECF No. 80-1 at 105.) Nurse Busalacchi did a detailed physical examination, including lab imaging results, and provided a detailed diagnosis and plan. (*Id.*) Additionally, Plaintiff understood and agreed with this plan that included continuing Dilantin. (*See id.*) Plaintiff does not dispute that he made these statements. (*See* ECF No. 82 at 19.)

The conduct towards Plaintiff on April 13, 2015 demonstrates Nurse Busalacchi's attempt to care and treat Plaintiff's medical needs, contradicting Plaintiff's claim that Nurse Busalacchi did not care and consciously disregarded his medical needs. Plaintiff's request for Gabapentin or Morphine is a difference of opinion and preference by Plaintiff. But failure to provide Plaintiff with the specific medication he requested and differences in

86

judgment regarding an appropriate medical treatment is not enough to establish deliberate indifference.  *See Jackson*, 90 F.3d at 332; *Toguchi*, 391 F.3d at 1058.

Even if Plaintiff sufficiently showed that Nurse Busalacchi consciously disregarded an excess risk to his health, Plaintiff's deliberate indifference claim still fails because he did not provide specific facts showing Nurse Busalacchi's course of treatment was medically unacceptable.  *See Alexander*, 683 F. App'x at 582–83 (affirming district court's decision granting summary judgment when plaintiff failed to show that the challenged treatment was medically inappropriate); *see also Torlucci*, 2011 WL 13142507, at *10 (showing that the court did not even need to decide whether defendants' course of treatment was in conscious disregard of an excessive risk to plaintiff's health when plaintiff had not shown treatment was medically unacceptable).

Thus, viewing the evidence in the light most favorable to the nonmoving, Plaintiff has failed to show that Nurse Busalacchi's chosen course of treatment on April 13, 2015 to address Plaintiff's seizures was medically unacceptable under the circumstances.  *See Jackson*, 90 F.3d at 332.  Further, Plaintiff failed to present sufficient evidence indicating that Nurse Busalacchi chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health.  *Id.*

Therefore, based on everything stated above, the Court finds that Nurse Busalacchi was not deliberately indifferent to Plaintiff's medical needs.  The Court **RECOMMENDS** Defendants' Motion for Summary Judgment (ECF No. 80) as to Plaintiff's Eighth Amendment claim against Nurse Busalacchi be **GRANTED**.

### D. Qualified Immunity

Qualified Immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine of Qualified Immunity entitles government officials to "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is

erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified Immunity's purpose is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The Qualified Immunity doctrine was made to create a way to resolve unwarranted claims against government officials at the earliest possible stage of litigation. *Id.*

The courts administer a two-prong analysis in determining whether a government official is entitled to Qualified Immunity.[39] *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). In examining the alleged facts in favor of the plaintiff, the court must first consider whether the alleged facts show the government official's actions violated the plaintiff's constitutional rights. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*; *accord Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 711 (9th Cir. 2010).

However, if a violation could be made out on a favorable view of the plaintiff's facts, then the court must next determine whether the constitutional right purportedly violated was clearly established in the specific context of the case at hand. *Saucier*, 533 U.S. at 201. "A right is 'clearly established' when its contours are sufficiently defined, such that 'a reasonable official would understand that what he is doing violates that right.'" *Foster v. Runnels*, 554 F.3d 807, 815 (9th Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). If the law does not "put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. If, however, a reasonable official would have known that the alleged conduct

---

[39] Courts are not required to conduct the Saucier two-prong analysis in a particular sequence. *Pearson*, 555 U.S. at 236.

was in violation of a clearly established constitutional right, then immunity is forfeited. *Id.* "[T]he law may be clearly established even if there is no case directly on point. . . . It is enough if 'in the light of pre-existing law the unlawfulness is apparent.'" *Inouye v. Kemna*, 504 F.3d 705, 715 (9th Cir. 2007) (quoting *Wilson*, 526 U.S. at 615). "The general law regarding the medical treatment of prisoners was clearly established at the time of the incident[s]." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002). It is clearly established that a prisoner has a right under the Eighth Amendment to "have prison officials not be deliberately indifferent to serious medical needs." *Kelley v. Borg*, 60 F.3d 664, 666–67 (9th Cir. 1995) (quotation omitted).

As discussed above, the Court concludes that Dr. Sedighi and Nurse Busalacchi were not deliberately indifferent to Plaintiff's serious medical needs. Thus, without further inquiry, Dr. Sedighi and Nurse Busalacchi did not violate Plaintiff's constitutional rights and are entitled to Qualified Immunity. *See Saucier*, 533 U.S. at 201.

### E. Motion for Appointment of Counsel

In passing, Plaintiff requests the Court to appoint counsel. (ECF No. 82 at 9 n.1.) Plaintiff claims that he needs an attorney to be able to locate inmates that are no longer in RJD in order to obtain declarations to support Plaintiff's argument that his seizures have been witnessed. (*Id.*)

"There is no absolute right to counsel in civil proceedings." *Hedges v. Resolution Trust Corp.*, 32 F.3d 1360, 1363 (9th Cir. 1994); *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). Further, there is no constitutional right to a court-appointed attorney in § 1983 claims. *Rand v. Rowland*, 113 F.3d 1520, 1525 (9th Cir. 1997). District Courts have discretion, however, pursuant to 28 U.S.C. § 1915(c)(1), to "request" that an attorney represent indigent civil litigants upon a showing of exceptional circumstances. *See Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991); *Burns v. Cty. of King*, 883 F.2d 819, 823 (9th Cir. 1989); *Palmer*, 560 F.3d at 970. "A finding of exceptional circumstances requires an evaluation of both the 'likelihood of success on the merits and the ability of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues involved.'

Neither of these issues is dispositive and both must be viewed together before making a decision." *Terrell*, 935 F.2d at 1017. Thus, upon a showing of exceptional circumstances, the Court would have discretion in requesting that an attorney be appointed for Plaintiff.

Plaintiff claims that he needs an attorney to locate former RJD inmates in order to obtain declarations that would support his argument that he had witnessed seizures. (ECF No. 82 at 9 n.1.) However, this Court already indicated that Plaintiff's inability to locate witnesses who are not at RJD does not demonstrate exceptional circumstances. (ECF No. 75 at 2–3) (citing *Price v. Weise*, No. 16CV1174-CAB-KSC, 2019 WL 3887341, at *2 (S.D. Cal. 2019); *Morris v. Barr*, No. 10-CV-2642-AJB BGS, 2011 WL 3859711, at *3 (S.D. Cal. 2011)). Plaintiff's arguments are based on the general difficulty of litigating *pro se*, which is shared by all incarcerated litigants lacking legal experience, not on the complexity of the legal issues involved. *See Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) (noting that "[i]f all that was required to establish successfully the complexity of the relevant issues was a demonstration of the need for development of further facts, practically all cases would involve complex legal issues").

Plaintiff has demonstrated that he is able to understand and articulate the essential facts supporting his claims through his filings. (*See docket.*) Further, Plaintiff has been able to successfully litigate his case and survive a motion to dismiss. (*Id.*) The Court finds that Plaintiff has an adequate understanding of the relevant facts and legal issues involved. Accordingly, the Court does not find exceptional circumstances warranting the appointment of counsel. Therefore, the Court **RECOMMENDS** that Plaintiff's request for the Court to appoint counsel be **DENIED**.

### F. Motion for Copies

Plaintiff requests a copy of his Cross-Motion for Summary Judgment. (ECF No. 87 at 1.) While Plaintiff should have a copy of his own Cross-Motion for Summary Judgment, the Court nevertheless **RECOMMENDS** that Plaintiff's request for a copy of Docket Number 87 be **GRANTED**.

///

## II.    Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87)

Plaintiff argues that summary judgment should be granted in his favor as to his Eighth Amendment claims against Dr. Sedighi and Nurse Busalacchi.  (ECF No. 87.)  As to Dr. Sedighi, Plaintiff argues that he was deliberately indifferent for not prescribing any seizure medication and for restarting Elavil.  (*Id.* at 1, 3–5.)  Plaintiff claims that there is no evidence/diagnosis that would have instructed Dr. Sedighi to discontinue his seizure medication or disregard the neurologists' decision to prescribe seizure medication.  (*Id.* at 3.)  Plaintiff also claims that Dr. Sedighi was deliberately indifferent for prescribing Elavil for his severe pain, even though Dr. Sedighi knew it was ineffective to treat his pain and gave symptoms such as anxiety, stress, inability to sleep, "frighten [and] depressive [moods] with Tendency of Suicidal Ideation."  (*Id.* at 1, 4–5.)

As for Nurse Busalacchi, Plaintiff argues that she was deliberately indifferent for increasing Elavil despite knowing that the medication was ineffective to his pain and caused suicidal thoughts.[40]  (*Id.* at 2, 5–6.)  Plaintiff claims that Nurse Busalacchi could have prescribed Gabapentin or medications that he has not tried before, but still prescribed Elavil against his will and knowing it has side effects.  (*Id.* at 5–6.)  Plaintiff claims that the harm he suffered was "all the physical pain [. . .] [a]nd mental severeness [sic] symptoms" and that he was deprived of life's necessities "such as unable to sleep because Anxiety attacks and pain."  (*Id.* at 6.)

A cross-motion for summary judgment requires the court to apply the same standard and rule on each motion independently.  *Creech*, 815 F. Supp. at 166–67.  When both parties move for summary judgment, "[t]he granting of one motion does not necessarily warrant the denial of the other motion, unless the parties base their motions on the same legal theories and same set of material facts."  *Stewart*, 523 F. Supp. at 220; *see also We Are Am. v. Maricopa Cty. Bd. of Sup'rs*, 297 F.R.D. 373, 381 (D. Ariz. 2013); *Ingram v.*

---

[40] Plaintiff does not address his own TAC allegation that Nurse Busalacchi was deliberately indifferent for prescribing Dilantin for his seizures.  (*See* ECF No. 87.)

*AAA Fire & Cas. Ins., Co.*, No. 6:12-CV-01215-AA, 2013 WL 1826359, at *2 (D. Or. 2013). In Section I, the Court recommends granting Defendants' Motion for Summary Judgment (ECF No. 80). Thus, the denial of Plaintiff's Cross-Motion for Summary Judgment would be warranted if both motions were based on the same legal theories and same set of material facts. *See Stewart*, 523 F. Supp. at 220.

First, Plaintiff's Cross-Motion for Summary Judgment relies on the same exact legal theory that is at issue in Defendants' Motion for Summary Judgment. Each summary judgment motion deals with whether Dr. Sedighi and Nurse Busalacchi were deliberately indifferent to Plaintiff's serious medical needs, in violation of the Eighth Amendment. (*See* ECF Nos. 80, 87.) Second, Plaintiff's Cross-Motion for Summary Judgment relies on the exact same set of material facts. Both motions deal with the factual circumstances surrounding Dr. Sedighi's course of treatment on March 24, 2015 and Nurse Busalacchi's course of treatment on April 13, 2015. (*See id.*) Accordingly, since the Court recommends granting the Defendants' Motion for Summary Judgment and the parties base their summary judgment motions on the "same legal theories and same set of material facts," the Court **RECOMMENDS** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87) be **DENIED**. *See Stewart*, 523 F. Supp. at 220.

## III. <u>Plaintiff's Motion to Amend (ECF No. 94)</u>

On June 26, 2020, Plaintiff filed a Motion for Doe #1 be Addressed as Dr. Silva and be Amended as Dr. Silva. (ECF No. 94.) Plaintiff requests to now name and serve Dr. Silva as Doe #1 after discovering his name in Defendants' Motion for Summary Judgment. (*Id.* at 1.) Plaintiff asks the court to allow him to amend Doe #1 and not allow Defendants' to file another Motion for Summary Judgment as to Dr. Silva because "[Defendants] choose not to." (*Id.*) The Court interprets Plaintiff's motion as a request to amend his complaint in order to identify Doe #1 as Dr. Silva.

Previously, on June 27, 2017, Plaintiff brought a Motion to Disclose Name of Doe #1. (ECF No. 36.) Plaintiff requested Doe #1's name to be provided since he was "beginning to think" that Dr. Sedighi is Doe #1, the person that Plaintiff alleges initially

removed him from all seizure and pain medication.  (*Id.*)  On March 20, 2018, the Court adopted Magistrate Judge Skomal's R&R, which denied Plaintiff's Motion to Disclose Name of Doe #1.  (ECF Nos. 43 at 25–27; 44 at 2.)   In denying Plaintiff's motion, the Court stated it was unnecessary since Doe #1's identity could be discovered by reviewing the contents of Plaintiff's own medical records.  (ECF No. 43 at 26.)   The Court explained that these medical records could be obtained through Plaintiff's requests via prison procedures or through the normal course discovery.  (*Id.*)

Even though Plaintiff did not identify Doe #1 in the TAC's caption, Plaintiff dedicated less than one page to discuss Doe #1 in the body of the TAC.  (*See* ECF No. 70 at 1–2, 10.)  Civil Local Rule 15.1 requires that an amended complaint "be complete in itself without reference to the superseded pleading."  This requirement exists because, as a general rule, an amended complaint supersedes the original complaint.  *See Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.")   Giving Plaintiff's TAC "the benefit of any doubt," it appears that Plaintiff intended to plead claims against Doe #1, but simply failed to list Doe #1 as a named party on the TAC's cover page.  *See Hebbe*, 627 F.3d at 342.

With the exception of amendments made as a matter of course under Rule 15(a)(1), "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  The district court has discretion in determining whether to grant or deny leave to amend, *Foman v. Davis*, 371 U.S. 178, 182 (1962), but leave should freely be given "when justice so requires," Fed. R. Civ. P. 15(a)(2).   In determining whether to grant leave to amend under Rule 15(a)(2), the Court considers whether there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

etc." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) (quoting *Foman*, 371 U.S. at 182).   While "[d]elay alone does not provide sufficient grounds for denying leave to amend" under Rule 15(a)(2), "prejudice to the nonmoving party is among the most important factors in considering whether amendment should be permitted." *See Hurn v. Ret. Fund Tr. of Plumbing, Heating & Piping Indus. of S. Cal.*, 648 F.2d 1252, 1254 (9th Cir. 1981); *Reed v. Bryant*, No. CIV-16-461-C, 2018 WL 5091916, at *2 (W.D. Okla. 2018), *report and recommendation adopted*, No. CIV-16-461-C, 2018 WL 5111028 (W.D. Okla. 2018).

Furthermore, "a pending motion for summary judgment militates against a motion to amend." *See Maldonado v. City of Oakland*, No. C-01-1970-MEJ, 2002 WL 826801, at *5 (N.D. Cal. 2002) (citing *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983)).   Denial of an amendment is also appropriate when "the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint." *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990); *see also Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990) (denied motion for leave to file amended complaint after appellants knew of facts/theories raised by the amendment for over one year prior to filing motion); *E.E.O.C. v. Boeing Co.*, 843 F.2d 1213, 1222 (9th Cir. 1988); *Federal Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987); *Reed*, 2018 WL 5091916, at *1–*2 (denying state prisoner's motion to amend since state prisoner did not provide any justifiable reasons for the undue delay and Defendants would be substantially prejudiced due to their Motion to Dismiss was pending. Proposed amendments were not based on new information or evidence, but "merely additional claims based upon the exact same factual allegations originally alleged two years ago."); *Norwood v. Cate*, No. 109CV00330OWWSMSPC, 2010 WL 1006559, at *2 (E.D. Cal. 2010) ("Based on the record, Plaintiff either knew or should have known the dates of the deprivation periods giving rise to his claims prior to the date he filed suit. Plaintiff tenders no explanation for the delay[. . . .] This is insufficient to excuse a delay measured in years.")

Here, Plaintiff is now requesting to amend his complaint in order to address Doe #1 as Dr. Silva.[41]  (ECF No. 94 at 1.)  However, both undue delay and the potential prejudice to the nonmoving party supports the denial of Plaintiff's motion.  Magistrate Judge Skomal's R&R issued on February 27, 2018, with District Judge Battaglia adopting the recommendation on March 20, 2018, denied Plaintiff's Motion to Disclose the Identity of Doe #1.  (*See* ECF Nos. 43, 44.)  Magistrate Judge Skomal's R&R informed Plaintiff of the ability to acquire this information through Plaintiff's own medical records in 2018. (ECF No. 43 at 26.)  Further, the R&R explained that Plaintiff would be able to obtain this information through the normal course of discovery or through Plaintiff's request via prison procedures.  (*Id.*)  Plaintiff has had over two years to obtain the information that he bases the amendment on.  Plaintiff does not provide any explanation for this delay nor why Plaintiff did not seek this information sooner.

Furthermore, granting Plaintiff's Motion to Amend would also unduly prejudice the named Defendants.  This case has been pending for over five years, where the original complaint was filed on September 15, 2015 and Plaintiff has been allowed to amend his complaint three times.  (ECF Nos. 1, 7, 10, 70.)  There are also two fully briefed Motions for Summary Judgment pending as to the remaining two Defendants.  (ECF Nos. 80, 87.) The fact that the case is over five years old and there are two fully briefed dispositive motions pending, weighs against granting leave to amend.  *See M/V Am. Queen*, 708 F.2d at 1492 ("a motion for summary judgment was pending and possible disposition of the case would be unduly delayed by granting the motion leave to amend"); *Martin*, 2014 WL 794342, at *8 (viewing state prisoner's motion to amend as an improper attempt to avoid summary judgment due to Plaintiff's "shifting account of his interaction with defendant"

---

[41] Plaintiff has made conflicting statements as to who he thinks was the person that discontinued his medication without providing any replacements.  Plaintiff first claimed that it was Dr. Sedighi who was the person that discontinued his pain and seizure medication.  (ECF No. 70 at 8, 8 n.1, 10 n.1.)  Now, Plaintiff argues that Dr. Silva was deliberately indifferent for discontinuing his medication (ECF No. 94 at 1), despite already stating that Dr. Silva's conduct was "reasonable."  (ECF No. 85 at 4.)

and the motion being filed after two dispositive motions have been fully briefed); *Brodsky v. City & Cty. of Denver*, No. 10-CV-01625-MSK-MEH, 2011 WL 4972087, at *14 (D. Colo. 2011) (adopting Magistrate's recommendation on state prisoner's motion to amend, noting that the party to be added has not been served , proposed amendments do not materially change substance of claims, and Defendants would be prejudiced since they have already filed dispositive motions); *Henderson v. City & Cty. of San Francisco*, No. C05-234-VRW, 2006 WL 3507944, at *16–*17 (N.D. Cal. 2006) (denying plaintiffs' motion to amend since plaintiffs had over six months of additional discovery to uncover additional defendants/claims and plaintiffs did not provide explanation for why they sought leave to amend six weeks after defendants filed their motion for summary judgment). Additionally, the person Plaintiff is trying to add to its complaint as Doe #1, Dr. Silva, would also be prejudiced if Plaintiff is granted leave to amend, especially since Plaintiff has not served Dr. Silva with the TAC.

Plaintiff was notified over two years ago on how he can get information regarding Doe #1.  For unknown reasons, Plaintiff chose not to try to obtain this information through the normal course of discovery or through prison procedures.  After Motions for Summary Judgment by Plaintiff and Defendants have been fully briefed, Plaintiff now wants to amend his complaint to add another party after being presented with evidence indicating that Dr. Sedighi was not the person that discontinued his pain and seizure medications. (*See* ECF No. 80-1 at 75–78.)  The Court views this as an improper attempt at avoiding summary judgment being granted against him.  *See Martin*, 2014 WL 794342, at *8 (finding that "Plaintiff's shifting account of his interaction with defendant shows undue delay at best and bad faith at worst, both of which weigh against granting leave to amend."). Thus, in light of these circumstances and having considered the relevant factors, the Court **RECOMMENDS** Plaintiff's Motion for Doe #1 be Addressed as Dr. Silva and be Amended as Dr. Silva (ECF No. 94) be **DENIED**.

///

///

## CONCLUSION

For the reasons discussed, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) adopting this Report and Recommendation; (2) **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 80) and **DENYING** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87) as to Defendant Dr. Sedighi; (3) **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 80) and **DENYING** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 87) as to Defendant Nurse Busalacchi; (4) **DENYING** Plaintiff's Motion for Appointment of Counsel; (5) **GRANTING** Plaintiff's request for copies; and (6) **DENYING** Plaintiff's Motion for Doe #1 be Addressed as Dr. Silva and be Amended as Dr. Silva (ECF No. 94).

**IT IS ORDERED** that no later than **October 23, 2020**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **October 30, 2020**. The parties are advised that failure to file objections within the specified time waive the right to raise those objections on appeal of the Court's order.

**IT IS SO ORDERED.**

Dated:  October 1, 2020

Hon. Bernard G. Skomal
United States Magistrate Judge

15-cv-02059-AJB-BGS